## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RICHARD J. GONZAGOWSKI,

       Plaintiff,

vs.                                                                    No. CIV 19-0206 JB\LF

UNITED STATES OF AMERICA;
THE DIAMOND GROUP a/k/a
THE J. DIAMOND GROUP, INC.;
and SECTEK, INC.;

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the United States' Motion to Dismiss First

Amended Complaint, or in the Alternative, Motion for Summary Judgment and Memorandum in

Support, filed June 3, 2020 (Doc. 69)("Motion").  The Court held a hearing on June 24, 2020.  <u>See</u>

Clerk's Minutes at 1, filed June 24, 2020 (Doc. 79).  The primary issues are: (i) whether Plaintiff

Richard J. Gonzagowski timely filed his administrative claim with the appropriate federal agency

as the Federal Tort Claims Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-80

("FTCA"), requires; (ii) whether Gonzagowski's assault and battery claim against Defendant

United States of America arises from an independent contractor's action, and so is barred under

the FTCA; (iii) whether Gonzagowski exhausted his administrative remedies regarding his

negligent hiring, training, and supervision claim against the United States; (iv) whether the

FTCA's intentional tort exception bars Gonzagowski's assault and battery claim against the United

States; and (v) whether the FTCA's discretionary function exception bars Gonzagowski's

negligence claim against the United States.  The Court concludes that: (i) Gonzagowski did not

timely submit his administrative claim to the United States Department of Homeland Security, and

he is not entitled to equitable tolling; (ii) Defendant the Diamond Group, Inc. is an independent contractor, and Gonzagowski's intentional tort claim against the United States arises from the Diamond Group's actions, and so is barred under the FTCA; (iii) Gonzagowski did not exhaust his administrative remedies regarding his negligence claim against the United States, because his administrative claim does not give the United States notice that he would assert such a claim; (iv) even if the Diamond Group's security officers are federal employees, the FTCA's intentional tort claim bars Gonzagowski's assault and battery claim against the United States, because the Diamond Group's security officers and not federal law enforcement officers; and (v) the FTCA's discretionary function exception bars Gonzagowski's negligent hiring, training, and supervision claim against the United States, because the United States' hiring, training, and supervision of the Diamond Group are discretionary acts. Some of the Motion's arguments go to the merits of Gonzagowski's claims, and so the Court evaluates those arguments under the summary judgment standard and thus considers materials outside the pleadings in ruling on those arguments. Nonetheless, the Court concludes that it lacks subject-matter jurisdiction over Gonzagowski's claims against the United States. Accordingly, the Court grants the Motion and dismisses Gonzagowski's claims against the United States without prejudice. The Court retains subject-matter jurisdiction over Gonzagowski's remaining claims against Defendants the Diamond Group, Inc., and Sectek., Inc, because diversity jurisdiction is apparent from the Complaint's allegations.

**FACTUAL BACKGROUND**

The Court takes the facts from the parties' undisputed material facts in the (i) the First Amended Complaint for Damages under the Federal Tort Claims Act for Compensatory Damages, filed April 1, 2019 (Doc. 7)("Complaint"); (ii) the Motion; and (iii) the Plaintiff's Response in

Opposition to United States' Motion to Dismiss First Amended Complaint, or in the Alternative, Motion for Summary Judgment, and Memorandum in Support, filed June 17, 2020 (Doc. 77)("Response").  The United States seeks, as an alternative to dismissal under rule 12(b)(1) of the Federal Rules of Civil Procedure, summary judgment under rule 56 of the Federal Rules of Civil Procedure.  See Motion at 1-2.  The Court concludes that the United States' arguments regarding the FTCA's discretionary function exception and the Diamond Group's independent contractor status are intertwined with the case's merits, and so the Court resolves those issues under rule 56.  See Franklin Sav. Corp. v. United States, 180 F.3d 1124, 1129 (10th Cir. 1999).  The Court addresses the remaining issues under rule 12(b)(1)'s standard for factual attacks, and so considers materials outside the pleadings.  See Franklin Sav. Corp. v. United States, 180 F.3d at 1129.  The Court makes clear in this Opinion's Analysis section which standard it uses for each issue.

Gonzagowski is a citizen of the State of New Mexico.[1]  See Complaint ¶ 5, at 2.  The Diamond Group is a Texas corporation with headquarters in Dallas, Texas, and offices across the United States, including in Albuquerque, New Mexico.[2]  See Complaint ¶ 7, at 2.  The Diamond Group provides security services to the United States Social Security Administration.[3]  See

_____

[1]Neither party asserts this fact as a material undisputed fact in the briefing on the Motion, so the Court provides this fact for background only and does not adopt it as true or undisputed.

[2]Neither party asserts this fact as a material undisputed fact in the briefing on the Motion, so the Court provides this fact for background only and does not adopt it as true or undisputed.

[3]Neither party asserts this fact as a material undisputed fact in the briefing on the Motion, so the Court provides this fact for background only and does not adopt it as true or undisputed.

Complaint 7, at 2.  The Diamond Group is a wholly owned subsidiary of SecTek, a Virginia Corporation that controls the Diamond Group. [4]  See Complaint ¶ 8, at 2.

### 1.    The Altercation at the Social Security Administration's Albuquerque Office.

On August 23, 2016, at approximately 12:00 p.m., Gonzagowski went to a United States Social Security Administration Office at 500 Lead Avenue SW, in Albuquerque.  See Motion ¶ 1, at 2 (citing Deposition of Richard Gonzagowski at 85:1-4 (taken December 20, 2019), filed June 3, 2020 (Doc. 69-2)("Gonzagowski Depo.")); Response ¶ A, at 2 (admitting this fact).  While Gonzagowski waited, he used his cellular telephone to call Annabel Silva, a Social Security Administration "representative" who was "expecting papers from him."  Motion ¶ 2, at 2.  See Response ¶ A, at 2 (admitting this fact).  As Gonzagowski spoke to Silva, he paced around the Social Security Administration office, a Diamond Group security guard "question[ed] him and shoved him."  Motion ¶ 2, at 2 (citing Gonzagowski Depo. at 86:14-87:24).  See Response ¶ A, at 2 (admitting this fact).  That security guard is Steven Oglesby, a Protective Security Officer ("PSO" or "security officer") whom the Diamond Group employed.  Motion ¶ 9, at 4 (citing Deposition of Steven Oglesby at 22:6-12 (taken January 2, 2020), filed June 3, 2020 (Doc. 69-3)("Oglesby Depo.")); Response ¶ A, at 2 (admitting this fact).

Oglesby asked Gonzagowski to end his telephone call and to sit.  See Motion ¶ 10, at 4 (citing Oglesby Depo. at 286:16-31:7); Response ¶ A, at 2 (admitting this fact).  Gonzagowski asked Oglesby "if there was a problem."  Motion ¶ 2, at 2 (citing Gonzagowski Depo. at 86:14-87:24).  See Response ¶ A, at 2 (admitting this fact).  This exchange grew "heated" and drew two

---

[4]Neither party asserts this fact as a material undisputed fact in the briefing on the Motion, so the Court provides this fact for background only and does not adopt it as true or undisputed.

other PSOs' attention, who then "accosted" Gonzagowski and tried "to take him down to the floor."  Motion ¶ 3, at 2 (citing Gonzagowski Depo. at 87:25-88:6).  See Response ¶ A, at 2 (not disputing this fact).  The two other PSOs are Anthony Molina and Aaron Villancourt.  See Motion ¶ 12, at 4 (citing Oglesby Depo. at 24:15-20); Response ¶ A, at 2 (admitting this fact).  Molina and Villancourt work for the Diamond Group.  See Motion ¶ 11, at 4 (citing Oglesby Depo. at 24:15-23); Response ¶ A, at 2 (admitting this fact).

Shortly after the altercation, United States Federal Protective Service Inspector Jose Carrillo, at Oglesby's request, arrived at the Social Security Administration office "to investigate." Motion ¶ 5, at 3 (citing Gonzagowski Depo. at 102:3-20).  SEe Response ¶ A, at 2 (admitting this fact).[5]  Carrillo did not assault Gonzagowski or take part in the altercation.  See Motion ¶ 13, at 4 (citing Oglesby Depo. at 25:12-17; id. at 138:5-139-10); Response ¶ A, at 2 (admitting this fact). Each of the PSOs involved in the altercation were the Diamond Group's employees.  See Motion ¶ 5, at 3 (asserting this fact); Response ¶ A, at 2 (admitting this fact).[6]  Gonzagowski was treated medically that night, and sustained injuries to his neck, shoulder, and head in the altercation.  See Motion ¶ 6, at 4 (citing Gonzagowski Depo. at 113:7-19); Response ¶ A, at 2 (admitting this fact).

---

[5]The United States asserts that Gonzagowski "admits that no federal agent was involved in the altercation at issue."  Motion ¶ 5, at 3.  The United States provides no citation for this assertion, and the Court, in searching the record, has not found such an admission.  The Court, accordingly, does not adopt as undisputed the United States' contention that Gonzagowski "admits that no federal agent was involved in the altercation[.]"  Motion ¶ 5, at 2.  See D.N.M.LR-Civ. 56(b) (providing that the movant  must refer with particularity to those portions of the record upon which the movant relies" for all material facts).

[6]The United States does not cite the record to support this fact, but the Court has found support for the text's fact in the record.  See Gonzagowski Depo. at 202:10-12 ("Q. You're not alleging that any federal officer beat you up.  A.  No.").

2. **The PSOs' Relationship With the Diamond Group and the United States.**

The Diamond Group employs each of the security guards involved in the altercation; none of the security guards that "beat . . . up" Gonzagowski is a federal employee.  See Motion ¶ 7, at 4 (citing Gonzagowski Depo. at 201:9-202:12; id. at 231:7-12); Response ¶ A, at 2 (admitting this fact).  Oglesby, Molina, and Villancourt's supervisors are Sergeant Dennis Barneys and Captain Patrick Stephens.  See Motion ¶ 15, at 5 (citing Oglesby Depo. at 14:25-15:9); Response ¶ B, at 2 (not disputing this fact).  Barneys and Stephens work for the Diamond Group.  See Motion ¶ 15, at 5 (citing Oglesby Depo. at 14:25-15:9).[7]

The Diamond Group set Oglesby's work hours.  See Motion ¶ 17, at 5 (citing Oglesby Depo. at 148:3-21); Response ¶ C, at 2 (admitting this fact).  The Diamond Group processed Oglesby, Molina, and Betancourt's paychecks and social security taxes, and is responsible for maintaining its own liability insurance.  See Motion ¶ 18, at 5 (citing Oglesby Depo. at 149:5-24); Response ¶ C, at 2 (admitting this fact).  The Diamond Group trained Oglesby, Molina, and Betancourt in firearm use and defensive tactics.  See Motion ¶ 18, at 5 (citing Oglesby Depo. at 168:9:22).[8]  The United States Federal Protective Service, a uniformed security division under

---

[7]Gonzagowski purports to dispute the text's fact and points to Oglesby's statement that he considers Federal Protective Service, a uniformed security division under the Department of Homeland Security, his second "boss," Oglesby Depo. at 147:15-21, and that Federal Protective Service "runs the show" at the Social Security Administration's Albuquerque office, Oglesby Depo. at 162:11-17.  See Response ¶ C, at 2.  Gonzagowski does not specifically dispute, however, that the Diamond Group, and not the Federal Protective Service, employs Barneys and Stephens.  See Response ¶ C, at 2; id. ¶ 10, at 4.  Because the record supports the United States' asserted fact -- that Barneys and Stephens are employees of the Diamond Group -- the Court deems that fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.).

[8]Gonzagowski purports to dispute the text's fact and asserts that security guard training "is dictated by SMART book written by and use of force ;jaldfj;alfjd [sic]."  Response ¶ D, at 3.

the United States Department of Homeland Security, trained Oglesby, Molina, and Betancourt in the use of magnetometers.[9]  See Motion ¶ 19, at 5 (citing Oglesby Depo. at 168:9-22).[10]

Jennifer Sienkiewicz is a Contracting Officer for the Department of Homeland Security and managed the contract between the Federal Protective Service and the Diamond Group.  See Motion ¶ 20, at 5 (citing Declaration of Jennifer Sienkiewicz ¶¶ 1-3, at 1 (executed May 29, 2020), filed June 3, 2020 (Doc. 69-4)("Sienkiewicz Decl.")).[11]  The contract between the Federal

---

Gonzagowski does not cite to the record to dispute the text's fact.  See D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies.").  Because the portion of the record to which the United States cites supports the text's fact, the Court deems the fact undisputed.

[9]A magnetometer measures magnetism and, in the context described here, is used as a metal detector for security purposes.  See Walk-Through Metal Detectors Market Survey Report at 2, Dep't       of       Homeland       Sec.       (June       2014), https://www.dhs.gov/sites/default/files/publications/WTMD-MSR_0614-508.pdf  (last  visited July 16, 2020).

[10]Gonzagowski purports to dispute the text's fact and asserts that security guard training "is dictated by SMART book written by and use of force ;jaldfj;alfjd [sic]."  Response ¶ D, at 3. Gonzagowski does not cite to the record to dispute the text's fact.  See D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies.").  Because the portion of the record to which the United States cites supports the text's fact, the Court deems the fact undisputed.

[11]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d 200, 202 (10th Cir. 1970)(providing that legal conclusions couched as factual assertions do not comport with rule 56). Because the portion of the record to which the United States cites supports the text's fact, the Court deems the fact undisputed.

Protective Service and the Diamond Group is numbered HSHQC7-15-D-00004 ("Contract")[12] and

was executed on June 2, 2015.[13]   The Contract allows the Diamond Group to subcontract with

other vendors.  See Motion ¶ 24, at 6 (citing Sienkiewicz Decl. ¶ 9, at 2); Contract § 52.212-4(b),

at 9.[14]   The Contract's price for the Diamond Group's security services includes all federal, state,

and local taxes, which the Diamond Group is responsible for paying.  See Motion ¶ 25, at 6 (citing

Sienkiewicz Decl. ¶ 9, at 2); Contract § 52.212-4(h), at 11.[15]

---

[12]For clarity, the Court's citations to the Contract refer to the page numbers in the Court's electronic filing system, rather than the page numbers list on the Contract.

[13]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d 200, 202 (10th Cir. 1970)(providing that legal conclusions couched as factual assertions do not comport with rule 56).  Because the portion of the record to which the United States cites supports the text's fact, the Court deems the fact undisputed.

[14]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[15]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security

Under the Contract, the Diamond Group is responsible for security at the Social Security Administration's Albuquerque office.  See Motion ¶ 20, at 5 (citing Sienkiewicz Decl. ¶ 4, at 1).[16] The Contract provides that the Diamond Group "shall provide for all day-to-day supervision, inspection and monitoring all work performed to ensure compliance with the contract requirements."  Contract ¶ 06, at 15.  See Motion ¶ 21, at 5 (citing Sienkiewicz Decl. ¶ 6, at 2).[17]

---

guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[16]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents.  See Motion ¶ 20, at 5.
   Gonzagowski does not object to the United States' reliance on the Sienkiewicz Decl. to prove the Contract's contents.  Had Gonzagowski objected, the Court likely would not rely on the Sienkiewicz Decl. to discern the Contract's contents.  The best-evidence rule states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required."  Fed. R. Evid. 1002.  Because the United States cites a portion of the record in which Sienkiewicz is summarizing the Contract to prove the Contract's contents, had Gonzagowski objected, the Court would conclude that rule 1002 precludes its reliance on the Sienkiewicz Decl. to determine the Contract's terms.  Because Gonzagowski does not object, however, the Court relies upon the Sienkiewicz Decl., but the Court also will rely on the Contract itself, thus negating any rule 1002 concerns.  See Contract, filed June 3, 2020 (Doc. 69-5).

[17]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security

Under the Contract, the Diamond Group is responsible for maintaining "satisfactory standards of employee conduct, appearance, and integrity, and imposing disciplinary action when necessary." Motion ¶ 30, at 6 (citing Sienkiewicz Decl. ¶ 15, at 3).  See Contract ¶ 10.1.1, at 30.[18]

The Contract provides that the Federal Protective Service supervises the Diamond Group's compliance with the Contract.  See Motion ¶ 23, at 6 (citing Sienkiewicz Decl. ¶ 8, at 2); Contract § 52.212-4(a).[19]  Under the Contract, the Diamond Group is responsible for addressing civil

---

guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[18]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[19]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies

disturbances and "other criminal acts," including disruptive individuals, at the Social Security

Administration's New Mexico offices.   Contract ¶ 9.18, at 28.   See Motion ¶ 21, at 5 (citing

Sienkiewicz Decl. ¶ 6, at 2).[20]   The Contract provides that, in the event of an emergency or security

---

on the Contract, which supports the text's fact.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[20]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The Court changes the text's fact slightly, however, to reflect more accurately what the record supports.  The United States asserts that the Federal Protective Service "does not supervise or direct the . . . employees of [the Diamond Group]; rather, it provides contract oversight to ensure that performance is being provided by [the Diamond Group] in accordance with the contractual requirements."  Motion ¶ 23, at 6.  To support this contention, the United States cites the Sienkiewicz Decl., but Sienkiewicz purports to have personal knowledge of the Contract, rather than the extent to which the Federal Protective Service supervises the Diamond Group.  See Sienkiewicz Decl. ¶¶ 2-6, at 1-2 (describing the Contract's terms).  "Generally Rule 56(e)'s requirements of personal knowledge and competence to testify may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge."  Gonzales v. City of Albuquerque, 849 F. Supp. 2d 1123, 1179 (D.N.M. 2011)(Browning, J.)(citing Barthelemy v. Air Lines Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990)), aff'd, 701 F.3d 1267 (10th Cir. 2012).  Sienkiewicz does not assert, however, that she has personal knowledge of the extent to which the Federal Protective Service in fact supervised the Diamond Group, but rather describes the Contract itself.  See Barber v. Lovelace Sandia Health Sys., 409 F. Supp. 2d 1313, 1342 (D.N.M. 2005)(Browning, J.)(disregarding an affidavit stating a party's beliefs rather than firsthand knowledge).  Further, the Oglesby Depo., based on Oglesby's personal knowledge, speaks more directly to the extent of the Federal Protective Service's supervision.  See, e.g., Oglesby Depo. at 96:11-16 (providing instances in which Oglesby's supervisors would act at the Federal Protective Service's behest in managing the Diamond Group's employees).  Accordingly, the Court changes the United States' proposed fact slightly to reflect what the record can support, i.e., that the Contract provides that the Federal Protective Service supervises only the Contract's compliance.

breach, the Diamond Group "may have to act independently as primary security response until law enforcement assistance arrives." Contract ¶ 9.20.1, at 28. See Motion ¶ 29, at 6 (citing Sienkiewicz Decl. ¶ 13, at 3).[21]

The Contract provides that the Diamond Group is responsible for most of its security guards' training, but the Contract sets minimum training requirements. See Motion ¶ 28, at 6 (citing Sienkiewicz Decl. ¶ 13, at 3).[22] The Diamond Group is responsible for training its security guards in: (i) "Basic Training," Contract ¶ 6.4.1.2, at 21; (ii) "Initial Weapon Training and

---

[21]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors." Response ¶ E, at 3. Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202. The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact. The Court modifies the United States' proposed text slightly to reflect that the Court is describing the Contract's terms. Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[22]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors." Response ¶ E, at 3. Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202. The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact. The Court modifies the United States' proposed text slightly to reflect that the Court is describing the Contract's terms. Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

Qualifications," Contract ¶ 6.4.1.2; (iii) "Less-Than-Lethal weapons used under the scope of the contract," Contract ¶ 6.1.4, at 21; (iv) ongoing "Refresher Training . . . within three years of basic training or previous refresher training," Contract ¶ 6.4.1.2, at 21; (v) "First Aid, Cardiopulmonary Resuscitation (CPR) and Automated External Defibrillator (AED) training," Contract ¶ 6.8, at 27; and (vi) "any training required by state or local jurisdictions pertaining to [the security guards'] duties and functions required in this contract," Contract ¶ 6.9.1, at 27.  See Motion ¶ 28, at 6 (citing Sienkiewicz Decl. ¶ 13, at 3).[23]  The Diamond Group is responsible for providing its security guards with a minimum of thirty-two hours of firearms training before taking an initial qualification test which the Federal Protective Service administers.  See Motion ¶ 28, at 6 (citing Sienkiewicz Decl. ¶ 13, at 3); Contract ¶ 6.6.2.1, at 25.[24]  The Diamond Group is also responsible

---

[23]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact. The Court modifies the United States' proposed text slightly to reflect that the Court is describing the Contract's terms.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[24]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies

for providing its security guards firearms, ammunition, and equipment for the firearms training, but must use targets that the United States Immigration and Customs Enforcement Agency provides. See Motion ¶ 28, at 6 (citing Sienkiewicz Decl. ¶ 13, at 3); Contract ¶¶ 6.6.1.4; 6.6.1.5, at 24.[25] The Contract sets minimum qualifying scores for each of these tests and trainings, as well as these tests and trainings' frequency, but the Diamond Group is responsible for scheduling in consultation with the Department of Homeland Security. See Motion ¶ 28, at 6 (citing Sienkiewicz Decl. ¶ 13, at 3).[26] The Diamond Group "'rush[ed Oglesby] through'" to become certified in the

---

on the Contract, which supports the text's fact. The Court modifies the United States' proposed text slightly to reflect that the Court is describing the Contract's terms. Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[25]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors." Response ¶ E, at 3. Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202. The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact. The Court modifies the United States' proposed text slightly to reflect that the Court is describing the Contract's terms. Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[26]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors." Response ¶ E, at 3. Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202. The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact. The Court modifies the United States' proposed

use of force.  Response ¶ 13, at 5 (quoting Oglesby Depo. at 109:19).[27]  Under the Contract, the

Federal Protective Service provides "Orientation Training" and administers a written examination

for all new Diamond Group security guards.  Contract ¶ 6.4.1.2, at 21.  See Motion ¶ 28, at 6 (citing

Sienkiewicz Decl. ¶ 13, at 3).[28]

The Contract provides hiring criteria and security clearance requirements, but the Diamond

Group makes individual hiring decisions.  See Response ¶ 11, at 4; Contract ¶ 01, at 13.[29]  The

--------------------------

text slightly to reflect that the Court is describing the Contract's terms.  Because Gonzagowski
does not cite to the record to support his purported factual dispute, and because the record supports
the text's fact, the Court deems this fact undisputed.

[27]The United States purports to dispute the text's fact by asserting that "Oglesby's opinion
on 'minimal training' is not relevant or material to the issues here."  Reply ¶ 13, at 4.  The Court
has held previously that a "relevance argument similarly does not dispute the fact" and that
"relevance is a legal argument that is best left for the Analysis Section" of an opinion.  SEC v.
Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22,
2015)(Browning, J.).  Because the United States does not dispute the statement's accuracy or cite
a portion of the record that controverts the text's fact, the Court deems the fact undisputed.  See
D.N.M.LR-Civ. 56.1(b).

[28]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of
which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract
required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's]
actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security
guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to
support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with
particularity to those portions of the record upon which the non-movant relies."), which is more a
legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United
States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies
on the Contract, which supports the text's fact.  Because Gonzagowski does not cite to the record
to support his purported factual dispute, and because the record supports the text's fact, the Court
deems this fact undisputed.

[29]The Court changes slightly Gonzagowski's asserted fact to reflect what the record
supports.  Gonzagowski proposes as undisputed fact that the Federal Protective Service
"determines who is hired."  Response ¶ 11, at 4.  To support this assertion, he points to a portion
of the Oglesby Depo. in which Oglesby responds to a question regarding a domestic violence
incident that he did not report to the Diamond Group, because the incident happened before the
time period that his security form's questions covered.  See Oglesby Depo. at 45:20-1.  When

Contract provides that the Department of Homeland Security has the right to "deny and/or restrict facility information access or to direct removal from contract of any contract employee who[] . . . engages in serious misconduct, to include, but not limited to dishonest and untrustworthy behavior."  Contract ¶ 10.1, at 30.  See Motion ¶ 23, at 6 (citing Sienkiewicz Decl. ¶ 8, at 2).[30]

_____

asked whether the Diamond Group would have hired him had it known of this incident, Oglesby said: "I mean, I don't see why not.  It wasn't required because it was past the . . . timeframe of our clearance. . . .  It's not Diamond Group determining that, it's the federal government[.]"  Oglesby Depo. at 86:14-20.  The United States purports to dispute Gonzagowski's assertion that the Federal Protective Service determines whom the Diamond Group hires, because the assertion "mischaracterizes the evidence."  Reply at 4.  It asserts that the Contract requiring applicants to complete a federal security clearance form, which provides a reporting range, "does not translate to the Agency making . . . hiring decisions."  Reply at 4.

The portion of the Oglesby Depo. which Gonzagowski cites does not support his assertion that the Federal Protective Service "determines who is hired."  Response ¶ 11, at 4.  Instead, Oglesby's statement is consistent with the Contract's terms that, although the Diamond Group makes individual hiring decisions, its security guards must complete federal security clearance forms that the Federal Protective Service provides, and the Diamond Group must ensure that its security guards meet certain minimum qualifications.  See Contract ¶ 01, at 13.  Because Gonzagowski does not provide a citation to the record that supports his assertion, the Court does not adopt Gonzagowski's proposed fact as undisputed.  See D.N.M.LR-Civ. 56.1(b).

[30]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract.  The United States asserts that the Federal Protective Service "does not supervise or direct" the Diamond Group's employees, but rather "provides contract oversight to ensure" the Diamond Group's compliance with the Contract.  Motion ¶ 23, at 6.  For specificity's sake, Court changes the proposed fact slightly, to reflect that the Contract gives the Department of Homeland Security the authority to revoke access to federal facilities for the Diamond Group's security guards.  See Contract ¶ 10.1, at 29.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

Under the Contract, the Department of Homeland Security "shall use methods deemed necessary to ensure Contractor and contract employees are following terms of contract."  Contract ¶ 15.2, at 33.  See Motion ¶ 23, at 6 (citing Sienkiewicz Decl. ¶ 8, at 2).[31]  Under the Contract, these methods "may include, but are not limited to[:]" (i) "Audits of records"; (ii) "Audits of security and administrative procedures"; (iii) "Uniformed or undercover surveillance by FPS staff"; (iv) "Intrusion tests by undercover [Federal Protective Service] staff to evaluate security force's actions"; and (v) "Surveys of facility tenants regarding PSO performance, to include, but not limited to, professionalism, courtesy, and knowledge of their assigned duties."  Contract ¶ 15.2.1, at 33.  See Motion ¶ 23, at 6 (citing Sienkiewicz Decl. ¶ 8, at 2).[32]

---

[31]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract.  The United States asserts that the Federal Protective Service "does not supervise or direct" the Diamond Group's employees, but rather "provides contract oversight to ensure" the Diamond Group's compliance with the Contract.  Motion ¶ 23, at 6.  For accuracy, Court changes the proposed fact slightly, to reflect that the Contract gives the Department of Homeland Security the authority to revoke access to federal facilities for the Diamond Group's security guards.  See Contract ¶ 10.1, at 29.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[32]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a

The Contract requires the Diamond Group to "provide uniform and equipment items in a condition that is acceptable to the government," including personal protective equipment that 29 C.F.R. § 1910.120 requires.  Motion ¶ 31, at 7 (citing Sienkiewicz Decl. ¶¶ 16-17, at 3).  See Contract ¶ 14.5, at 33.[33]  The Contract describes the firearms, ammunition, and related equipment that the Diamond Group must provide to its security guards, at the Diamond Group's expense, and the Diamond Group must acquire and maintain all firearms licenses.  See Motion ¶ 31, at 7 (citing Sienkiewicz Decl. ¶¶ 16-17, at 3); Contract ¶ 14.4, at 33.[34]  Under the Contract, the Department of

---

legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract.  The United States asserts that the Federal Protective Service "does not supervise or direct" the Diamond Group's employees, but rather "provides contract oversight to ensure" the Diamond Group's compliance with the Contract.  Motion ¶ 23, at 6.  For accuracy, Court changes the proposed fact slightly, to reflect that the Contract gives the Department of Homeland Security the authority to revoke access to federal facilities for the Diamond Group's security guards.  See Contract ¶ 10.1, at 29.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[33]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact.  See Contract ¶ 14.1.4, at 32.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[34]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with

Homeland Security provides some property and equipment, such as magnetometers, and the Diamond Group is "solely responsible for care and accountability of Government-provided equipment in accordance with terms and conditions of this Contract." Contract ¶ 13.1.1.  See Motion ¶ 31, at 7.[35]

### 3.    The Federal Protective Service's Practices.

The Diamond Group may consult with the Federal Protective Service in deciding disciplinary matters, and it is Oglesby's belief that the Diamond Group is responsive to the Federal Protective Service's direction regarding whom to discipline.  See Response ¶ 10, at 4 (citing Oglesby Depo. at 162:11-17).[36]  The Federal Protective Service issues a "Security Manual and

_____

particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact.  See Contract ¶ 14.1.4, at 32.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[35]Gonzagowski purports to dispute the Motion's proposed undisputed facts ¶¶ 20-33, of which the text's fact is one, "because contrary evidence exists that all though [sic] the Contract required [the Diamond Group] to act as independent contractors, neither [the Diamond Group's] actions nor [the Federal Protective Service] treated [the Diamond Group] and/or [its security guards] as independent contractors."  Response ¶ E, at 3.  Gonzagowski does not cite the record to support this contention, see D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies."), which is more a legal conclusion than a factual objection, cf. Morgan v. Willingham, 424 F.2d at 202.  The United States relies on the Sienkiewicz Decl. to describe the Contract's contents, but the Court also relies on the Contract, which supports the text's fact.  See Contract ¶ 14.1.4, at 32.  Because Gonzagowski does not cite to the record to support his purported factual dispute, and because the record supports the text's fact, the Court deems this fact undisputed.

[36]Gonzagowski asserts that the Federal Protective Service "controls" the Diamond Group, "because [the Federal Protective Service] 'run[s] the show' at [the Albuquerque Social Security Office]."  Response ¶ 10, at 4 (quoting Oglesby Depo. at 162:14).  As support for this assertion, Gonzagowski points to a portion of the Oglesby Depo. in which Oglesby responds to a question about the chronology leading up to a Federal Protective Service inspection report:

Resource Tool ("SMART Book"), a "resource guide on the policies, practices, and standards expected of" the Diamond Group's security guards, although Oglesby did not receive the Security

---

> **Q.   And so logically the [Federal Protective Service's] 10/7/16 inspection would not have been related to the disciplinary action report on September 2nd, 2016.**
>
> A.   Right.  So that's -- that kind of maybe enforces what I was talking about earlier.  I think it was all about FPS, right?  They run the show over there. And if they want somebody removed or written up, they tell [the Diamond Group.] So, you know, it's kind like those two work together, the management, Diamond Group management works with FPS.  Like they talk to each other obviously.  So it almost looks like I basically got the disciplinary report before FPS had done their report.

Oglesby Depo. at 162:11-20 (bold in original).  See Response ¶ 10, at 4.  Gonzagowski says that this portion of the Oglesby Depo. demonstrates that the Federal Protective Service "controls" the Diamond Group.  Response ¶ 10, at 4.  The United States purports to dispute Gonzagowski's proposed fact, "because it mischaracterizes the evidence.  Responding to a question asking for a chronology leading up to a FPS Inspection Report, . . . Oglesby testified that [the Diamond Group] management works with FPS and . . . disciplinary write-ups."  Response ¶ 10, at 3-4.  The United States contends that Oglesby's "colloquial" statement that the Federal Protective Service "'runs the show' pertained to these write-ups; it does not establish that FPS managed or controlled the [Diamond Group's] day-to-day activities."  Reply ¶ 10, at 4 (quoting Oglesby Depo. at 162:14).

Oglesby's statement does not demonstrate that the Federal Protective Service controls the Diamond Group's daily activities at the Social Security Administration's Albuquerque offices. Gonzagowski draws too broad a conclusion from too specific an answer.  The Court therefore changes the text's fact to better reflect what the record can support: the Federal Protective Service and the Diamond Group "work together" in investigating for potential disciplinary action, and the Diamond Group is responsive to the Federal Protective Service's positions regarding who should be disciplined.  Oglesby Depo. at 162:14-17.  In the quoted passage, Oglesby responds to a question regarding the chronology of reports from the Diamond Group and the Federal Protective Service, and his answer is a thin reed on which to hang the assertion that the Federal Protective Service "controls" the Diamond Group, Response ¶ 10, at 4, especially because the Contract places disciplinary discretion in the Diamond Group's hands, see Contract ¶ 10.1.1, at 29 ("Contractor shall be responsible for maintaining satisfactory standards of employee conduct, appearance, and integrity, and imposing disciplinary action when necessary.")  Oglesby also asserts, however, his belief that the Federal Protective Service sometimes tells the Diamond Group whom to discipline, which the United States does not dispute specifically, so the Court deems the text's fact undisputed.

Office Smart Book until after he had started working for the Diamond Group.  Reply ¶ 12, at 4

(admitting this fact).  See Response ¶ 12, at 5 (citing Oglesby Depo. at 88:11-16).[37]  Oglesby

testified that he "had two bosses:" the Diamond Group and the Federal Protective Service.

---

[37]Gonzagowski contends that the SMART Book "dictates" the Diamond Group security guards' actions and that the Federal Protective Service "delays providing" the SMART Book. Response ¶ 12, at 5.  The United States purports to dispute Gonzagowski's proposed fact, because it "mischaracterizes the evidence."  Reply ¶ 12, at 4.  The United States "admits that the FPS Security Manual and Resource Tool (SMART Book) is a resource guide on the policies, practices and standards expected of [PSOs, but] denies that the guide dictates or controls their daily activities."  Reply ¶ 12, at 4.  The United States also contends that this manual "is not determinative of the issues here," and asserts that Gonzagowski has not "point[ed] out any regulations or mandates from that publication."  Reply ¶ 12, at 4.

Gonzagowski has not provided the SMART Book, but the United States does not raise an objection under rule 1002 of the Federal Rules of Evidence.  "The best evidence rule, set forth in Federal Rule of Evidence 1002, holds that 'to prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress.'"  United States v. Phillips, 543 F.3d 1197, 1203-04 (10th Cir. 2008)(quoting Fed. R. Evid. 1002).  Had the United States raised a rule 1002 objection, the Court likely would not rely on Oglesby's statements regarding the SMART Book. Nonetheless, the Court must change the text's fact slightly to reflect what the record supports, and to reflect what the United States admits.  Rule 56 requires Gonzagowski to cite with particularity the portion of the record that supports his proposed facts, see Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the citation by[] citing to particular parts of materials in the record[.]"), and the portion of the record that Gonzagowski cites provides that the Diamond Group's security guards are "expected to follow" the SMART book, Oglesby Depo. at 88:11-13.  The text's fact thus reflects, as the United States concedes, that the Diamond Group's security guards are expected to follow the SMART Book, rather than that the SMART Book "dictates" the security guards' "actions."  Response ¶ 12, at 5.  See Reply ¶ 12, at 4.

The Court also deems undisputed that the Federal Protective Service did not always provide the Diamond Group's employees the SMART Book before they started working.  Because the United States does not specifically dispute Gonzagowski's assertion that the Federal Protective Service "delays providing" the SMART Book to the security guards, Response ¶ 12, at 5, and because the record supports the text's fact, see Oglesby Depo. at 88:14-15, the Court deems that fact undisputed, see D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Response ¶ 14, at 5 (citing Oglesby Depo. at 147:15-21).[38]  If a person visiting the Social Security

Administration's New Mexico offices "'was acting up,'" Oglesby was told to "'detain them and

FPS would come,'" and that FPS "'always found something wrong'" with the way the Diamond

Group's PSOs used force against such individuals.  Response ¶ 16, at 5-6 (quoting Oglesby Depo.

at 67:1-18).[39]  Oglesby believes that the Federal Protective Service had a role in his and other

Diamond Group employees' termination following the incident with Gonzagowski.  See Response

¶ 17, at 6 (citing Oglesby Depo. at 108:8-15, 113:8-114:1).[40]

---

[38]The United States purports to dispute the text's fact, because "it misstates the evidence."
Reply ¶ 14, at 4.  The United States asserts that Oglesby's "statement about having more than one
boss is merely a figure of speech and does not provide an authoritative definition of respective
duties or responsibilities under the Contract."  Reply ¶ 14, at 4.  The Court already has discussed
the Contract's allocation of authority between the Federal Protective Service, see supra nn. 7-35,
at 6-19, and the United States does not specifically dispute the text's fact -- that Oglesby testified
that he has "more than one boss," Oglesby Depo. at 147:15-21.  Accordingly, the Court deems the
text's fact undisputed and will discuss its relevance in this Memorandum Opinion and Order's
Analysis section.

[39]The United States purports to dispute the text's fact, because it is immaterial, and "does
not establish th[at] FPS manages the daily activities and actions of the PSOs."  Reply ¶16, at 5.  A
materiality issue is not a factual dispute.  The Court will address materiality, and whether the
Diamond Group is an independent contractor, in this Opinion's Analysis section.  See SEC v.
Goldstone, No. CIV 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22,
2015)(Browning, J.).

[40]Gonzagowski asserts that the Federal Protective Service "determines who is fired."
Response ¶ 17, at 6.  The United States says that it disputes Gonzagowski's proposed fact, "because
it mischaracterizes the evidence," and because Oglesby "speculated" that the Federal Protective
Service "had a role" in the Diamond Group's termination decisions.  Reply ¶ 17, at 5.  The United
States further argues that, "[e]ven if true, it does not prove FPS controls the PSOs' daily activities."
Reply at 5.  The United States does not, however, point to any evidence that contradicts
Gonzagowski's asserted fact or demonstrates that he is mischaracterizing the evidence.  See
D.N.M.LR-Civ. 56.1 ("All material facts set forth in the Response will be deemed undisputed
unless specifically controverted.").  The Court changes Gonzagowski's proposed fact slightly,
however, to better reflect what the record supports, because Oglesby tempers his assertion with
speculative language that undermines Gonzagowski's sweeping assertion.  See Colony Nat'l Ins.
v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing

4.     <u>**Gonzagowski's Notice of Administrative Claims**</u>.

On August 6, 2018, Gonzagowski submitted administrative claim Standard Form 95 ("SF-95") via certified mail to the United States Social Security Administration in which he asserted "'violation of his violation of his civil rights as a result of the assault and battery of four security agents beating him up.'"  Motion ¶ 34, at 7 (quoting Gonzagowski SF-95 at 1, filed June 3, 2020 (Doc. 69-1).  <u>See</u> Response ¶ F, at 3 (admitting this fact).  Because the security guards who assaulted Gonzagowski were working under a contract with the Department of Homeland Security, Gonzagowski should have submitted the SF-95 Form to the Department of Homeland Security.  <u>See</u> Motion ¶ 34, at 7 (citing Declaration of Frank Levi, Esq. ¶ 6, at 1 (taken May 21, 2020), filed June 3, 2020 (Doc. 69-6)("Levi Decl.")); Response ¶ F, at 3 (admitting this fact).  In the SF-95 Form that Gonzagowski submitted to the Social Security Administration he stated:

> Mr. Gonzagowski intends to make claims stemming from an incident which occurred on or about August 23, 2016, at the main Albuquerque office of the United States, located at 500 Lead Avenue SW in Albuquerque, Bernalillo County, New Mexico.  He is claiming negligence and violation of his civil rights on the part of the United States as a result of the assault and battery of at least four (4) security agents beating him up.  He was placed in hand cuffs and underwent a blood test.  This resulted in a torn rotator cuff and he has now been advised that he needs a neck fusion.

Gonzagowski SF-95 Form at 1.  <u>See</u> Motion ¶ 34, at 7 (quoting Gonzagowski SF-95 at 1, filed June 3, 2020 (Doc. 69-1)); Response ¶ F, at 3 (admitting this fact).  The Social Security Service received the Gonzagowski SF-95 Form on August 9, 2018.  <u>See</u> Response ¶ 1, at 3 (citing Domestic

---

Fed. R. Civ. P. 56(e)(noting that party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation").  The Court thus notes that the text's fact reflects Oglesby's belief and personal experience, and, because the United States does point to evidence that controverts the fact, the Court deems it undisputed.  <u>See</u> D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Return Receipt at 1, filed June 17, 2020 (Doc. 77-3)); Reply to Plaintiff's Response to Motion to Dismiss or in the Alternative for Summary Judgment at 3, filed June 29, 2020 (Doc. 81)("Reply")(admitting this fact).  In the SF-95 Form which Gonzagowski submitted to the United States, Gonzagowski does not "include any claims for negligent hiring, supervision, training or employing the" security guards.  Motion ¶ 34, at 7 (citing Levi Decl. ¶ 8, at 2).  See Response ¶ F, at 3 (admitting this fact).  On August 6, 2018, Gonzagowski also sent the SF-95 Form to the United States Attorney for the District of New Mexico, who received the SF-95 Form on August 9, 2018.  See Response ¶ 2, at 3 (citing Domestic Return Receipt at 2); Reply at 3 (admitting this fact).  Gonzagowski "did not file a supplemental or amended administrative claim with [the Department of Homeland Security] to add any other claims."  Motion ¶ 34, at 7 (citing Levi Decl. ¶ 9, at 2).  See Response ¶ F, at 3 (admitting this fact).

On August 17, 2018, Gonzagowski sent the SF-95 Form to the United States Attorney General's Office, which received the SF-95 Form on September 12, 2018.  See Response ¶ 3, at 3 (citing Domestic Return Receipt - Office of the Attorney General at 1, filed June 17, 2020 (Doc. 69-4)); Reply at 3 (admitting this fact).  On November 2, 2018, the United States notified Gonzagowski that it was forwarding the Gonzagowski SF-95 Form to the Department of Homeland Security.  See Motion ¶ 34, at 7 (citing Levi Decl. ¶ 6, at 1); Response ¶ F, at 3 (admitting this fact); id. ¶ 6, at 3.  On December 6, 2018, Gonzagowski received an email from the Department of Homeland Security acknowledging that it has received his SF-95 Form.  See Response ¶ 7, at 4 (stating this fact); Reply at 3 (admitting this fact).

On March 27, 2019, the Department of Homeland Security sent Gonzagowski a letter in which it denied Gonzagowski's administrative claim, because "the alleged tortfeasors were

employed by the Diamond Group and not by the federal government," Response ¶ 8, at 4, and the Department of Homeland Security told him that he "had six months from the date of the letter to file suit in the United States District Court," Motion ¶ 34, at 7 (citing Levi Decl. ¶ 10, at  2); Response ¶ F, at 3 (admitting this fact).  In the letter to Gonzagowski, the Department of Homeland Security "reserved right to any and all defenses, [but] the letter does not mention that [the SF-95 Form] had been received after the deadline."  Reply ¶ 9, at 4.  See Reply at 3 (admitting this fact).[41]

---

[41]Gonzagowski asserts other facts which the Court does not adopt.  First, Gonzagowski contends that, after the incident in which he was injured, "Oglesby was advised that he 'should have acted sooner' with regard to Mr. Gonzagowski, and this directive was possibly made by Federal Officer Carrillo and/or other FPS agents."  Response ¶ 19, at 7 (quoting Oglesby Depo. at 39:2-17.  In the Oglesby Depo., however, Oglesby says that he "can't recall" who gave him that "directive," and that it may have come from a Diamond Group supervisor.  Oglesby Depo. at 13:7-14:10.  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  Gonzagowski's speculation that a Federal Protective Service agent "possibly" told him is not enough to create a genuine dispute forestalling summary judgment.  Response ¶ 19, at 7.  See Phillips v. Calhoun, 956 F.2d 949, 951 (10th Cir. 1992); Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 929 (7th Cir. 1995)("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.").  Gonzagowski's asserted fact rests on Oglesby's speculation.  The Court thus does not adopt as undisputed Gonzagowski's asserted fact.

Second, Gonzagowski avers: "Whatever FPS wanted, Diamond Group went along with." Response ¶ 18, at 6.  He points to a portion of the Oglesby Depo. in which Oglesby says, in the context of discussing the discipline he received after the incident with Gonzagowski, that "it was basically whatever FPS wanted Diamond Group kind of went along with."  Oglesby Depo. at 13:21-14:10.  The United States contends that Gonzagowski's asserted fact "misconstrues the evidence and is based on speculation," because the portion of Oglesby's statement that the Federal Protective Service "got 'whatever it wanted' was non-specific and does not establish that FPS manages the daily activities and actions of the" Diamond Group security guards.  Reply ¶ 18, at 5.

Gonzagowski's assertion does not create a genuine factual dispute.  The nonmovant cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Anderson v. Liberty Lobby, 477 U.S. 242, 249

## PROCEDURAL BACKGROUND

Gonzagowski asserts negligence claims against the Diamond Group; SecTek, Inc.; and the United States.  See Complaint ¶¶ 13-15, at 3-4.  Gonzagowski says that he "fully complied with the provisions of 28 U.S.C. § 2675 of the Federal Tort Claims Act" in bringing this lawsuit. Complaint ¶ 3, at 2.  He also states that he served notice of his claim to the United States and the United States Attorney's Office for the District of New Mexico less than two years after the events on which the Complaint is based.  See Complaint ¶ 4, at 2.  Gonzagowski alleges that the Diamond Group security guards "were negligent, egregious, reckless, malicious, willful, wanton and intentional in their actions toward Plaintiff."  Complaint ¶ 13, at 3.  Gonzagowski says that SecTek, Inc. "was negligent in providing, hiring, training and supervising the [Diamond Group] Security guards," and that the United States "was negligent in hiring and supervising" the Diamond Group security guards.  Complaint ¶ 13, at 3.  Gonzagowski asserts that, as a result of the Defendants' actions, he "endured significant emotional and physical distress, pain and trauma."  Complaint ¶ 14, at 3.

---

(1986). Gonzagowski draws too sweeping a conclusion from Oglesby's statement, which responds to a specific question about who told him that he should have acted sooner in responding to Gonzagowski.  See Oglesby Depo. at 13:21-14:10.  Oglesby did not know the answer to that question, but instead asserted that, when the Federal Protective Service "would come in and talk to security and say, 'You need to do this] . . . .  [I]t was basically whatever FPS wanted Diamond Group kind of went along with."  Oglesby Depo. at 14:1-3.  Oglesby hedges his sweeping statement by saying that the Diamond Group "kind of went along with" the Federal Protective Service's direction.  Oglesby Depo. at 14:1-3.  This is not enough to support Gonzagowski's conclusion that "[w]hatever FPS wanted, Diamond Group went along with," Response ¶ 18, at 6, and so does not create a genuine factual dispute, see Anderson v. Liberty Lobby, 477 U.S. at 251 (providing that, to create a genuine factual dispute, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party).  Further, Gonzagowski's asserted fact is reflected more accurately in the undisputed facts already discussed above: the Federal Protective Service supervised the Diamond Group's performance under the Contract, and the Diamond Group was responsive to the Federal Protective Service's requests and instructions.

The Complaint asserts two counts.  <u>See</u> Complaint at 4-5.  First, Gonzagowski asserts a negligence claim against the Defendants: "At all times relevant to this Complaint, Defendants had a duty to hire, supervise and train competent staff in order to meet its standard of safety for the public, including Plaintiff."  Complaint ¶ 17, at 4.  Gonzagowski states that the "Defendants breached their duty to Plaintiff by utilizing" SecTek and the Diamond Group's security guards.  Complaint ¶ 18, at 4.  Second, Gonzagowski asserts a claim for "vicarious liability, respondeat superior, ostensible agency and/or agency" against all of the Defendants.  Complaint ¶ 21, at 4.  Gonzagowski alleges that the Diamond Group security guards acted "within the capacity and scope of employment for" the United States when they injured him.  Complaint ¶ 23, at 5.  Gonzagowski avers that the Diamond Group Security guards "negligently and intentionally, willfully, wantonly and recklessly, proximately caused personal injury to Plaintiff, including both acts of omission and acts of commission."  Complaint ¶ 23, at 5.  Gonzagowski suffered "severe bodily harm and sustained serious injuries."  Complaint ¶ 12, at 3.  An ambulance took Gonzagowski to an emergency room at Presbyterian Hospital in Albuquerque.  <u>See</u> Complaint ¶ 12, at 3.  Presbyterian Hospital staff performed X-rays and MRIs[42] on Gonzagowski's chest and shoulder, and concluded that Gonzagowski's "right rotator cuff was torn during the aforementioned attack, and he has been

---

[42]"X-rays" are a type of radiation that uses concentrated electromagnetic waves to produce images of the human body, primarily bones, because bones absorb x-rays at a greater rate than other organs.  Jim Lucas, "What are X-Rays?" Live Science (October 25, 2018), https://www.livescience.com/32344-what-are-x-rays.html (last visited Sep. 1, 2020).  "MRI" is an initialism for "magnetic resonance imaging," which involves the use of powerful magnets whose fields are pulsed through a patient and which produce varying reactions in different kinds of tissues, thus creating an image of different organs.  Tanya Lewis, "What is an MRI (Magentic Resonance Imaging)?" Live Science (August 12, 2017), https://www.livescience.com/39074-what-is-an-mri.html (last visited July 16, 2020).

advised that he needs a neck fusion."[43]   Complaint ¶ 12, at 3.   Gonzagowski seeks to recover compensatory damages totaling $2,500,000.00, punitive damages totaling $5,000,000.00, and litigation costs.   See Complaint ¶¶ 1-2, at 5.

1. __The Motion.__

The United States seeks dismissal of Gonzagowski's claims against it under rule 12(b)(1) or, alternatively, rule 56.   See Motion at 8.   It asserts that it is immune from Gonzagowski's suit, and so the Court lacks subject-matter jurisdiction over Gonzagowski's claims against it.   See Motion at 8 (citing Boehme v. U.S. Postal Serv., 343 F.3d 1260, 1263 (10th Cir. 2003)).   The United States contends that Gonzagowski has the burden of establishing the Court's subject-matter jurisdiction.   See Motion at 9 (citing Wilshire Oil Co. of Tex. v. Riffe, 409 F.2d 1277, 1282 (10th Cir. 1969)).

The United States first argues that Gonzagowski did not submit his administrative claim to the appropriate federal agency.   See Motion at 9.   It avers that, under the FTCA, plaintiffs seeking to sue the United States must present their claims to the appropriate federal agency within two years after the claim accrues.   See Motion at 9 (citing 28 U.S.C. § 2401(b)).   The United States says that Gonzagowski filed his administrative claim with "the wrong federal agency, namely the United States," on August 6, 2018, "just 17 days before the two-year statute of limitations ran." Motion at 10.   It says that he should have filed his notice with the United States Department of Homeland Security.   See Motion at 10.   The United States says that it transferred the claim to the

---

[43]A neck fusion is a medical procedure that "joins selected bones in the neck," through surgery, to "stabilize the neck and prevent a bone fracture from causing instability or damage to the spinal cord," or to "treat conditions such as misalignment of the vertebrae." Health Wise, "Cervical Spine Fusion," Health Link, British Columbia (September 20, 2018), https://www.healthlinkbc.ca/health-topics/tr1677 (last visited Sep. 1, 2020).

Department of Homeland Security on November 2, 2018, but it contends that this transfer occurred after the statute of limitations lapsed.  See Motion at 10.  The United States acknowledges that, if a plaintiff presents notice of an administrative claim to the wrong federal agency, "'that agency shall transfer it forthwith to the appropriate agency if the proper agency can be identified from the claim and advise the claimant of the transfer,'" but the United States asserts that this transfer must happen before the statute of limitations runs.  Motion at 9 (quoting 28 C.F.R. § 14.2(b)(1)).  The United States thus argues that Gonzagowski's claim against it is time-barred under § 2401(b).  See Motion at 10.  It further asserts that constructive notice is not available to Gonzagowski, because he waited until "the last minute or eleventh hour," and that courts addressing similar situations have declined to find constructive notice.  Motion at 10 (citing Bukala v. United States, 854 F.2d 201, 204 (7th Cir. 1988)).  The United States thus contends that the Court should dismiss Gonzagowski's claims against the United States.  See Motion at 10.

The United States next asserts that it is not liable for its independent contractors' negligence.  See Motion at 10.  It avers that the "United States has not waived its sovereign immunity for torts allegedly committed by independent contractors," and so the Court lacks subject-matter jurisdiction of Gonzagowski's claims against the United States.  Motion at 10-11 (citing 28 U.S.C. § 2671).  The United States contends that the FTCA is a limited waiver of immunity that allows suits only for torts which federal employees commit within their employment's scope.  See Motion at 11 (citing Tsosie v. United States, 452 F.3d 1161, 1163 (10th Cir. 2006); Bethal v. United States, 456 F. App'x 771, 778 (10th Cir. 2012)(unpublished).  The United States argues that, "under its plain terms," the FTCA's waiver does not apply to torts which independent contractors commit, because the FTCA refers only to government employees.  Motion

at 11 (citing 28 U.S.C. § 1346(b)(1)).   It asserts that the "only tortious conduct Plaintiff can arguably establish is the assault and battery of him," and that the Diamond Group's employees committed these torts.   Motion at 11.  The United States argues that the Diamond Group's security guards "were not employees of the United States, but instead were employed by independent contractor [the Diamond Group], pursuant to a contract with the U.S. Department of Homeland Security[.]"  Motion at 12.  The United States contends that the United States has authority to determine "whether the alleged tortfeasor is a government employee or a contractor."  Motion at 12 (citing Tsosie v. United States, 452 F.3d at 1163).  To determine whether a tortfeasor is a federal employee, the United States says that courts must examine the United States supervises the tortfeasor's "'day-to-day operations.'"  Motion at 12 (quoting United States v. Orleans, 425 U.S. 807, 813-14 (1976)).

The United States says that the Diamond Group's security guards are not federal employees.  See Motion at 13   It contends that the Department of Homeland Security and the Diamond Group intended the Diamond Group's security guards to work as independent contractors rather than as federal employees.  See Motion at 13.  The United States says that, under the Diamond Group's contract with the Department of Homeland Security, the Diamond Group is "responsible to provide security services and maintain day-to-day security at" the Social Security Administration's New Mexico Offices, a service which "included addressing and controlling disrupting persons at the facility as needed."  Motion at 13.  According to the United States, the Federal Protective Service "provides oversight, but does not manage the day-to-day activities or control [the Diamond Group's] physical performance of the Contract."  Motion at 13.  The United

States thus contends that it is "undisputed that the parties intended [the Diamond Group] and its personnel to be independent contractors."  Motion at 14.

The United States next asserts that the "United States did not control the manner and method of the PSOs' performance."  Motion at 14.  It points to a deposition of one of the security guards in which the security guard said that the Diamond Group supervised him, set his employment terms and hours, processed his paychecks, and "provided most of the . . . training, except for x-ray/magnetometer training."  Motion at 14 (citing Oglesby Depo. at 149:5-24).  The United States also asserts that the Diamond Group "used its own equipment . . . necessary to perform [its] contract duties," maintained its own liability insurance, paid its own social security taxes, and hired its own employees.  Motion at 14-15.  To support further its contention that the Diamond Group is an independent contractor, the United States notes that the Contract prohibits the Federal Protective Service from "becom[ing] government contractors and suppliers," while stating that the Diamond Group is "responsible for hiring its own employees to perform the security services," including by hiring subcontractors.  Motion at 15.

The United States avers that the "foregoing facts establish" that the Diamond Group and its employees "were independent contractors, and not employees of the United States."  Motion at 16 (citing Tsosie v. United States, 452 F.3d at 1163).  The United States says that this case is similar to Rabieh v. United States, No. 5:19-cv-00944-EJD, 2019 WL 5788673 (N.D. Cal. Nov. 6, 2019)(Davila, J.), in which, the United States asserts, the Honorable Edward J. Davila, United States District Judge for the United States District Court for the Northern District of California, concluded that the Federal Protective Service did not "exercise sufficient supervisory control over [an independent contractor's] day-to-day activities" in providing security services that gave rise to

the plaintiff's claim.  Motion at 16 (citing Rabieh v. United States, 2019 WL 5788673, at *8-9).

The United States asserts that, when a purported independent contractor is charged with

independently making security decisions that give rise to an FTCA claim, courts typically dismiss

claims against the United States under the FTCA's independent contractor exception.  See Motion

at 17 (citing Singh v. S. Asian Soc'y of Geo. Wash. Univ., 572 F. Supp. 2d 1, 8 (D.D.C.

2008)(Collyer, J.)).  The United States argues that the Diamond Group "clearly employed and

managed" the security guards, and "the parties entered a detailed contract that intended [the

Diamond Group] and its employees to be contractors, not federal employees."  Motion at 17.

The United States next says that the Court should dismiss Gonzagowski's apparent agency

claims, because the "independent contractor defense is not subject to such state law exemptions."

Motion at 17.  Noting that the Complaint uses terms like "'ostensible agency,'" the United States

asserts that "'whether one is an employee of the United States is to be determined by federal law.'"

Motion at 18 (first quoting Complaint ¶¶ 21-24, at 4-5, and then quoting Lurch v. United States,

719 F.2d 333, 337 (10th Cir. 1983)).  The United States avers that the Supreme Court of the United

States of America has held that, while federal courts "'are free to look to the law of torts and

agency to define "contractor," it does not leave them free to abrogate the exemption that the

[FTCA] provides.'"  Motion at 18 (quoting Logue v. United States, 412 U.S. 521, 528 (1973)).

The United States contends that the FTCA provides no waiver for apparent agency, and so courts

"have routinely rejected apparent authority theories under the FTCA."  Motion at 18 (citing Briggs

v. United States, No. 14-cv-5608, 2015 WL 4459323, at *4 (W.D. Wash. July 21, 2015)(Leighton,

J.)).  The United States thus asserts that the Court should dismiss Gonzagowski's apparent agency

claims.  See Motion at 18.

The United States next argues that the Court does not have subject-matter jurisdiction over Gonzagowski's direct negligence claims against the United States, because Gonzagowski did not exhaust his administrative remedies before filing this lawsuit, and because "these claims are based on government activities protected by the intentional tort and discretionary function exceptions to the FTCA."  Motion at 19.  The United States argues that, in Gonzagowski's SF-95 Form, Gonzagowski states only assault and battery claims and does not "claim[] negligent hiring, supervision, or training."  Motion at 19.  It also asserts that Gonzagowski did not file a supplemental or amended SF-95 Form.  See Motion at 21.  The United States says that the Court should "dismiss the direct negligence claims, because they arise from a 'different set of facts' than in the administrative claim."  Motion at 21 (quoting Dukert v. United States, No. CIV 14-0506-WPJ (D.N.M. Jan. 5, 2016)(Johnson, J.), and citing Bethel v. United States ex rel. Veterans Admin. Med. Ctr. of Denver Colo., 495 F. Supp. 2d 1121, 1124 (D. Colo. 2007)(Figa, J.)).  The United States argues that Gonzagowski's SF-95 Form did not "direct[] the agency to investigate negligent contracting, hiring, retention, training, supervision, or investigation."  Motion at 21.  Instead, the United States asserts that Gonzagowski "specifically directed his late claim to the United States' purported negligence before the incident at issue, including hiring, supervising, and training decisions made by [the Department of Homeland Security], the agency that contracted with [the Diamond Group] for security services."  Motion at 21.  The United States thus asks that the Court "dismiss these direct claims."  Motion at 21.

The United States also argues that, if the Court concludes that the Diamond Group's security guards involved in the altercation are federal employees, the FTCA nonetheless bars Gonzagowski's "intentional tort claims."  Motion at 22 (citing 28 U.S.C. 2680(h)).  The United

States says that the FTCA limits its immunity waiver "for claims involving assault, battery, false imprisonment, and other intentional torts," which "may only be brought under the FTCA if the federal employees who committed the tort are 'investigative or law enforcement officers of the United States Government.'"  Motion at 22 (quoting 28 U.S.C. § 2680(h)).  The United States argues that, under the FTCA, the Diamond Group's security guards are not investigative or law enforcement officers, because they are not empowered to execute searches, seize evidence, or make arrests for federal offenses.  See Motion at 22 (citing 28 U.S.C. § 2680(h)).  Instead, the United States contends that, when the Diamond Group's security guards "discover[] a prohibited item or need[] to detain an individual, they are instructed to contact the FPS Megacenter, which dispatches an FPS officer or local law enforcement who can perform a constitutional, statutorily authorized arrest, if necessary."  Motion at 23 (citing Sienkiewicz Decl. ¶ 19, at 3).  It also contends that § 2680(h)'s limited waiver requires suits against the individual tortfeasor in his or her official capacity, and that  Gonzagowski has not "filed suit against any individual law officers, nor has he alleged that the PSOs who accosted him are federal law enforcement officers."  Motion at 22.  The United States thus contends that the FTCA bars Gonzagowski's negligence claim against the United States.  See Motion at 24.

Last, the United States avers that the FTCA's discretionary function exception bars Gonzagowski's claim that the United States negligently hired, supervised, trained, and employed the Diamond Group security guards who detained him.  See Motion at 24.  The United States argues that it has not waived immunity for "any liability that is 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be

abused.'"   Motion at 24 (quoting 28 U.S.C. § 2680(a)).   According to the United States, the FTCA's discretionary function exception "is intended to 'prevent judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'"   Motion at 24-25 (quoting United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984)).   The United States asserts that this exception's application does not depend on whether the United States' employees were negligent, but rather on whether the challenged conduct involves an element of judgment or choice, and, if so, whether the decision is based on policy considerations.  See Motion at 25 (citing Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988)).   The United States also contends that, to avoid dismissal, Gonzagowski must allege facts that place his claim outside the exception, and that he has not "identified any mandatory regulations or directives that prescribe[] particular course of action or makes [the Department of Homeland Security's] decision to contract with [the Diamond Group] to be non-discretionary."  Motion at 25 (citing Franklin Sav. Corp. v United States, 180 F.3d at 1130).   The United States argues that there is no evidence that the Federal Protective Service is "mandated . . . to provide security services in any specific manner," and so the discretionary function exception bars Gonzagowski's direct negligence claims against the United States.  Motion at 26.  It further asserts that the Tenth Circuit has "repeatedly applied the discretionary function exception to bar claims relating to independent contractors," because the hiring of independent contractors entails policy considerations about "cost-efficiency and allocation of resources."  Motion at 26-27 (citing Domme v. United States, 61 F.3d 787, 792 (10th Cir. 1995); Richman v. Straley, 48 F.3d 1139, 1146 (10th Cir. 1995)).   The United States thus

requests that the Court dismiss Gonzagowski's Complaint insofar as it asserts claims against the United States. <u>See</u> Motion at 27.

2.      **The Response.**

Gonzagowski responds. <u>See</u> Response at 1. He first asserts that he provided constructive notice of his administrative claim, because he "timely provided three Federal agencies with notice of his claim." Motion at 10. Gonzagowski contends that, where more than one federal agency may be involved in an administrative claim "and an agreed upon designation as to a single agency cannot be made by the affected agencies, 'the Department of Justice shall be consulted and will thereafter designate and agency to investigate and decide the merits of the claim.'" Response at 9-10 (quoting 28 C.F.R. § 14.2(b)(2)). Gonzagowski says that constructive notice occurs when a plaintiff mistakenly files an administrative claim with an agency that does not promptly transfer the claim to the appropriate agency or return the misdirected claim to the plaintiff. <u>See</u> Response at 10 (citing <u>Hart v. Dep't of Labor ex rel. United States</u>, 116 F.3d 1338 (10th Cir. 1997); <u>Greene v. United States</u>, 82 F.2d 236 (8th Cir. 1989); <u>Bukala v. United States</u>, 854 F.2d 201 (7th Cir. 1988)). That the Department of Justice forwarded the claim to the Social Security Administration, Gonzagowski argues, "should demonstrate that Plaintiff was correct to assume that [the Social Security Administration] was the appropriate agency giving rise to the claim." Response at 11. He also contends that the Department of Justice has an obligation to determine the appropriate recipient and that, "by forwarding Plaintiff's claim to [the Social Security Administration], it designated [the Social Security Administration] as the agency responsible for the final determination of the claim." Response at 11.

He argues, alternatively, that the Social Security Administration had a duty to promptly forward his administrative claim to the appropriate agency and, because it did not timely do so, he provided constructive notice to the Department of Homeland Security.  See Response at 11. Gonzagowski distinguishes Hart v. Department of Labor ex rel. United States, on which the United States relies, because, in that case, the United States investigated, forwarded, and denied the plaintiff's administrative claim within two months of the claim's submission, "[w]hereas in this case, it took [the Social Security Administration] three months just to forward the claim to the appropriate agency[.]"  Response at 11.  He also notes that the Department of Homeland Security did not base its denial of his claim on its untimeliness, but rather because it concluded that the United States was not negligent.  See Response at 11.  Gonzagowski also contends that the United States Attorney's Office for the District of New Mexico "wholly failed to comply with the transfer requirements as Plaintiff never received a response nor had his claim returned to him."  Response at 11.  He thus argues that the Court should conclude that he timely provided constructive notice to the Department of Homeland Security.  See Response at 12.  Gonzagowski next argues that his SF-95 form is not substantively deficient, because it "was broad enough that it should have put Defendant on notice that the particular conduct -- hiring, supervising and/or training -- was a possibility [sic]."  Response at 14.  He contends that the Court should interpret liberally the FTCA's notice requirement, and so his SF-95 form is substantively sufficient.  See Response at 14.

Gonzagowski next argues that the United States controls the Diamond Group.  See Response at 12.  He notes that, under the FTCA, an "individual is considered an employee and the government may be liable for [the] individual's actions . . . when the government retains power to

control detailed physical performance of the individual (e.g., supervises day-to-day operations of the individual)."  Response at 12-13 (citing Curry v. United States, 97 F.3d 412 (10th Cir. 1996)).  Gonzagowski cites De Baca v. United States, 399 F. Supp. 3d 105 (D.N.M. 2019)(Browning, J.), to contend that, under the test that the Court used in that case, the Diamond Group security guards who detained him were not independent contractors.  See Response at 13.  He asserts that the United States controlled whom the Diamond Group hired and their training, and that the United States provided "equipment such as cameras and X-ray machines as well as training for those machines, etc."  Response at 13.  Gonzagowski asserts that the United States sets hiring and training requirements, and that the SMART Book "dictate[s]" use of force by the Diamond Group's employees.  Response at 13.  He notes that Oglesby states that the Federal Protective Service "'runs the show'" at the Social Security Administration's New Mexico offices and that Oglesby had "'more than one boss.'"  Response at 13 (quoting Oglesby Depo. at 162:11-17).  He thus contends that, "with the very limited discovery that has been conducted so far, Plaintiff can establish issues of material fact as to whether FPS controlled [the Diamond Group]."  Response at 14.

Gonzagowski next argues that the discretionary function exception does not apply.  See Response at 15.  He contends that the "applicable policies and procedures, such as [the Standard Form 86 ('SF-86')] used for hiring of PSOs or the SMART Book used for training and outlining PSOs' conduct, precludes any judgment or choice on the part of any employee."  Response at 16.  He also asserts that "federal courts routinely reject immunity claims under the discretionary function exception in cases involving ordinary negligence."  Response at 16 (citing Cestonaro v. United States, 211 F.3d 749 (3d Cir. 2000)).  He argues that, when the United States exercises its

discretion and "'chooses to participate in an activity, the discretionary function exception does not protect the government from failing to provide due care in its performance of the activity.'" Response at 16 (quoting <u>Coffey v. United States</u>, 906 F. Supp. 2d 1114, 1157 (D.N.M. 2012)(Browning, J.)). Gonzagowski then requests that the Court deny the Motion. <u>See</u> Response at 17.

      **3.**     **<u>The Reply</u>.**

The United States replies. <u>See</u> Reply at 1. It first contends that Gonzagowski does not respond to its intentional torts argument, "which should constitute his consent to grant the motion on this issue." Reply at 6 (citing D.N.M.LR-Civ. 7.1(b)). The United States reiterates its argument that claims for intentional torts may "only be brought under the FTCA if the federal employees who committed the tort are 'investigative or law enforcement officers of the United States Government,'" and that the Diamond Group's security guards are not federal law enforcement officers. Reply at 5 (quoting 28 U.S.C. § 2680(h)). It asserts that Gonzagowski does not identify the Diamond Group's security guards "as federal law enforcement, but merely asserts that they were [Social Security Administration] agents," and that this "lack of evidence is fatal to his claim." Reply at 6 (citing <u>Rabieh v. United States</u>, 2019 WL 5788673, at *7). It thus argues that the FTCA bars Gonzagowski's intentional tort claim against the United States. <u>See</u> Reply at 6.

Turning to Gonzagowski's constructive notice argument, it asserts that constructive notice is not available if "'a claimant waits until the eleventh hour to file'" an administrative claim. Reply at 7 (quoting <u>Hart v. Dep't of Labor ex rel. United States</u>, 116 F.3d at 1341). The United States notes that Gonzagowski submitted his administrative claim seventeen days before the statute of limitations ran on his claims, and so "the issue here is whether it is reasonable to expect that the

[Social Security Administration] would have been able to process the claim and send it over to [the Department of Homeland Security by August 23rd, [2018], in the best of circumstances." Reply at 7.  It avers that "[e]ven the most efficient government agencies would need more than two weeks to determine that the claim should be forwarded to the correct agency."  Reply at 8.  It thus asserts that Gonzagowski did not constructively provide administrative notice of his claims against the United States.  See Reply at 8.

The United States turns to its argument that the Diamond Group is an independent contractor and asserts that the examples which Gonzagowski cites do not "amount to daily supervision or management."  Reply at 8.  It notes that the Contract "allows for [Federal Protective Service] oversight to ensure contractual performance; requires [the Diamond Group] to provide and maintain all management, supervision, manpower, training, equipment, supplies, schedule, training, licenses, and permits; and also to provide all day-to-day supervision [of] . . . all work performed to ensure compliance with the contract."  Reply at 8.  According to the United States, "the issue is not whether a contractor 'receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government.'"  Reply at 8 (quoting United States v. Orleans, 425 U.S. at 814).  It asserts that Gonzagowski "has conceded key facts" that establish an independent contract relationship under the test that the United States Court of Appeals for the Tenth Circuit has established, such as that Gonzagowski "did not analyze the Contract or otherwise address [the parties' intent] in his response," and that the Contract permits the Diamond Group to hire subcontractors.  Reply at 9.  The United States accordingly assert that it is not liable for the Diamond Group's actions.  See Reply at 9-10.

The United States next contends that Gonzagowski's SF-95 Form "does not provide notice of all claims he is asserting which deprives this court of subject matter jurisdiction."  Reply at 10. It argues that, under Tenth Circuit caselaw, an administrative claim must provide enough information for the federal agency to investigate the asserted claims, and that Gonzagowski did not notify the United States that he would claim negligent hiring, supervision, or training.  See Reply at 10 (citing Cizek v. United States, 953 F.2d 1232, 1233 (10th Cir. 1992)).  It asserts that Gonzagowski describes his claim in 106 words, and that his claim "is factually and legally insufficient to place the Agency on notice of anything other than the alleged assault and battery." Reply at 11.  The United States thus argues that the Court must dismiss Gonzagowski's claims against it.  See Reply at 12.

The United States last asserts that the discretionary function exception applies, and that Gonzagowski does not explain how the SF-86 Form and the SMART Book "limit[] judgment or choice on the part of the Agency that purportedly hired, trained or supervised the PSOs, under Plaintiff's theory."  Reply at 12-13  It contends that the United States did not hire the security guards who detained Gonzagowski, but rather contracted with the Diamond Group, which in turn hired the security guards.  See Reply at 13.  It asserts that the discretionary function exception is "strictly construed" and that Gonzagowski "bears the burden of proving that sovereign immunity has been waived."  Reply at 13 (citing Pipkin v. U.S. Postal Serv., 951 F.2d 272, 275 (10th Cir. 1991); James v. United States, 970 F.2d 750, 753 (10th Cir. 1992)).  The United States argues that, even if an "employer-employee relationship" exists between the United States and the Diamond Group, Gonzagowski "is unable to identify any specific mandated action, from the SMART Book or elsewhere," that the Department of Homeland Security "failed to follow in hiring, training, or

supervising."   Reply at 14-15.   It contends also that Gonzagowski "has not identified any restrictions or mandates that limited the government's discretion to hire [the Diamond Group] to provide security services at various federal facilities in New Mexico."  Reply at 15.  The United States thus asks that the Court grant the Motion.  See Reply at 15.

**4.      The Hearing.**

The Court held a hearing on June 24, 2020.  See Draft Transcript of Hearing (held June 24, 2020) at 1:3-5 (Court)("Tr.").[44]   The United States began by characterizing the Motion as "straightforward" and that it provides "multiple reasons that the Court should dismiss" the Complaint.  Tr. at 3:17-20 (Ortega).  The United States first argued that, "with respect to the exhaustion issue, . . . the law is very clear that the plaintiff in its administrative claim must contain sufficient details to give notice to the agency that it should investigate the possibility of all conduct and particular conduct."  Tr. at 4:4-9 (Ortega).  The United States pointed to Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d 840 (10th Cir. 2005), which the United States argued "basically says" that a plaintiff's administrative claim must contain more details than Gonzagowski provided to the Social Security Administration, because his SF-95 Form does not sufficiently apprise his intent to assert claims for negligent hiring, training, and supervision.  Tr. at 4:12 (Ortega).  See id. at 4:21-5:5 (Ortega).  According to the United States, "a plaintiff cannot present one claim to the agency and then maintain a suit on the basis of a different set of facts."  Tr. at 5:23-6:1 (Ortega).  It contended that the Court does not have "to go any further on this claim

---

[44]The Court's citations to the hearing transcript refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

because the plaintiff has not perfected the additional negligent hiring [and] supervision prongs of [his] complaint."  Tr. at 6:20-22 (Ortega).

Gonzagowski responded that it had reviewed the Court's decision in <u>De Baca v. United States</u> and concluded that "in all likelihood the exhaustion issue is not in [his] favor," but Gonzagowski contended that he "wasn't in a position to know the extent to which FPS was controlling the Diamond Group and the extent to which they were handling the training and supervision and day-to-day activities."  Tr. at 8:3-8 (Roehl).  He thus asserted that dismissing his Complaint for failure to exhaust "would be a technicality and unfair" to him.  Tr. at 8:8-10 (Roehl).  Turning to his administrative claim's timeliness, Gonzagowski argued that, under <u>Hart v. Department of Labor ex rel. United States</u>, he provided constructive notice to the Department of Homeland Security, because he timely notified the Department of Justice of his claim, and because the Social Security Administration "waited three months to transfer" his claim to the Department of Homeland Security, and so did not "act[] forthwith," as the FTCA requires.  Tr. at 8:12-24 (Roehl).

The Court asked the United States whether, if the Court dismisses Gonzagowski's negligent hiring, training, and supervision claim against the United States, any claims against the United States would remain that the Court would have to "deal with . . . on the substance[.]"  Tr. at 11:6-9 (Court).  The United States responded that Gonzagowski's failure to exhaust "would dispose of the negligent hiring, training, and supervision claims as to the United States," and that, "as to the assault and battery claims, those would be subject to dismissal for a number of reasons, but primarily due to the intentional tort exception of the Federal Tort Claims Act."  Tr. at 11:12-20 (Ortega).  The United States argued that Gonzagowski has conceded that "there were no federal

employees, much less any federal officer involved" in the "confrontation" that gives rise to the Complaint.  Tr. at 12:8-13 (Ortega).  It asserted that, "even if the Court were to find that the protective security officers involved in the assault were [federal] employees, plaintiff's intentional tort claims would still not survive under the intentional [torts] exception" to the FTCA's immunity-waiver.  Tr. at 12:14-19 (Ortega).  The United States asserted that the "complaint and the discovery thus far has not revealed or shown any evidence" that the Diamond Group's security officers "are in fact federal law enforcement officers," as the FTCA requires for intentional tort claims against the United States.  Tr. at 10-13 (Ortega).  It contended that the Sienkiewicz Decl. "made clear that the protective security officers are not federal officers, nor are they empowered by law to perform searches, seizures, or arrests for federal crimes," and so "the Government is not liable [for the] alleged assault [and] battery that occurred here[.]"  Tr. at 13:20-14:1 (Ortega).  The United States averred that the Contract provides that the Diamond Group's security officers "can detain persons who are disruptive but "can't effect an arrest or conduct searches," and that "their authority is really based on state citizens['] authority to detain a person who might be disruptive."  Tr. at 14:7-11 (Ortega).  It asserted that the "Court has ample cases to draw from" in deciding the Motion, but that the facts in <u>Rabieh v. United States</u> are most similar to Gonzagowski's claims.  Tr. at 14:23 (Ortega).  <u>See</u> <u>id.</u> at 15:1-4 (Ortega).  It accordingly argued that "there is just no basis for plaintiff's claim here against the United States[.]"  Tr. at 14:12-13 (Ortega).

Gonzagowski responded that the Diamond Group's security officers "were empowered to restrain and detain people coming into the Social Security [Administration]," and so "would qualify as [law enforcement] officers."  Tr. at 15:25-16:6 (Roehl).  He contended that the United States' reading of the intentional tort exception is too "narrow," and that the security officers were

sufficiently empowered to qualify as federal law enforcement officers.  Tr. at 16:10-12 (Roehl).

The United States responded that "the Court has [no] choice but to interpret this statue narrowly,"

because the "Tenth Circuit has endorsed that narrow reading" in <u>Dry v. United States</u>, 235 F.3d

1249 (10th Cir. 2000).  Tr. at 16:18-20 (Ortega).  <u>See id.</u> at 16:21-24 (Ortega).  It also "note[d] for

the record" that, in the Response, Gonzagowski "did not address the intentional tort arguments . . .

raised by the Government."  Tr. at 17:8-11 (Ortega).

Turning to the timeliness of Gonzagowski's administrative claim, the United States argued

that Gonzagowski did not provide timely notice, because the SF-95 form "was filed just 17 days

before the statute of limitations was to run and unfortunately it was filed with the wrong federal

agency, that being the Social Security [Administration] when in fact the [Department of Homeland

Security] should have been served."  Tr. at 17:21-18:1 (Ortega).  It contended that, "because of

this 11th hour filing[, . . .] there should not be constructive [notice] allowed under" <u>Hart v.</u>

<u>Department of Labor ex rel. United States</u>.  Tr. at 18:5-8 (Ortega).  It asserted that, to the extent

that "this was not promptly transferred from one agency to the next, . . . it was as prompt as it could

be under the circumstances, given the lateness of the filing," and that it is "not reasonable to expect

that a federal agency that receives numerous tort claims notices can . . . turn things around in less

than two weeks[.]"  Tr. at 18:11-17 (Ortega).  The United States said that the notice's timeliness

"is another issue . . . that would . . . result in dismissal of this claim altogether."  Tr. at 18:23-24

(Ortega).  Gonzagowski argued that the United States Attorney's Office "didn't even transfer the

claim to anyone and didn't send it back to the plaintiff."  Tr. at 19:14-15 (Roehl).  He further

asserted that "the Department of Justice interestingly sent it back to Social Security," which is

"further evidence that we had served the proper agency [and] fulfilled our requirements if even the

Department of Justice thought that after its investigation that [the] Social Security Administration was the proper agency." Tr. at 19:21-24 (Roehl).  Gonzagowski argued that the Department of Justice "is actually empowered when multiple agencies are involved in an administrative claim" and that "they are the parties to designate [the] appropriate agency." Tr. at 19:25-20:3 (Roehl). As for the United States' argument that the Social Security Administration promptly transferred his administrative claim to the Department of Homeland Security, Gonzagowski noted that the Department of Justice "received the claim much later than Social Security and then forwarded to Social Security much faster, within shorter time period than Social Security even looked at it," and so the Social Security Administration "did not fulfil [its] transfer requirement." Tr. at 20:13-18 (Roehl).  The United States contended that the Social Security Administration fulfilled its transfer obligations under 28 C.F.R. § 14.2(b)(1), and so "the claim was untimely." Tr. at 21:14-21 (Ortega).

The United States then argued that the Diamond Group and its security officers are independent contractors, which "forms the basis of another reason to dismiss plaintiff's claims as to the Government." Tr. at 22:6-8 (Ortega).  It contended that the "facts bear out that the parties intended [the Diamond Group] and its employees to be contractors," and that the United States "did not control the manner of" the security officers' "performance." Tr. at 22:12-16 (Ortega).  It said that the Diamond Group "largely used its [own] equipment" and "was responsible for liability insurance" and for "all Social Security taxes." Tr. at 22:17-25 (Ortega).  The United States also contended that the Federal Protective Service's "employees are barred from performing" the Diamond Group's duties and that the Diamond Group "was allowed to subcontract with other parties." Tr. at 23:4-8 (Ortega).  As for Gonzagowski's argument that the United States controlled

whom the Diamond Group hired, the United States argued that "SF-86 Forms are required of all contractors to be investigated for security purposes to make sure that a given contractor is not a security risk or going to be a problem at a given federal facility."  Tr. at 23:15-22 (Ortega).  The United States contended that these hiring requirements do "not establish day-to-day control."  Tr. at 23:22-23 (Ortega).  Regarding the Federal Protective Service's involvement in "write ups" and discipline, the United States argued that this "involvement was allowed under the contract as part of the supervision and oversight[.]" Tr. at 24:2-4 (Ortega).  It contended that, "if FPS had concerns with the suitability of a given [officer,] that was allowed under the contract, and it does not equate or rise to the level of day-to-day supervision and management of the protective security officers who were dispatched to work at the Social Security Administration." Tr. at 24:6-13 (Ortega).  The United States asserted that Gonzagowski's arguments regarding the Federal Protective Service's control over the Diamond Group are consistent with the Federal Protective Service's role in supervising the Contract's performance and do not demonstrate that the Diamond Group's security officers were federal employees.  See Tr. at 24:20-25 (Ortega).

Gonzagowski responded that Oglesby's testimony demonstrates that the Federal Protective Service exercised extensive control over the Diamond Group.  See Tr. at 25:11-14 (Roehl).  He also noted that he has not "been able to conduct much more discovery" than the two depositions in this case and so further discovery is needed to resolve whether the Diamond Group's security officers were federal employees.  Tr. at 25:15-17 (Roehl).  He acknowledged that the Contract permits the Federal Protective Service to supervise the Diamond Group's performance, but asserted that the Federal Protective Service "conduct[s] disciplinary write-ups[ and ]told the Diamond Group who to write up and for what."  Tr. at 25:24-26:2 (Roehl).  He noted that Oglesby

testified that he "had two bosses," and so the United States "did control the manner and method of, and the end result of the [security] officers over there." Tr. at 26:5-10 (Roehl). He also disagreed with the United States' contention that the Diamond Group carried its own liability insurance, because Oglesby testified that "he did not know" whether the Diamond Group had its own liability insurance and "no idea [of] any of that stuff." Tr. at 26:21-27:3 (Roehl). Gonzagowski contended that he does not "have enough information to say whether all of the 7 prongs" from Lilly v. Fieldstone, 876 F.2d 857, 859 (10th Cir. 1989) "are met or to dispute all of those," but that "with the limited information that we do have from the Oglesby deposition . . . there are issues of material fact." Tr. at 27:6-10 (Roehl). He thus argued that the Diamond Group and its employees are not independent contractors. See Tr. at 27:16-18 (Roehl).

The United States then argued that the FTCA's discretionary function exception also bars Gonzagowski's negligent hiring, training, and supervision claim against the United States. See Tr. at 29:15-17 (Ortega). It argued that the Court's decision in Begay v. United States, in which the Court concluded that "supervisory conduct . . . was discretionary and therefore exempt for liabilities under the Tort Claims Act," should compel dismissal here. Tr. at 30:5-7 (Ortega). It asserted that Gonzagowski has "not cited or pleaded any mandated conduct by the Department of Homeland Security or Federal Protective Service to provide hiring, training or supervision activities in any specific manner," and that the Department of Homeland Security's hiring and contracting decisions are based on policy considerations. Tr. at 31:2-4 (Ortega). See id. at 31:7-10 (Ortega). Gonzagowski conceded that "the choice to hire an independent contractor . . . is discretionary" but argued that "the training in this case was mandated by the SMART Book," and

that the Federal Protective Service's comment to Oglesby that he "should have acted sooner" in detaining Gonzagowski amounts to ratification of Oglesby's conduct.  Tr. at 32:11-20 (Roehl).

Gonzagowski then stated that he mistakenly filed a "draft version of [his] Response."  Tr. at 32:23 (Roehl).  Gonzagowski said that he does "not think it goes to any substantive issue that hasn't been raised here and wasn't sufficiently addressed by our brief," and so did not request leave to file an amended response.  Tr. at 33:3-6 (Roehl).  The Court asked Gonzagowski whether, if it grants the Motion, the Court would retain subject-matter jurisdiction over his remaining claims.  See Tr. at 33:17-21 (Court).  Gonzagowski responded that the Court would retain subject-matter jurisdiction in diversity, and the Diamond Group said that its principal place of business in Texas, and that SecTek Inc.'s principal place of business is in Virginia, and so agreed that the Court would continue that have subject-matter jurisdiction over Gonzagowski's remaining claims.  See Tr. at 34:12-35:3 (Roehl, Court, Shoemaker).  The Court nonetheless asked Gonzagowski, the Diamond Group, and SecTek, Inc. to "double-check that" and, if the parties' diversity is not apparent from the Complaint, "send a letter to the Court confirming that they are citizens of different states."  Tr. at 35:4-9 (Court).[45]  The Court then indicated that it is inclined to grant the Motion, because it "may be difficult for the Plaintiff to maneuver through all of the hurdles the Government has put before [him]."  Tr. at 38:11-13 (Court).  The Court told the parties that it would begin working on this Memorandum Opinion and Order as soon as possible.  See Tr. at 38:19 (Court).

---

[45]To date, the parties have not yet submitted the letter that the Court requested.

### LAW REGARDING RULE 12(b)(1)

"Federal courts are courts of limited jurisdiction; they are empowered to hear only those cases authorized and defined in the Constitution which have been entrusted to them under a jurisdictional grant by Congress."  Henry v. Office of Thrift Supervision, 43 F.3d 507, 511 (10th Cir. 1994)(citing Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541, (1986); United States v. Nixon, 418 U.S. 683 (1974); Tafoya v. U.S. Dep't of Justice, Law Enf't Assistance Admin., 748 F.2d 1389, 1390 (10th Cir. 1984)).  A plaintiff generally bears the burden of demonstrating the court's jurisdiction to hear his or her claims.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998)("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").  Because "federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction." U.S. ex rel. Hafter v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999).  Rule 12(b)(1) allows a party to raise, by motion, the defense of the court's "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1).  The Tenth Circuit has held that motions to dismiss for lack of subject-matter jurisdiction "generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject-matter jurisdiction; or (2) a challenge to the actual facts upon which subject-matter jurisdiction is based."  Ruiz v. McDonnell, 299 F.3d 1173, 1180 (10th Cir. 2002).

> On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a rule 12(b)(6) motion: the court must consider the complaint's allegations to be true.  See Ruiz v. McDonnell, 299 F.3d at 1180; Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir.), cert. denied, 454 U.S. 897 (1981).  But when the attack is factual,
>
> > a district court may not presume the truthfulness of the complaint's factual allegations.  A court has wide discretion to allow affidavits,

other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(citations omitted).

Alto Eldorado Partners v. City of Santa Fe, No. CIV 08-0175 JB/ACT, 2009 WL 1312856, at *8-9 (D.N.M. March 11, 2009)(Browning, J.), aff'd on other grounds by 634 F.3d 1170 (10th Cir. 2011). See World Fuel Servs., Inc. v. Nambe Pueblo Dev. Corp., 362 F. Supp. 3d 1021, 1086-87 (D.N.M. 2019)(Browning, J.). The United States Court of Appeals for the Fifth Circuit has stated:

> "[T]he trial court may proceed as it never could under 12(b)(6) or Fed. R. Civ. P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."

Williamson v. Tucker, 645 F.2d 404, 412-13 (5th Cir. 1981)(quoting Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).

When making a rule 12(b)(1) motion, a party may go beyond the complaint's allegations to challenge the facts upon which jurisdiction depends, and may do so by relying on affidavits or other evidence properly before the court. See New Mexicans for Bill Richardson v. Gonzales, 64 F.3d 1495, 1499 (10th Cir. 1995); Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995). In those instances, a court's reference to evidence outside the pleadings does not necessarily convert the motion to a rule 56 motion for summary judgment. See Holt v. United States, 46 F.3d 1000, 1003 (10th Cir. 1995)(citing Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir. 1987)). Where, however, the court determines that jurisdictional issues raised in a rule 12(b)(1) motion are intertwined with the case's merits, the court should resolve the motion under either rule 12(b)(6)

or rule 56.  See Franklin Sav. Corp. v. United States, 180 F.3d at 1129; Tippett v. United States, 108 F.3d 1194, 1196 (10th Cir. 1997).  "When deciding whether jurisdiction is intertwined with the merits of a particular dispute, 'the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim.'"  Davis ex rel. Davis v. United States, 343 F.3d 1282, 1296 (10th Cir. 2003)(quoting Sizova v. Nat'l Inst. of Standards & Tech., 282 F.3d 1320, 1324 (10th Cir. 2002)).  "When subject-matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case, the jurisdictional claim and the merits are considered to be intertwined."  Garcia v. United States, No. CIV 08-0295 JB/WDS, 2009 WL 1300938, at *9 (D.N.M. March 30, 2009)(Browning, J.)(citing Wheeler v. Hurdman, 825 F.2d at 259; Holt v. United States, 46 F.3d at 1003).

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(citing Williams v. Meese, 926 F.2d 994, 997 (10th Cir. 1991)).  The complaint's sufficiency is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the nonmoving party, and draw all reasonable inferences in the plaintiff's favor.  See Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "'At the motion-to-dismiss stage, the court does not weigh the evidence, and is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of N.M., No. CIV 16-0318 JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., No. CIV 17-1010 JB\SMV, 2019 WL 1434971, at *52 (D.N.M. March 29, 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must

give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted). "A court will not construe a plaintiff's pleadings 'so liberally that it becomes his advocate.'" Rivero v. Bd. of Regents of Univ. of N.M., 2019 WL 1085179, at *48 (quoting Bragg v. Chavez, No. CIV 07-0343 JB/WDS, 2007 WL 5232464, at *25 (D.N.M. Aug. 2, 2007)(Browning, J.)). The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible." The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted)(quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). See Gallegos v. Bernalillo Cty. Bd. of Cty. Comm'rs, 278 F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

    "When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'" Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc.,

861 F.3d at 1103-04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity"). "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record." Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186. The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87. In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City, 153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).[46] In Douglas v. Norton, 167 F. App'x

---

[46]Nard v. City of Okla. City is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . [a]nd we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." Douglas v. Norton, 167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach in their briefing. See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness. See 2013 WL 312881, at *50-51. The Court also has previously ruled that, when determining whether to toll a statute of

_____

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Nard v. City of Okla. City, Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006), Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009), Mecca v. United States, 389 F. App'x 775 (10th Cir. 2010), Morrison v. Kache, 576 F. App'x 715 (10th Cir. 2014), Ruppert v. Aragon, 448 F. App'x 862 (10th Cir. 2012), Stevens v. United States, 61 F. App'x 625 (10th Cir. 2003), Garling v. United States Environmental Protection Agency, 849 F.3d 1289, 2017 WL 894432 (10th Cir. 2017), Bethel v. United States, 456 F. App'x 771 (10th Cir. 2012)(unpublished), McDaniel v. United States, 53 F. App'x 8 (10th Cir. 2002), Clark v. United States, 695 F. App'x 378 (10th Cir. 2017), Fritz v. United States, 42 F.3d 1406, 1994 WL 678495 (10th Cir. 1994), Rothenberger v. United States, 931 F.2d 900, 1991 WL 70719 (10th Cir. 1991), Barnes v. United States, 707 F. App'x 512 (10th Cir. 2017), have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.)("Crabtree").  The Court in Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).   See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007).

Plustwik v. Voss of Nor. ASA, No. CIV 11-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[47]  Once the movant meets this burden, rule 56

---

[47]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent

requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  Alternatively, the movant may show that the nonmoving party lacks the evidence to establish its case at trial, and the nonmovant will have the burden of showing that it can produce sufficient evidence to establish the essential elements of its case.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor); 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).  In American Mechanical Solutions, LLC v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court confronted such a situation in which the movant did not offer evidence disproving the nonmovant's allegations, but, rather, argued, under the second option in Celotex, that the nonmovant lacked evidence to establish an element of its claim.  See 184 F. Supp. 3d at 1075.  The Court granted summary judgment for the movant, because the nonmovant -- the plaintiff -- did not offer expert evidence supporting causation or proximate causation for its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims as New Mexico law requires to establish a prima facie case for those elements.  See 184 F. Supp. 3d at 1075.

---

both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("'However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" (quoting Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc., 912 F.2d at 1241)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 256. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (internal quotation marks omitted)(quoting Coleman v. Darden, 595 F.2d, 533, 536 (10th Cir. 1979)). A party may not "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. CIV 07-2123 JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir.

2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of

facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that

something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting

Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be

resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.

Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there

must be sufficient evidence on which the fact finder could reasonably find for the nonmoving

party.   See Liberty Lobby, 477 U.S. at 251 (citing Vitkus v. Beatrice Co., 11 F.3d at 1539;

Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)).  "[T]here

is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly

probative, . . . summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations

omitted)(citing First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 290 (1968); Dombrowski

v. Eastland, 387 U.S. 82, 87 (1967)).  Where a rational trier of fact, considering the whole record,

cannot find for the nonmoving party, there is no genuine issue for trial.  See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind certain

principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S.

at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary

judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability." Liberty Lobby, 477 U.S. at 254. Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party. See Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999). Fourth, the court cannot decide any issues of credibility. See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts. This doctrine developed most robustly in the qualified immunity arena. In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court of the United States concluded that summary judgment is appropriate where video evidence "quite clearly contradicted" the plaintiff's version of the facts. 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus[.] Co. v. Zenith Radio Corp., 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have

believed him.  The Court of Appeals should not have relied on such visible fiction;
it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (emphasis in original).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation,
a plaintiff's version of the facts must find support in the record: more specifically,
"[a]s with any motion for summary judgment, when opposing parties tell two
different stories, one of which is blatantly contradicted by the record, so that no
reasonable jury could believe it, a court should not adopt that version of the facts."
York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott[ v.
Harris], 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511
F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (brackets from Thomson v. Salt Lake Cty. omitted).

"The Tenth Circuit, in Rhoads v. Miller, 352 F. App'x 289 [, 291 (10th Cir.

2009)(unpublished),] . . . explained that the blatant contradictions of the record must be supported

by more than other witnesses' testimony[.]"  Lymon v. Aramark Corp., 728 F. Supp. 2d 1222,

1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).

## LAW REGARDING THE FTCA

It is "axiomatic that the United States may not be sued without its consent and that the

existence of consent is a prerequisite for jurisdiction."  United States v. Mitchell, 463 U.S. 206,

212 (1983)(citing United States v. Sherwood, 312 U.S. 584, 586 (1941); 14 Charles Wright, Arthur

Miller & Edward Cooper, Federal Practice and Procedure § 3654, at 156-157 (1976).  See Garcia

v. United States, 709 F. Supp. 2d 1133, 1137 (D.N.M. 2010)(Browning, J.)("The United States

cannot be sued without its consent.  Congressional consent -- a waiver of the traditional principle

of sovereign immunity -- is a prerequisite for federal-court jurisdiction.").  The law generally

places the burden of proving federal jurisdiction on the proponent of jurisdiction, and the party

suing the United States thus similarly bears the burden of proving that sovereign immunity has

been waived.  See James v. United States, 970 F.2d at 753.  See also Garcia v. United States, 709

F. Supp. 2d at 1138 ("The plaintiff bears the burden of proving that Congress has waived sovereign

immunity for all of his claims.").  The terms of the United States' consent define the federal court's

jurisdiction to entertain suits against the country.  See United States v. Orleans, 425 U.S. at 814;

Ewell v. United States, 776 F.2d 246, 248 (10th Cir. 1985).  Although a "waiver of immunity

should be neither extended nor narrowed beyond that which Congress intended," United States v.

Kubrick, 444 U.S. 111, 117-18 (1979); see Ewell v. United States, 776 F.2d at 248, "[w]aivers of

sovereign immunity are to be read narrowly," James v. United States, 970 F.2d at 753 (citing Engel

v. United States (Estate of Johnson), 836 F.2d 940, 943 (5th Cir. 1988); Schmidt v. King, 913 F.2d

837, 839 (10th Cir. 1990)).  "A waiver of sovereign immunity 'cannot be implied and must be

unequivocally expressed.'"  United States v. Mitchell, 445 U.S. 535, 538 (1980)(quoting United

States v. King, 395 U.S. 1, 4, 89 (1969)).  See United States v. Nordic Vill., Inc., 503 U.S. at 33-

34; United States v. Murdock Mach. & Eng'g Co. of Utah, 81 F.3d 922, 930 (10th Cir. 1996).

The Tenth Circuit has emphasized that all dismissals for lack of jurisdiction, including

those for a failure to establish a waiver of sovereign immunity under the FTCA, should be without

prejudice.  See Mecca v. United States, 389 F. App'x 775, 780 (10th Cir. 2010)(unpublished).  It

has explained: "'A longstanding line of cases from this circuit holds that where the district court

dismisses an action for lack of jurisdiction . . . the dismissal must be without prejudice.'"  Mecca

v. United States, 389 F. App'x at 780 (quoting Brereton v. Bountiful City Corp., 434 F.3d 1213,

1216 (10th Cir. 2006)).  The Tenth Circuit held in Mecca v. United States that the district court

improperly dismissed with prejudice the plaintiff's FTCA claims after it concluded that it lacked jurisdiction over those claims.  See 389 F. App'x at 780-81 ("Here, because the district court found itself without jurisdiction over the FTCA claims, dismissal should have been entered without prejudice, even if the court deemed further amendment futile.  We therefore remand with instructions to enter dismissal of these claims without prejudice.").

In 1948, Congress enacted the FTCA, which waives the United States' sovereign immunity for some tort actions against the United States seeking money damages.  See 28 U.S.C. § 1346(b); Fed. Deposit Ins. v. Meyer, 510 U.S. 471, 475 (1994); Warren v. United States, 244 F. Supp. 3d 1173, 1212 (D.N.M. 2017)(Browning, J.); Romanach v. United States, 579 F. Supp. 1017, 1019 (D.P.R. 1984)(Laffitte, J.).  In enacting the FTCA, Congress waived the United States' sovereign immunity as to

> claims against the United States, for money damages accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be held liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b).  "The FTCA's waiver of sovereign immunity is limited, however."  Cortez v. EEOC, 585 F. Supp. 2d 1273, 1284 (D.N.M. 2007)(Browning, J.).  "If the claim does not fall within the FTCA's express provisions, or if it falls within one of its exceptions, the claim is not cognizable under the FTCA, and the court must deny relief."  Cortez v. EEOC, 585 F. Supp. 2d at 1284 (citing Williams v. United States, 50 F.3d at 304-05).  Moreover, the only proper party in an action under the FTCA is the United States.  See 28 U.S.C. § 2679(a); Romanach v. United States, 579 F. Supp. at 1018 n.1 (holding that no suit under the FTCA may lie against any agency of the

United States eo nomine); Painter v. FBI, 537 F. Supp. 232, 236 (N.D. Ga. 1982)(Forrester, J.)(holding that "[t]he FBI may not be sued eo nomine").

Even when the FTCA waives the United States' sovereign immunity, the United States is liable for FTCA claims, if at all, only "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. "The Tort Claims Act was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." Richards v. United States, 369 U.S. 1, 6 (1962). The FTCA leaves untouched the states' laws that might apply to the United States once Congress removes that immunity. The Supreme Court has noted:

> Rather, [the FTCA] was designed to build upon the legal relationships formulated and characterized by the States, and, to that extent, the statutory scheme is exemplary of the generally interstitial character of federal law. If Congress had meant to alter or supplant the legal relationships developed by the States, it could specifically have done so to further the limited objectives of the Tort Claims Act.

Richards v. United States, 369 U.S. at 6-7. Accordingly, "the United States is placed in the same position as a private individual by rendering the United States liable for the tortious conduct of its employees if such conduct is actionable in the state in which the United States' action or inaction occurred." Cortez v. EEOC, 585 F. Supp. 2d at 1284. Cf. Garcia v. United States, No. CIV 08-0295 JB/WDS, 2010 WL 2977611, at *18 (D.N.M. June 15, 2010)(Browning, J.)("The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA." (citing 28 U.S.C. § 1346(b)). See Richards v. United States, 369 U.S. at 9; Williams v. United States, 350 U.S. 857, 857 (1955); Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970).

The United States' liability is coextensive with that of private individuals under the respective states' law, even if comparable government actors or public entities would have additional defenses or additional obligations under that state's law.  See United States v. Olson, 546 U.S. 43, 44-47 (2005); In re FEMA Trailer Formaldehyde Prod. Liab. Litig. (Miss. Plaintiffs), 668 F.3d 281, 288 (5th Cir. 2012)("Because the federal government could never be exactly like a private actor, a court's job in applying the standard is to find the most reasonable analogy.  Inherent differences between the government and a private person cannot be allowed to disrupt this analysis." (citing LaBarge v. Cty. of Mariposa, 798 F.2d 364, 366-69 (9th Cir. 1986); United States v. Olson, 546 U.S. at 47)); DeJesus v. U.S. Dep't of Veterans Affairs, 479 F.3d 271, 283 n.9 (3d Cir. 2007)("Under the FTCA, the federal government can only be held liable for breaches of duties imposed on private, rather than state, parties."); Ewell v. United States, 776 F.2d at 248-49; Cox v. United States, 881 F.2d 893, 895 (10th Cir. 1989)(stating that "[t]his and other courts have applied the same rationale in holding that the United States may invoke the protection of a [private] recreational use statute"); Proud v. United States, 723 F.2d 705, 706 (9th Cir. 1984)("But appellants overlook the fact that in enacting the FTCA, Congress -- not the Hawaii Legislature -- determined the tort liability of the United States.  And the FTCA specifically provides that the federal government's tort liability is co-extensive with that of a private individual under state law.").  The Tenth Circuit reasoned in Ewell v. United States:

> The main goal of the FTCA was to waive sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts. Congress was primarily concerned with allowing a remedy where none had been allowed.  There is no evidence that Congress was concerned with the prospect that immunities created solely for private persons would shield the United States from suit.  The Supreme Court, in United States v. Muniz, 374 U.S. 150 . . . (1963), considered whether it is appropriate to apply immunities created by state law to the United States when it is sued under the FTCA.  The Court was concerned with state

laws that immunized prison officials from suits by prisoners and concluded that it is "improper to limit suits by federal prisoners because of restrictive state rules of immunity."  374 U.S. at 164 . . . .  The immunity under consideration in that case applied to state, county and municipal prison officials.  Noting its decision in Indian Towing Co. v. United States, 350 U.S. [61]at 65 [(1955)] . . . wherein the Court determined that federal liability had to be determined as if it were a private person and not as if it were a municipal corporation, it concluded that state law immunity applicable to state, county and municipal prison officials would not be applicable to a private person and, therefore, not applicable to the federal government in a suit under the FTCA.

Thus, while immunities afforded state, county and municipal employees are not applicable to the federal government when sued under the FTCA, immunities created by state law which are available to private persons will immunize the federal government because it is liable only as a private individual under like circumstances.  It is evident, therefore, that the Utah district court was correct in granting the motion for summary judgment.

Ewell v. United States, 776 F.2d at 249.

The FTCA "does not apply where the claimed negligence arises out of the failure of the United States to carry out a [federal] statutory duty in the conduct of its own affairs."  United States v. Agronics Inc., 164 F.3d 1343, 1345 (10th Cir. 1999).  The Tenth Circuit has recognized that "[o]ther courts invoke the same rule by the shorthand expressions of immune 'quasi-legislative' or 'quasi-judicial' action."  United States v. Agronics Inc., 164 F.3d at 1345.  Thus, for example, courts have rejected FTCA claims premised upon such administrative/regulatory acts or omissions as: (i) the Federal Aviation Administration's failure to take enforcement action against an entity not complying with federal laws and rules; (ii) the Agriculture Department's failure to prohibit the exportation of disease-exposed cattle; and (iii) various agencies' noncompliance with proper rulemaking procedures.  See United States v. Agronics Inc., 164 F.3d at 1346 (collecting cases).

The Court examined the exceptions to the FTCA's waiver of sovereign immunity in Coffey v. United States, 906 F. Supp. 2d at 1157.  In that case, a plaintiff brought a wrongful death and

negligence action against the United States Bureau of Indian Affairs ("BIA") based on its decision to contract with a county detention center. See 906 F. Supp. 2d at 1121. The United States argued against liability on the grounds that the detention center was an independent contractor and that the United States' decision to contract with it fell within the FTCA's discretionary-function exemption. See 906 F. Supp. 2d at 1121. The Court agreed on both points. See 906 F. Supp. 2d at 1121. It explained that the BIA's decision to contract with the detention center was "a matter of the BIA's judgment and choice, which is susceptible to policy analysis," and thus protected under the discretionary function exemption. 906 F. Supp. 2d at 1157. It added that the United States "is liable under the FTCA for the actions of its employees only," thereby prohibiting liability for the detention center's actions. 906 F. Supp. 2d at 1164.

## LAW REGARDING THE FTCA'S EXHAUSTION REQUIREMENT AND STATUTE OF LIMITATIONS

Two procedural steps limit plaintiffs' abilities to sue pursuant to the FTCA: (i) an administrative exhaustion requirement; and (ii) a statute of limitations. See Barnes v. United States, 776 F.3d 1134, 1139 (10th Cir. 2015). Together the steps define the time period within which the plaintiff may bring a suit. See Barnes v. United States, 776 F.3d at 1139. A plaintiff must provide the agency notice of his, her, or its claims, see 28 U.S.C. § 2675(a), and must present the claim within a limited time after the claim accrues, see 28 U.S.C. § 2401(b).

### 1.   **Exhaustion Requirements**.

The exhaustion requirement is "'jurisdictional and cannot be waived.'" Morrison v. Kache, 576 F. App'x 715, 717 (10th Cir. 2014)(unpublished)(quoting Bradley v. U.S. ex rel. Veterans Admin., 951 F.2d 268, 270 (10th Cir. 1991)). Before bringing an action in federal court, a claimant

must present the claim to the appropriate federal agency; the FTCA's jurisdictional statute provides:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a).  This statute "requires that claims for damages against the government be presented to the appropriate federal agency by filing (1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852 (quoting Bradley v. U.S. ex. rel. Veterans Admin., 951 F.2d at 270).

"[A] claim should give notice of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'"  Staggs v. U.S. ex rel. Dep't of Health & Human Servs., 425 F.3d 881, 884 (10th Cir. 2005)(quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853).  The Tenth Circuit has added that "the FTCA's notice requirements should not be interpreted inflexibly."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853.  Whether a plaintiff's administrative claim is sufficient to meet 28 U.S.C. § 2675(a)'s notice requirement is a question of law.  See Staggs v. U.S. ex rel. Dep't of Health & Human Servs., 425 F.3d at 884; Warren v. United States, 244 F. Supp. 3d at 1213.

## 2.    **Filing Deadlines.**

Once a tort claim accrues against the United States, 28 U.S.C. § 2401 gives a claimant two years to present that claim in writing to the appropriate federal agency.  See 28 U.S.C. § 2401(b) (explaining that claim is "forever barred" unless presented within two years).  If the agency denies

the claim, the claimant has six months to file suit in federal court.  See 28 U.S.C. § 2401(b).  The Tenth Circuit has clarified that a party must satisfy both of § 2401's prongs: "28 U.S.C. § 2401(b) bars a tort claim against the United States 'unless it is presented to the proper agency within two years of its accrual *and* suit is commenced within six months of notice of the claim's denial by the agency.'"  Ponce v. United States, No. CIV 13-0334 JB/ACT, 2013 WL 6503535, at *14 (D.N.M. Nov. 25, 2013)(Browning, J.)(emphasis in Ponce v. United States)(quoting Indus. Constructors Corp. v. U.S. Bureau of Reclamation, 15 F.3d 963, 968 (10th Cir. 1994)). )).  28 U.S.C. § 2401(b)'s time limitations are non-jurisdictional and subject to equitable tolling.  See United States v. Kwai Fun Wong, 575 U.S. 402, 410-11 (2015).

If the agency fails to make a final disposition of the claim within six months, the claimant may "deem . . . " that failure a "final denial of the claim," and proceed with his or her suit under the FTCA.  28 U.S.C. § 2675(a).  In the Tenth Circuit, "(at least until there has been a final denial by the relevant agency) there is no limit on when a plaintiff may file a lawsuit predicated on a deemed denial."  Barnes v. United States, 776 F.3d at 1140.  An agency may "trigger . . . § 2401(b)'s six-month limitations period through final denial of administrative FTCA claims after a 'deemed denial.'"  Barnes v. United States, 776 F.3d at 1141.  See Warren v. United States, 244 F. Supp. 3d at 1213.

**3.     Effect of Failure to Exhaust.**

"[A]s a general rule, a premature 'complaint cannot be cured through amendment, but instead, plaintiff must file a new suit.'"  Duplan v. Harper, 188 F.3d 1195, 1199 (10th Cir. 1999)(quoting Sparrow v. U.S. Postal Serv., 825 F. Supp. 252, 255 (E.D. Cal. 1993)(Wagner, J.)).  This rule exists, because "[a]llowing claimants generally to bring suit under the FTCA before

exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." Duplan v. Harper, 188 F.3d at 1199. Courts must dismiss these claims "without regard to concern for judicial efficiency." Ruppert v. Aragon, 448 F. App'x 862, 863 (10th Cir. 2012)(unpublished). Even the filing of an amended complaint may not serve to cure a prematurely filed original complaint. See Stevens v. United States, 61 F. App'x 625, 627 (10th Cir. 2003)(unpublished).

There is at least one limited exception to the general rule. Duplan v. Harper recognizes an exception where the United States "expressly agreed" to the district court's decision to treat the amended complaint as a new action. 188 F.3d at 1199. See Mires v. United States, 466 F.3d 1208, 1211 (10th Cir. 2006)(concluding that there is a new action where plaintiff "sought permission to file -- and, with the government's consent and district court's permission, did file -- an amended complaint"). See also Warren v. United States, 244 F. Supp. 3d at 1214.

### 4. Definition of "Sufficient Notice."

Courts define "sufficient notice" based on the facts of each case before them. In Estate of Trentadue ex rel. Aguilar v. United States, the United States contended that the plaintiffs' administrative claim was insufficient for notice of intentional infliction of emotional distress, because it was based on a theory that prison officials had murdered Trentadue, the inmate, and the allegations did not discuss the specific grounds on which the district court relied in awarding damages, "namely the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval." 397 F.3d at 852. The Tenth Circuit disagreed, holding that the "plaintiffs'

administrative claim provided notice that [the United States Department of Justice ('DOJ')] should investigate the prison officials' conduct."  397 F.3d at 853.  The Tenth Circuit reasoned that language within the administrative claim "gave DOJ notice of the facts and circumstances surrounding plaintiffs' emotional distress claim and, moreover, is consistent with the plaintiffs' subsequent allegations in their amended complaints."  397 F.3d at 853.

The Tenth Circuit contrasted Estate of Trentadue ex rel. Aguilar v. United States with Dynamic Image Technologies, Inc. v. United States, 221 F.3d 34 (1st Cir. 2000), where the United States Court of Appeals for the First Circuit held that the plaintiff's administrative claim did not put the agency on notice that it should have investigated the potentially tortious conduct, because the plaintiff's administrative claims were for "misrepresentation, libel, slander, contractual interference, and discrimination," and the amended claims for false arrest arose out of two separate incidences. 221 F.3d at 40.  The First Circuit stated: "Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it." 221 F.3d at 40.  The First Circuit thus concluded that, "regardless of the labels employed in the amended complaint, that complaint, in substance, seeks recovery based solely on an incident that was not mentioned in the plaintiffs' administrative claim." 221 F.3d at 40 (emphasis omitted).

In Glade ex rel. Lundskow v. United States, 692 F.3d 718 (7th Cir. 2012), a man receiving mental health treatment at a Veterans Administration ("VA") facility alleged that his therapist worsened his condition by initiating a sexual relationship with him.  See 692 F.3d at 720.  He filed a notice of claim with the VA that "does not mention a failure of anyone to use due care besides the therapist." 692 F.3d at 722.  The United States Court of Appeals for the Seventh Circuit, reviewing the notice, commented that "reading the administrative claim you would think the

plaintiff was just seeking damages under a theory of respondeat superior against an employer for an employee's battery, and we know that such a theory won't fly under the Tort Claims Act." 692 F.3d at 722. The plaintiff recognized this problem before filing his complaint and thus asserted a "special relationship" theory of liability instead. 692 F.3d at 723. The Seventh Circuit affirmed the district court's decision to dismiss the suit, explaining:

> The administrative claim need not set forth a legal theory, but it must allege facts that would clue a legally trained reader to the theory's applicability. *Palay v. United States,* 349 F.3d 418, 425-26 (7th Cir. 2003); *Murrey v. United States,* 73 F.3d 1448, 1452-53 (7th Cir. 1996). The plaintiff's claim didn't do that. The legally trained reader would assume that the plaintiff simply was unaware that the mere fact of a battery by a VA employee would not impose liability on the employer. We're about to see that the "special relationship" tort theory advanced in the plaintiff's complaint (as distinct from the administrative claim) is outside the bounds of plausibility -- hardly the sort of theory that the VA's legal department should have guessed would be the ground of a lawsuit.

Glade ex rel. Lundskow v. United States, 692 F.3d at 722-23. See Warren v. United States, 244 F. Supp. 3d at 1215.

## **LAW REGARDING THE DISCRETIONARY FUNCTION EXCEPTION**

The FTCA contains several exceptions to its waiver of immunity. See 28 U.S.C. § 2680. The Supreme Court has characterized § 2680(a) as the "boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. Varig Airlines, 467 U.S. 808. These exceptions must be strictly construed in the United States' favor. See U.S. Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992)("Waivers of immunity must be 'construed strictly in favor of the sovereign' and not 'enlarge[d] . . . beyond what the language requires.'" (alterations in U.S. Dep't of Energy v. Ohio)(first quoting McMahon v. United States, 342 U.S. 25, 27 (1951); then quoting E. Transp. Co. v. United States, 272 U.S. 676, 686 (1927)).

The discretionary function exception provides that the FTCA shall not apply to claims "based upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Its application is a threshold jurisdictional issue in any FTCA case. See Johnson v. U.S. Dep't of Interior, 949 F.2d 332, 335 (10th Cir. 1991). Cf. Warren v. United States, 244 F. Supp. 3d at 1233 (noting that, at the motion-to-dismiss stage, in an FTCA case, a plaintiff "must establish more than . . . abstract negligence" "and, instead, must also first establish that her claims are not based upon actions immunized from liability under the FTCA's discretionary function exception"). In Berkovitz by Berkovitz v. United States, the Supreme Court enunciated a two-prong analysis for determining when the FTCA's discretionary function exception applies. See 486 U.S. at 536; Domme v. United States, 61 F.3d at 789-90; Black Hills Aviation, Inc. v. United States, 34 F.3d 968, 972-73 (10th Cir. 1994); Kiehn v. United States, 984 F.2d 1100, 1102-03 (10th Cir. 1993). First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 536). Second, the conduct must be "'based on considerations of public policy.'" United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537). See Garling v. U.S. Envtl. Prot. Agency, 849 F.3d 1289, 1294-95, 2017 WL 894432, at *3 (10th Cir. 2017)(unpublished).

An action is not discretionary where a statute, regulation, or policy mandates certain conduct, because the employee has "no room for choice." United States v. Gaubert, 499 U.S. 315, 324 (1991). See Garcia v. U.S. Air Force, 533 F.3d at 1176 ("Conduct is not discretionary if 'a

federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive.'" (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537)).  On the other hand,

> [w]here Congress has delegated the authority to an independent agency or to the Executive Branch to implement the general provisions of a regulatory statute and to issue regulations to that end, there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception, as is the promulgation of regulations by which the agencies are to carry out the programs.

United States v. Gaubert, 499 U.S. at 323.

Berkovitz by Berkovitz v. United States' second prong protects conduct if it was or could have been "'based on considerations of public policy.'"  Kiehn v. United States, 984 F.2d at 1105 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537).  This principle is a result of the rule that the second prong requires that the challenged conduct must be, by its nature, "susceptible to policy analysis."  United States v. Gaubert, 499 U.S. at 325.  Where agency policy allows an employee to exercise discretion, there is a "strong presumption" that the acts authorized by the policy are grounded in public policy.  United States v. Gaubert, 499 U.S. at 324.  Where a plaintiff alleges a negligent omission, it is "irrelevant whether the [omission] was a matter of 'deliberate choice,' or a mere oversight," Kiehn v. United States, 984 F.2d at 1105 (quoting Allen v. United States, 816 F.2d 1417, 1422 n.5 (10th Cir. 1987)), because "[t]he failure to consider some or all critical aspects of a discretionary judgment does not make that judgment less discretionary and does not make the judgment subject to liability," Kiehn v. United States, 984 F.2d at 1105.

The two-prong test in Berkovitz by Berkovitz v. United States applies equally to all government employees, regardless of their rank or position: "[I]t is the nature of the conduct, rather

than the status of the actor, that governs whether the discretionary function exception applies in a given case."  United States v. Varig Airlines, 467 U.S. at 813.  See United States v. Gaubert, 499 U.S. at 325 ("Discretionary conduct is not confined to the policy or planning level."); United States v. Varig Airlines, 467 U.S. at 811 ("'Where there is room for policy judgment and decision there is discretion.  It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.'" (quoting Dalehite v. United States, 346 U.S. 15, 35-36 (1953))).

In applying the Berkovitz by Berkovitz v. United States analysis, the question of negligence is irrelevant: "When the government performs a discretionary function, the exception to the FTCA applies regardless of 'whether or not the discretion involved be abused.'"  Redman v. United States, 934 F.2d 1151, 1157 (10th Cir. 1991)(quoting 28 U.S.C. § 2680(a)).  A court must decide first whether the discretionary function exception shields the "government's conduct" before the court addresses the government's duties under the common law.  Domme v. United States, 61 F.3d at 789.  The Tenth Circuit has explained:

> Considering state tort law as a limit on the federal government's discretion at the jurisdictional stage impermissibly conflates the merits of plaintiffs' claims with the question whether the United States has conferred jurisdiction on the courts to hear those claims in the first place.  Indeed, the only conceivable way plaintiffs might succeed on their theory is by pointing to a *federal* policy incorporating state tort law as a limit on the discretion of federal employees with the meaning of the FTCA.

Sydnes v. United States, 523 F.3d 1179, 1184 (10th Cir. 2008).

## LAW REGARDING THE FTCA'S INDEPENDENT CONTRACTOR EXCEPTION

Torts committed through independent contractors' acts are also excepted from the FTCA, although not pursuant to 28 U.S.C. § 2680's exceptions.  See Curry v. United States, 97 F.3d at 414

(citing United States v. Orleans, 425 U.S. at 814; Logue v. United States, 412 U.S. at 527).  The FTCA's waiver of sovereign immunity applies to government employees acting within their employment's scope, see, e.g., Tsosie v. United States, 452 F.3d at 1163 (citing Curry v. United States, 97 F.3d at 414), and the statute defines the term "federal employees" for FTCA purposes as "officers or employees of any federal agency," and "federal agency" to include "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States," but not to "include any contractor with the United States," 28 U.S.C. § 2671.  Accordingly, government employees include "officers and employees of federal agencies," but not independent contractors and their employees.  Tsosie v. United States, 452 F.3d at 1163 (citing Curry v. United States, 97 F.3d at 414).

"[T]he question whether one is an employee of the United States is to be determined by federal law."  Waconda v. United States, No. CIV 06-0101 JB/ACT, 2007 WL 2219472, at *10 (D.N.M. May 23, 2007)(Browning, J.)(quoting Lurch v. United States, 719 F.2d 333, 337 (10th Cir. 1983)).  Under federal law, the analysis focuses on whether the alleged principal controls the contractor's physical performance of his, her, or its work.  See Lurch v. United States, 719 F.2d at 337 (citing United States v. Orleans, 425 U.S. at 814).[48]  If the principal controls the conduct,

---

[48]In drawing this distinction between independent contractors and employees, the Supreme Court imported the common law of tort's test for identifying employer-employee relationships, see Logue v. United States, 412 U.S. at 525-28, and, as early as 1973, described this test as one of the alleged principal's control, and, thus, of the alleged principal's supervision, over the contractor's work, see Logue v. United States, 412 U.S. at 527; cf. United States v. Orleans, 425 U.S. at 814-15 (describing that, as in Logue v. United States, and Maryland v. United States, 381 U.S. 41 (1965), "the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government").

the contractor is an employee rather than an independent contractor.  See Lurch v. United States, 719 F.2d at 337.  "The key inquiry under this control test is whether the Government supervises the day-to-day operations of the individual."  Lurch v. United States, 719 F.2d at 337 (citing United States v. Orleans, 425 U.S. at 815).  The Tenth Circuit has directed courts engaging in this inquiry to consider:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Curry v. United States, 97 F.3d at 414 (citing Lilly, 876 F.2d at 859).

### LAW REGARDING THE FTCA'S INTENTIONAL TORT EXCEPTION

"Congress was careful to except from the Act's broad waiver of immunity several classes of tort claims."  United States v. Varig Airlines, 467 U.S. 797, 808 (1984).  The waiver of immunity set forth in 28 U.S.C. § 1346(b) is subject to thirteen statutory exceptions enumerated in 28 U.S.C. § 2680.  See Kosak v. United States, 465 U.S. 848, 852 (1984).  Specifically, under section 2680(h), the United States retains its sovereign immunity with respect to "[a]ny claim arising out of assault, battery," and other enumerated intentional torts.  The exception is, however, subject to the following:

> Provided, that, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) . . . shall apply to any claim arising . . . out of assault, battery, false imprisonment, false imprisonment, false arrest, abuse of process, or malicious prosecution. . . .  For the purpose of this subsection, 'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violation of Federal law.

28 U.S.C. § 2680(h).  By this proviso, section 2680(h) waives the defense of sovereign immunity for suits against the United States for certain intentional torts that its law enforcement officers commit while acting within the scope of their employment.  See Dry v. United States, 235 F.3d 1249, 1257 (10th Cir. 2000).  An "investigative or law enforcement officer" is defined as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law."  28 U.S.C. § 2680(h).

When a § 2680 exception to the FTCA bars a claim, the court lacks subject-matter jurisdiction to hear the case.  Although liability under the FTCA generally depends on the law of the state where the allegedly negligent or wrongful act or omission occurred, see 28 U.S.C. § 1346(b)(1), whether a claim is excepted by § 2680(h) is a question of federal law, see United States v. Neustadt, 366 U.S. 696, 705-06 (1961); Franklin v. United States, 992 F.2d 1492, 1495 (10th Cir. 1993).  The law of the place where the alleged negligent conduct took place determines the scope of employment under the FTCA.  See Williams v. United States, 350 U.S. 857, 857 (1955)(per curiam); Henderson v. United States, 429 F.2d 588, 590 (10th Cir. 1970); 28 U.S.C. § 1346(b).

## ANALYSIS

The Court grants the Motion.  The Court first concludes that Gonzagowski did not timely submit his administrative claim.  Accordingly, the Court dismisses the Complaint.  Second and alternatively, the Court concludes that, even if he did timely file his claim, Gonzagowski did not provide sufficient notice, because his negligent hiring, training and supervision claim is not apparent from the notice's face.  Accordingly, the FTCA bars Gonzagowski's negligent hiring, training, and supervision claim against the United States.  Third, the Court concludes that the

Diamond Group and its security officers are independent contractors and not federal employees, because the United States did not exercise day-to-day control over the Diamond Group's services at the Social Security Administration's New Mexico offices.  Accordingly, the Court lacks subject-matter jurisdiction over Gonzagowski's assault and battery claims against the United States. Fourth and alternatively, the Court concludes that the FTCA's intentional tort exception applies, because the Diamond Group's security officers are not federal law enforcement or investigative officials.  Accordingly, the Court lacks subject-matter jurisdiction over Gonzagowski's assault and battery claims against the United States.  The Court therefore grants the Motion and dismisses the Complaint insofar as it asserts claims against the United States.

## I.    THE COURT CONVERTS THE MOTION'S REQUEST FOR DISMISSAL ON DISCRETIONARY FUNCTION AND INDEPENDENT CONTRACTOR GROUNDS TO RULE 56 SUMMARY JUDGMENT REQUESTS.

The Court converts the United States' independent-contractor and discretionary-function arguments to rule 56 requests for summary judgment.  Those jurisdictional arguments are intertwined with the case's merits.  See Redmon By & Through Redmon v. United States, 934 F.2d at 1155 ("Rule 56 governs because the determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues."); United States ex rel. Hafter D.O. v. Spectrum Emergency Care, Inc., 190 F.3d at 1159.  The Court also converts the United States' assertions regarding the timeliness of Gonzagowski's administrative claim to a rule 56 motion for summary judgment, because that argument is not jurisdictional and requires the Court to examine materials outside the pleadings. See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103.  The Court considers the United States' assertions that Gonzagowski did not exhaust his administrative remedies and

that the FTCA's intentional tort exception divests the Court of subject-matter jurisdiction under the rule 12(b)(1) standard, because those issues are not intertwined with the case's merits.  See Estate v. Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852 ("'Because the FTCA constitutes a waiver of the government's sovereign immunity, the notice requirements established by the FTCA must be strictly construed.  The requirements are jurisdictional and cannot be waived.'" (quoting Bradley v. United States ex rel. Veterans Admin., 951 F.2d at 270)); Mendoza v. United States, 661 F. App'x 501, 501-02 (9th Cir. 2016)(unpublished)(affirming a district court's dismissal of an FTCA claim for failure to exhaust on jurisdictional grounds); Caldwell v. Klinker, 646 F. App'x 842, 846 (11th Cir. 2016)(unpublished)("Unless and until a claimant has exhausted his administrative remedies under the FTCA, the district court lacks subject-matter jurisdiction.").

## II.   GONZAGOWSKI DID NOT COMPLY WITH THE FTCA'S LIMITATIONS PERIOD, BECAUSE THE DEPARTMENT OF HOMELAND SECURITY RECEIVED HIS CLAIM MORE THAN TWO YEARS AFTER IT ACCRUED, AND THE COURT DECLINES TO TOLL THE LIMITATIONS PERIOD.

Gonzagowski does not dispute that the Department of Homeland Security is his administrative claim's proper recipient.  See Response at 3.  The parties agree that Gonzagowski submitted his administrative claim to the Social Security Administration on August 6, 2018.  See Motion at 10; Response at 3-4.  The parties also agree that the statute of limitations on Gonzagowski's administrative claim ran on August 23, 2018.  See Motion at 10; Response at 3-4. Gonzagowski also does not dispute that the Department of Homeland Security received his administrative claim more than two years after his claim against it accrued.  See Response at 3. On October 9, 2018, Gonzagowski sent a letter to the Social Security Administration requesting that it preserve evidence relevant to his administrative claim.  See Response ¶ 4, at 3; Reply at 3.

On October 30, 2018, the Department of Justice forwarded Gonzagowski's claim to the Social Security Administration, concluding that it was the claim's proper recipient.  See Response ¶ 5, at 3; Reply at 3.  Three days later, on November 2, 2018, the Social Security Administration told Gonzagowski that it would forward his claim to the Department of Homeland Security, the proper recipient.  See Response ¶ 6, at 3; Reply at 3.  The Department of Homeland Security confirmed receipt on December 6, 2018.  See Response ¶ 7, at 4; Reply at 3.  While it is thus undisputed that the Department of Homeland Security received Gonzagowski's claim after the limitations period lapsed, Gonzagowski contends that the Social Security Administration did not promptly forward his claim to the Department of Homeland Security, and so he provided constructive notice within the limitations period.  See Response at 9-10.

The FTCA provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues[.]"  28 U.S.C. § 2401(b).  The appropriate federal agency is the agency "whose activities gave rise to the claim."  28 C.F.R. § 14.2(b)(1).  "[T]here is little guidance for plaintiffs in determining the appropriate agency when filing an FTCA claim."  Ainsworth v. United States, No. CIV-11-418-RAW, 2012 WL 3014409, at *2 (E.D. Okla. July 23, 2012)(White, J.).  When a plaintiff presents an administrative claim to the wrong agency, "that agency shall transfer it forthwith to the appropriate agency, if the proper agency can be identified from the claim, and advise the claimant of the transfer."  28 C.F.R. § 14.2(b)(1).  If a plaintiff files his, her, or its administrative claim with the wrong agency, but "the agency fails promptly to comply with the transfer regulation and, as a result, a timely filed, but misdirected claim does not reach the proper agency within the limitations period, the claim may be considered timely filed."  Hart, 116 F.3d at

1341.  Whether the forwarding agency does not act promptly is a question of law.  See Hart, 116 F.3d at 1340-41.

Courts' willingness to toll equitably the FTCA's statute of limitations varies with the timeliness of a plaintiff's misdirected claim and the promptness of the recipient agency's forwarding the misdirected claim to the proper agency.  The Seventh Circuit has interpreted "forthwith" to mean in a "dutiful and timely fashion."  Bukala v. United States, 854 F.2d at 204.  The Seventh Circuit, against the United States' argument that the limitations period for administrative claims is jurisdictional, concluded that equitable tolling, in certain cases, is consistent with Congressional intent: "When Congress added the present mandatory administrative claims procedure to the FTCA, it did so specifically to provide for more fair and equitable treatment of private individuals and claimants when they deal with the Government or are involved in litigation with their Government."  Bukala v. United States, 727 854 F.2d at 2013 (citing S. Rep. No. 1327, 89th Cong., 2d Sess. 2, reprinted in 1966 U.S. Code Cong. & Admin. News 2515-16).  The Supreme Court has since agreed with the Seventh Circuit and concluded that courts may toll the FTCA's limitations period, because "the [FTCA's] time bars are nonjurisdictional and subject to equitable tolling."  United States v. Wong, 135 S. Ct. 1625, 1638 (2015).

In Bukala v. United States, 727 F. Supp. 382 (N.D. Ill. 1989)(Aspen, J.), the plaintiff, due to her attorney's inadvertence, submitted her claim to the wrong agency eight months before the statute of limitations ran.  See 727 F. Supp. at 384-85.  A year later, she inquired with the VA -- which she knew was the proper recipient -- about her claim's status, and the VA responded that it had no record of her claim.  See 727 F. Supp. at 383.  On remand from the Seventh Circuit, the Honorable Marvin Aspen, then-United States District Judge for the United States District Court for

the Northern District of Illinois, equitably tolled the limitations period, because the recipient agency never forwarded or otherwise responded to the plaintiff's administrative claim.  See 727 F. Supp. at 384-85.  The United States Court of Appeals for the Eighth Circuit, relying on Bukala v. United States, has similarly tolled the limitations period, where a plaintiff submitted her claim to the wrong agency two months before the limitations period ran, but the recipient agency denied her claim without forwarding it to the correct agency or otherwise informing her that she had misdirected her claim.  See Green v. United States, 872 F.2d 236, 237 (8th Cir. 1989).

Conversely, an agency's haste in transferring a misdirected claim matters less when the plaintiff waits until late in the limitations period to file and cannot justify a claim's untimeliness or misdirection.  For example, the Tenth Circuit did not allow constructive filing where a claim was filed with the wrong agency on the last day of the limitations period.  See Hart, 116 F.3d at 1341.  Similarly, in Lotrionte v. United States, 560 F. Supp. 41 (S.D.N.Y. 1983)(Pollack, J.), the district court did not allow constructive filing, because the plaintiff filed her claim with the wrong agency only two days before the limitations period expired, because § 2401(b)'s reference to the "'appropriate'" federal agency implies "at least a minimal period for transfer of the claim to the appropriate agency." 560 F. Supp. at 43 (quoting 28 U.S.C. § 2401(b)).  This principle thus reflects the notion that, to justify entitlement to tolling, a plaintiff must show that his or her claim was late despite due diligence.  See Norman v. United States, 467 F.3d 773, 776 (D.C. Cir. 2006).  At a minimum, due diligence requires the plaintiff to make earnest efforts to determine his or her claim's proper defendant.  See, e.g., T.L. ex rel. Ingram v. United States, 443 F.3d 956, 964 (8th Cir. 2006); Gonzalez v. United States, 284 F.3d 281, 291-92 (1st Cir. 2002); Gould v. U.S. Dep't of Health & Human Servs., 905 F.2d 738, 744 (4th Cir. 1990)("[P]laintiffs have an affirmative

duty to inquire as to the legal identity of the defendant."). Courts are thus more likely to conclude that the recipient agency did not act promptly when the plaintiff submits the misdirected claim with time to spare, or if the plaintiff can justify a claim's timeliness or misdirection.

Gonzagowski contends that the Court should toll the limitations period for two reasons. First, he asserts that the Social Security Administration did not transfer his claim to the Department of Homeland Security "forthwith," as 28 C.F.R. § 14.2(b) requires. Response at 9. On this point, he also notes that the Department of Homeland Security denied his claim, not because it was untimely filed, but because it concluded that no federal employee was negligent. See Response at 11. He further notes that, in Hart, the recipient agency transferred the plaintiff's claim to the appropriate agency within two months of receiving the claim, whereas here the Social Security Administration transferred his claim three months after its receipt, "an act that was seemingly prompted by a second letter from Plaintiff and/or receipt of the forwarded claim from [the Department of Justice] itself." Response at 11. Second, he argues that his mistake in submitting his administrative claim to the Social Security Administration is reasonable, because the Department of Justice also mistook the Social Security Administration as his claim's proper recipient. See Response at 9-10.

Gonzagowski submitted his claim seventeen days before the statute of limitations expired, and the Social Security Administration forwarded the claim eighty-five days later. The Court cannot conclude, as a matter of law, that the Social Security Administration forwarded Gonzagowski's claim "forthwith," as the regulations require. 28 C.F.R. § 14.2(b)(1). The Social Security Administration's delay in transferring Gonzagowski's claim does not by itself, however, create constructive notice. See Hart, 116 F.3d at 1341. While Gonzagowski makes much of the

time it took for the Social Security Administration to forward his claim, Gonzagowski offers no reason for his own delayed filing.  See Hart, 116 F.3d at 1341 (noting that constructive notice or equitable tolling may not be proper when "a claimant waits until the eleventh hour to file").  The Court hesitates to afford Gonzagowski equitable tolling when he has not explained the reasons for his filing's timing.  Cf. Smith v. Brownlee, 130 F. App'x 257, 258 (10th Cir. 2005)(unpublished)(affirming a district court's decision not to toll the statute of limitations, because the plaintiff offered no explanation for his late filing).  The Supreme Court has noted that, in suits against the United States, "principles of equitable tolling described above do not extend to what is at best a garden variety claim of excusable neglect."  Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990).  There is no evidence that any late discovery of his claim's nature or extent delayed his filing, because Gonzagowski alleges that his injuries were diagnosed the night of the altercation.  See Complaint ¶ 12, at 3.  While the Department of Justice's mistaken belief that the Social Security Administration is the claim's proper recipient makes Gonzagowski's similar mistake more reasonable, this mistake says nothing about his claim's timeliness.  Similarly, although the Department of Homeland Security does not cite the claim's untimeliness as grounds for its rejection, an agency's administrative answer does not govern the scope of its defenses in subsequent litigation.  See, e.g., 28 C.F.R. § 14.9 (providing that an agency may, but need not, provide reasons when denying an administrative claim).  Although the Social Security Administration took eighty-five days to forward Gonzagowski's claim, it is not realistic to expect that it could have forwarded his claim within seventeen days, before the statute of limitations lapsed.  His claim thus very likely would have been late in any case, regardless of the Social Security Administration's compliance with § 14.2(b)(1).  Further, Gonzagowski offers no excuse

for his inability to determine independently that the Department of Homeland Security is his administrative claim's proper recipient.  Accordingly, because Gonzagowski did not comply with the FTCA's statute of limitations, his claims against the United States are time-barred.

### III.   EVEN IF GONZAGOWSKI IS ENTITLED TO EQUITABLE TOLLING, HE DID NOT COMPLY WITH THE FTCA'S NOTICE REQUIREMENTS, BECAUSE HE DID NOT PROVIDE SUFFICIENT INFORMATION FOR THE UNITED STATES TO ANTICIPATE A NEGLIGENT HIRING, TRAINING, AND SUPERVISION CLAIM.

If Gonzagowski is entitled to equitable tolling, he still must demonstrate that his administrative claim provided the Homeland Security sufficient notice of the claims he would later assert in federal court.  See 28 U.S.C. § 2675(a).  The United States asserts that Gonzagowski's administrative claim does not sufficiently allege negligent hiring, training, and supervision, which Gonzagowski now alleges in the Complaint's Count I.  See Motion at 19-20.  Gonzagowksi counters that the FTCA's "notice requirements should not be interpreted inflexibly," and that his administrative claim is "broad enough that it should have put Defendant on notice that the particular conduct -- hiring, supervising, and/or training -- was a possibility."  Response at 14 (citing Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853).  The Court concludes that Gonzagowski did not give sufficient notice of his negligent hiring, training, and supervision claim against the United States, and so the FTCA bars the Complaint's Count I.

The FTCA provides that a plaintiff may not sue the United States in federal court "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency[.]" 28 U.S.C. § 2675(a).  The FTCA's exhaustion requirement is "'jurisdictional and cannot be waived.'"  Morrison v. Kache, 576 F. App'x at 717 (quoting Bradley v. U.S. ex rel. Veterans Admin., 951 F.2d at 270).  "[A] claim should give notice

of the underlying facts and circumstances 'rather than the exact grounds upon which plaintiff seeks to hold the government liable.'" Staggs v. United States ex rel. Dep't of Health & Human Servs., 425 F.3d at 884 (quoting Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853). Although "the FTCA's notice requirements should not be interpreted inflexibly," Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853, an administrative claim must fairly apprise the United States of the grounds for its potential liability so that it may properly investigate and adjudicate the claim. Cf. Kikumura v. Osagie, 461 F.3d 1269, 1302 (10th Cir. 2006)(finding, in a situation similar to the allegations here, where an inmate filed a notice of claim alleging an employee's direct liability, the claim "fail[ed] to mention the possibility that his injuries were caused by the inadequate training and supervision," and so it did not exhaust the plaintiff's administrative remedies). The Tenth Circuit has cited approvingly the United States Court of Appeals for the First Circuit's statement that, "as long as the language of an administrative claim serves due notice that the agency should investigate the possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement."[49] Dynamic Image Techs., Inc. v. United States, 221 F.3d at 40. See Estate of

---

[49]The United States contends that the Court has described the FTCA's notice requirements as "'extensive,'" Motion at 19 (quoting Warren v. United States, 244 F. Supp. 3d 1173, 1215 (D.N.M. 2017)(Browning, J.)), but the United States takes the Court's language out of context. In Warren v. United States, the Court noted that, in FTCA cases alleging medical malpractice, "[s]ome courts have required the claimant to provide extensive information about the injuries alleged in the complaint." Warren v. United States, 244 F. Supp. 3d at 1215 (discussing cases in which courts take a "restrictive" view of the FTCA's notice requirements). The Court later noted, however, that "[o]ther courts have been more generous," including the Court. 244 F. Supp. 3d at 1216 (citing Coffey v. United States, 906 F. Supp. 2d 1114 (D.N.M. 2012)(Browning, J.)). The Court has therefore not concluded, as a matter of law, that the FTCA's notice requirements are extensive, but rather that they vary pragmatically according to each case's facts. Cf. Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852 (noting that the test for whether a plaintiff has exhausted his or her administrative remedies is "an eminently pragmatic one").

Trentadue ex rel. Aguilar v. United States, 397 F.3d at 852.  Whether a plaintiff's administrative

claim is sufficient to meet § 2675(a)'s notice requirement is a question of law.  See Staggs v.

United States ex rel. Dep't of Health & Human Servs., 425 F.3d at 884.

In Estate of Trentadue ex rel. Aguilar v. United States, the plaintiff-estate's administrative

claim generally related to the allegation that prison officials murdered the decedent, Trentadue,

and covered up their involvement in his death.  See 397 F.3d at 852-53.  In the plaintiff's

administrative claim for negligent infliction of emotional distress, the plaintiffs stated that federal

prison officials,

> "[i]n the course of attempting to conceal the manner of [Trentadue's] death,
> engage[d] in extreme acts of misconduct including, but not limited to the mutilation
> of . . . Trentadue's body, asserting that the injuries and trauma inflicted upon . . .
> Trentadue's body had been done by his family following death, and stating that . . .
> Trentadue had killed himself because he had AIDS. . . .  These and other acts by
> [prison officials] were so extreme as to exceed all bounds of what is tolerated in a
> civilized community."

Br. for Appellants, Estate of Trentadue ex rel. Aguilar v. United States, 2002 WL 32870605, at *22

(quoting the Plaintiff's Administrative Claim).  The plaintiff's administrative claim was thus

"based on the belief that prison guards had murdered Trentadue, and included a claim for damages

for intentional infliction of emotional distress based on prison officials' attempt to conceal the

manner of his death."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 851.  The

plaintiff later filed a lawsuit against the United States alleging that the United States

> "engaged in extreme acts of misconduct such as, but not limited to concealing the
> manner and circumstances of Kenneth Michael Trentadue's death, the mutilation
> of Kenneth Michael Trentadue's body, falsely asserting that Kenneth Michael
> Trentadue had committed suicide, saying that the injuries and trauma upon Kenneth
> Michael Trentadue's body [were] self-inflicted or implying that those injuries had
> been done by his family following death, stating that Kenneth Michael Trentadue
> had killed himself because he had AIDS, and other illegal and wrongful acts."

Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 851 (quoting the plaintiff's complaint).  The United States contended that the plaintiff did not exhaust its administrative remedies, because its administrative claim asserted that prison officials murdered Trentadue, while its lawsuit focused on "the government's treatment of the Trentadue family in the aftermath of his death and its actions in conducting an autopsy after claiming that no autopsy would be performed without prior approval." 397 F.3d at 852.  The Tenth Circuit disagreed with the United States and concluded that the plaintiff's "administrative claim specifically included a claim for intentional infliction of emotional distress and was based on the same underlying conduct that supported their amended complaint." 397 F.3d at 853.

The Tenth Circuit in Estate of Trentadue ex rel. Aguilar v. United States distinguished a United States Court of Appeals for the First Circuit case in which the plaintiff, a mail vendor, attended a United States Postal Service trade show at which a federal employee forcibly removed the plaintiff and later told his customers that he was not authorized to conduct certain business with the United States, which eroded his customer base.  See Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853 (citing Dynamic Image Techs., Inc. v. United States, 221 F.3d at 36).  The plaintiff later "filed an administrative claim for damages with the United States Postal Service following his forcible removal from a postal service trade show." Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853 (citing Dynamic Image Techs., Inc. v. United States, 221 F.3d at 36).  In his prolix administrative claim, the plaintiff alleged "negligent misrepresentation, libel, slander, intentional interference with contractual relations, and discrimination under 42 U.S.C. § 1983." Dynamic Image Techs., Inc. v. United States, 221 F.3d at 36.  The plaintiff later sued under the FTCA for false arrest, intentional infliction of emotional

distress, and negligent supervision, focusing his claims primarily on his forcible removal from the trade show. See Dynamic Image Techs., Inc. v. United States, 221 F.3d at 37. "Because those causes of action were based on an incident not mentioned in plaintiff's administrative claim, the First Circuit held that the agency was not put on notice that it should investigate the potentially tortious conduct, and dismissed the complaint for lack of subject matter jurisdiction." Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853 (citing Dynamic Image Techs., Inc. v. United States, 221 F.3d at 40-41).[50]

This case is more like Dynamic Image Technologies, Inc. v. United States. Gonzagowski's administrative claim provides that he

> intends to make claims stemming from an incident which occurred on or about August 23, 2016, at the main Albuquerque office of the Social Security Administration . . . . He is claiming negligence and a violation of his civil rights on the part of the Social Security Administration as a result of the assault and battery of at least four (4) security agents beating him up. He was placed in hand cuffs and underwent a blood test. This resulted in a torn rotator cuff and he has now been advised that he needs a neck fusion.

---

[50]Also relevant in these cases was the administrative notice's length and specificity. The administrative claim in Dynamic Image Technologies v. United States was prolix, and so a legally trained reader would fairly assume that the administrative claim encompassed all possible theories of liability. See 221 F.3d at 37, 40-41 ("Though prolix, that claim did not contain so much as a hint about the alleged false arrest or the incident that spawned it."). Conversely, in Estate of Trentadue ex rel. Aguilar v. United States, the administrative claim's brevity, coupled with broad language, would cue a legally trained reader to investigate more broadly the alleged tortfeasor's conduct. See 397 F.3d at 852. Accordingly, a concise but broad administrative claim may provide the plaintiff with more legal theories from which to choose in drafting a complaint, whereas a lengthy but specific administrative claim may constrict the subsequent complaint. Cf. Staggs v. United States ex rel. Dep't of Health and Human Servs., 425 F.3d at 885 (concluding that the plaintiff's failure to mention "consent" was notable, based upon "the length and factual specificity of Staggs' description of her claim"); Coffey v. United States, 906 F. Supp. 2d at 1153-54 ("Moreover, the lengthy and factually specific administrative claim found insufficient in Staggs v. United States ex rel. Dep't of Health and Human Servs. failed to mention 'consent,' which was part of the negligence theory in that federal case, and the prolix claim in Dynamic Image Techs., Inc. v. United States did not mention the incident underlying the allegations in the federal case.").

Gonzagowski SF-95 Form at 1.  He did not file a supplemental claim.  The United States contends that Gonzagowski's administrative claim does not put the United States on notice that he would pursue a claim for negligent hiring, training, and supervision.  <u>See</u> Motion at 19.  The Court agrees with the United States.  Gonzagowski's newly proposed claim is based on events separate from those he sets out in his administrative claim.  A plaintiff may not expand FTCA litigation beyond claims fairly alleged in his or her administrative claim.  <u>Cf.</u> <u>Deloria v. Veterans Admin.</u>, 927 F.2d 1009, 1012 (7th Cir. 1991)(concluding that a plaintiff could not expand his administrative claim alleging conspiracy to deprive him of VA benefits by manipulating medical records to include claims of medical malpractice and negligent hiring).  Gonzagowski's administrative claim alleges assault, and makes no allegation pertaining to the United States' negligent hiring, supervision, and training of the security officers involved in the assault.  <u>See</u> <u>Doe v. United States</u>, 618 F. Supp. 71 (D.S.C. 1985)(Hamilton, J.)(holding that an administrative claim alleging sexual assault and battery did not provide not sufficient notice of medical malpractice allegation); <u>Johnson by Johnson v. United States</u>, 594 F. Supp. 728 (E.D.N.Y. 1984)(Nickerson, J.)(holding that an administrative claim alleging of sexual assault did not give sufficient notice that the plaintiff would pursue a negligent supervision claim).  In <u>De Baca v. United States</u>, the Court concluded that the plaintiffs did not exhaust their administrative claims, because their administrative notice asserted negligent hiring, training, and supervision claims, while their complaint alleged that the United States was more directly involved and at fault in the forest fire that gave rise to the complaint.  <u>See</u> 399 F. Supp. 3d at 1229-30.

Here, Gonzagowski's terse administrative claim -- 110 words, thirteen of which describe the Social Security Administration office's address -- did not alert the United States that it should

investigate its hiring, training, and supervision of the Diamond Group, but rather that the Diamond Group may have committed intentional torts against Gonzagowski.  Cf. Kikumura v. Osagie, 461 F.3d at 1302 (concluding that, where an inmate filed a notice of claim alleging an employee's direct liability, the claim "fail[ed] to mention the possibility that his injuries were caused by the inadequate training and supervision" so did not exhaust the plaintiff's administrative remedies). Unlike the notice at issue in Estate of Trentadue ex rel. Aguilar v. United States, Gonzagowski's administrative claim is both brief and specific -- it focuses only on an alleged assault and battery, and nowhere does it point a legally trained reader to investigate the United States' hiring, training, and supervision of the Diamond Group's security guards.  His administrative claim thus is not "based on the same underlying conduct that support[s his] amended complaint."  Estate of Trentadue ex rel. Aguilar v. United States, 397 F.3d at 853.  It does not provide the kind of broad language on which courts have relied in concluding that an administrative claim has provided sufficient notice, but rather articulates a specific, discrete theory of liability: assault and battery. Cf. Dynamic Image Techs., Inc. v. United States, 221 F.3d at 40 (concluding that an administrative claim was deficient, because it "did not contain so much as a hint about the" legal theories asserted in the subsequent complaint).  Because Gonzagowski did not exhaust his administrative remedies as to his negligent hiring, training, and supervision claim against the United States, the Court lacks subject-matter jurisdiction over the Complaint's Count I.

## IV.   GONZAGOWSKI DOES NOT SHOW A GENUINE ISSUE OF MATERIAL FACT WHETHER THE DIAMOND GROUP AND ITS SECURITY OFFICERS ARE INDEPENDENT CONTRACTORS.

Although the Court concludes that Gonzagowski has not satisfied the FTCA's administrative requirements, the Court examines whether Gonzagowski's claims fit within the

FTCA's limited immunity waiver.  As the Court discusses above, the Court evaluates under rule 56 the United States' argument regarding the FTCA's independent contractor exception.  The United States asserts that it cannot be liable for the Diamond Group's actions, because the Diamond Group is an independent contractor.  See Motion at 10.  The United States relies heavily on the Contract, while Gonzagowski asserts that the Oglesby Depo. demonstrates that the Federal Protective Service in fact controlled the Diamond Group's day-to-day actions at the Social Security Administration's Albuquerque office, and so the Diamond Group's security officers who detained Gonzagowski were federal employees.  See Response at 12.  The Court applies the Lilly test to determine whether the Diamond Group and its security officers were federal employees.  That test directs that the Court focus on:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Curry v. United States, 97 F.3d at 414 (citing Lilly, 876 F.2d at 859).  The Court concludes that the Federal Protective service supervised the Diamond Group's general performance, but did not control its day-to-day activities, and that the parties intended the Diamond Group to operate as independent contractors.  In this regard, the Contract contemplates clearly an independent contractor relationship, and the Oglesby Depo. does not show a genuine dispute that the Federal Protective Service's practices rendered the Diamond Group's security officers federal employees.  Accordingly, the Court concludes that Gonzagowski has not created a genuine dispute regarding the Diamond Group's independent contractor status.

A. **THE CONTRACT DEMONSTRATES AN INTENT TO FORM AN INDEPENDENT CONTRACTOR RELATIONSHIP, AND THE FEDERAL PROTECTIVE SERVICE DOES NOT CONTROL THE DIAMOND GROUP'S DAY-TO-DAY PERFORMANCE.**

A United States agency can exercise detailed direction over a contractor's end results before the supervision amounts to an employer-employee relationship; as long as the United States does not direct the contractor's daily work, an independent contractor relationship exists.  See Curry v. United States, 97 F.3d at 413-15.  In Curry v. United States, Joe Cordova, United States Forestry Service contract supervisor, had oversight responsibilities including making payments to the purported contractor, "issuing orders to suspend or resume work, and maintaining a daily diary." 97 F.3d at 413.  In the diary, the contract supervisor recorded the work done, the payments made, and any problems encountered, and, in one entry, he "described in the diary several instances when he told [the purported contractor] that a certain portion of the []work would not be approved until the area was cleaned properly."  97 F.3d at 413.  A Forestry Service inspector frequently visited the purported contractor's work site and "gave specific orders such as to remove certain debris or to go back and finish cleaning certain areas, making sure that [the purported contractor] complied with the contract's specifications."  97 F.3d at 413. The Tenth Circuit described that, although Forestry Service officials "had some general supervisory authority to make sure that [the purported contractor's] performance conformed with the contract specifications, they did not otherwise tell [the purported contractor] how or when to do his work. They did not tell [him] whom to hire or how to operate his equipment." 97 F.3d at 413.  Further, although the purported contractor thought of the Forestry Service official as his "boss," because the official had the power to terminate the contract, the contractor did not consider himself a federal employee.  97 F.3d at 413.  The Tenth Circuit affirmed the district court's conclusion that an independent contract relationship existed.

See 97 F.3d at 415.  "The [Forestry Service] monitored his activities to the extent necessary to ensure that the desired results were achieved, but it otherwise gave [the contractor] discretion in choosing how to perform the contract."  97 F.3d at 415.  The Tenth Circuit emphasized: "The USFS exercised considerable control over [the contractor] to the extent that the contract was very detailed and specific, but it did not supervise [the contractor's] day-to-day operations in a way that made him an employee."  97 F.3d at 415.

At the other end of the independent contractor case spectrum, in Patterson & Wilder Construction Co. v. United States, 226 F.3d 1269 (11th Cir. 2000), the United States Court of Appeals for the Eleventh Circuit affirmed the denial summary judgment and deemed a contractor a federal employee where the United States directed each step in the day of the contractor's employees:

> The Government (1) directed the pilots to fly in sequence to a specified location in St. Petersburg, then to and from a specified location in Ft. Lauderdale, then to a specified location in Panama, and only at that point to Colombia; (2) selected the exact location in Colombia where the deal was to occur, provided the pilots with the coordinates of that location, and instructed them to fly to that location; (3) made the arrangements for a particular drug dealer (Armando) to be at that location at a prescribed time; (4) determined the times at which the pilots were to leave from Florida for Panama and then from Panama to Colombia; (5) provided a radio frequency for the pilots to contact Armando, and instructed the pilots to use that frequency, and installed a transponder on the plane so its movements could be tracked and so that it could be identified as part of a U.S. Government operation; (6) instructed the pilots to attend meetings with its agents; (7) instructed the pilots to modify the aircraft's interior while the aircraft was on the ground at the American base in Panama; (8) participated in preparing the flight plan for the Panama-Colombia leg; (9) at least nominally supervised the personal activities of the pilots as they spent the night at crew lodgings in Panama before flying to Colombia; and (10) clearly instructed the pilots as to what they were expected to do when they arrived in Colombia (meet Armando, load the contraband and return to Panama).

> The record may fairly be read to show the Government decided, and instructed the pilots on, virtually every important aspect of the aircraft's intended use. This was clearly not an operation where the pilots were given an objective and

left to achieve that objective however they saw fit -- the Government actively
supervised and dictated many if not most of the significant day-to-day activities
of the mission up to the point when events went awry on the ground.  Moreover, the
Government not only dictated the pilots' activities, but arranged what would occur
on the ground in Colombia, thereby controlling both ends of the mission.  Presented
with this kind of evidence of the Government's involvement in the major as well
as minor details of how the mission went down, a reasonable factfinder could well
conclude that the Government exercised enough control over the pilots' day-to-day
activities to make the pilots employees.

Patterson & Wilder Constr. Co. v. United States, 226 F.3d at 1274-78.  See Duplan v. Harper, 188

F.3d at 1201-02 (reversing a district court's conclusion that a doctor was a federal employee where

the government required the doctor to meet minimum qualifications, reviewed his performance,

and required him to follow the clinic's regulations and dress code); Bird v. United States, 949 F.2d

1079, 1086 (10th Cir. 1991)(classifying as an employee a nurse who was "under [the employee

physicians'] actual control to the extent they chose to exercise it"; "was required to work with

patients designated by others"; "maintained no separate office"; "could see patients in no other

place nor under any other circumstance than as directed by government employees"; and "was

under the control and supervision of the government surgeon at the hospital to the same extent that

. . . a regular employee of the government[] was").

     This case's facts resemble most closely the situation in Curry v. United States.  The

Diamond Group chose whom to hire, paid their applicable social security taxes, and provided their

equipment and direct supervision.  See Contract ¶ 1.1.2, at 20.  The Diamond Group is responsible

for "all management, supervision, manpower, training, equipment, supplies, licenses, permits,

certificates, insurance, pre-employment screenings, reports, filed and any other resource necessary

to accomplish PSO services[.]"  Contract ¶ 1.1.2, at 20.  Cf. Curry v. United States, 97 F.3d 414

(stating that the contractor "had several employees, and he was fully in charge of hiring and firing them, paying their salaries, and paying the necessary taxes").

### 1. The Contract Evidences an Intent to Form an Independent Contractor Relationship.

In resolving the first Lilly factor regarding the parties' intent, the Tenth Circuit has weighed heavily contractual provisions identifying the contractor as an employee or as an independent contractor. See, e.g., Bethel v. United States, 456 F. App'x at 778-79 ("The express language of the contract identifying [University of Colorado School of Medicine] as an independent contractor coupled with the lack of evidence manifesting an intent to create an employee relationship tip the second factor in favor of independent contractor status."); Tsosie v. United States, 452 F.3d at 1164 (considering a contract's express provision that an entity is an independent contractor); Duplan v. Harper, 188 F.3d at 1200 (considering relevant evidence of an independent contractor relationship that the contract identified the physician in question as an independent contractor); Norton v. Murphy, 661 F.2d 882, 884-85 (10th Cir. 1981)(emphasizing that the contracts in question referred to the mail carrier at issue as a contractor and not an employee); Begay v. United States, 188 F. Supp. 3d at 1082-83 (considering an independent contractor provision evidence of an independent contractor relationship). As a preliminary matter, the Court notes that, contrary to Gonzagowski's argument, a contract's degree of specificity does not correlate positively with the likelihood of an employer-employee relationship. As the Tenth Circuit has noted, a long and detailed contract renders it unlikely that a master-servant relationship exists: "Indeed, the very length and detail of the contract entered into by the United States and Murphy suggests, to us, an independent contractor relationship between the parties." Norton v. Murphy, 661 F.2d at 884.

Regarding the United States' and the Diamond Group's intents, the Contract evidences that the Federal Protective Service and the Diamond Group did not intend the Federal Protective Service to supervise the Diamond Group's day-to-day work.  An intent to create an independent contractor relationship is unmistakable.  The Contract provides that the Diamond Group "shall provide all management, supervision, personnel, equipment, and supplies, schedule, training, licenses, and permits" subject to narrowly defined exceptions.  Contract at 1.  See Duplan v. Harper, 188 F.3d at 1200 (considering as factors pointing to an independent contractor relationship that the contract gave the entity in question "the responsibility of selection, assignment, reassignment, transfer, supervision, management, and control of contract doctors," and of designating a doctor to act with "direct supervisory authority").  The Contract refers to the Diamond Group as "Contractor" and never characterizes the Diamond Group's security officers as employees.  E.g., Contract ¶ 01, at 13.  Accordingly, the first Lilly factor supports an independent contract relationship.

### 2.     The Federal Protective Service Does Not Control the Diamond Group's Day-to-Day Performance.

Similarly, the second Lilly factor -- whether the United States controls the Diamond Group's end result rather than its day-to-day performance -- does not support an employer-employee relationship.  The Contract provides that the Diamond Group "shall provide for all day-to-day supervision, inspection and monitoring of all work performed to ensure compliance with the contract requirements," but it grants the Federal Protective Service the right to inspect the Diamond Group's performance and order it to cure performance and equipment defects.  Contract ¶ 06, at 15.  It provides that the Department of Homeland Security's contract administrator "has the overall responsibility for the administration of the contract" and "alone is authorized to take

action on behalf of the Government to amend, modify or deviate from the contract's terms and

conditions; make final decisions on unsatisfactory performance; terminate the contract or task

order for convenience or cause; and issue final decisions regarding questions or matters under

dispute."   Contract ¶ 10(A)(3), at 16.   This authority does not create an employer-employee

relationship.   See Logue v. United States, 412 U.S. at 529-30.   In Logue v. United States, the

Supreme Court considered persuasive toward finding an independent contractor relationship

evidence that

> [t]he county undertakes to provide custody in accordance with the Bureau of
> Prisons' 'rules and regulations governing the care and custody of persons
> committed' under the contract.   These rules in turn specify standards of treatment
> for federal prisoners, including methods of discipline, rules for communicating with
> attorneys, visitation privileges, mail, medical services, and employment.   But the
> agreement gives the United States no authority to physically supervise the conduct
> of the jail's employees; it reserves to the United States only "the right to enter the
> institution . . . at reasonable hours for the purpose of inspecting the same and
> determining the conditions under which federal offenders are housed."

Logue v. United States, 412 U.S. at 529-30 (providing no citations to quotations).   The Tenth

Circuit has likewise stated:

> For example, under the contract, the contracting officer for the [United States] Air
> Force had the authority to stop all or part of the work to correct any conditions that
> posed a risk to the public or to government personnel. . . .   However,
>
>> [t]he fact that the contract may have reserved to the United
>> States the right to inspect the work and facilities of the independent
>> contractor, and the right to stop the work, does not in itself override
>> or alter the general rule of non-liability for the torts of the contractor
>> because no duty is created to employees or third parties.   This
>> includes the reservation to inspect for the adherence to contract
>> safety provisions.

McDaniel v. United States, 53 F. App'x at 11-12.   Cf. Tsosie v. United States, 452 F.3d at 1164

(deeming an independent contractor relationship to exist where a contract directed the entity in

question "to provide professional medical services in both inpatient and outpatient settings, including emergency room physicians on an 'as needed' basis.  Another Contract provision required that patient care services were to be appropriate and timely in accordance with the standards of care established by recognized medical care organizations."); Begay v. United States, 188 F. Supp. 3d at 1083 (noting that a provision for control over the quality of work does not necessarily convert a relationship into an employer-employee relationship).

The Diamond Group is responsible for all "inspection and monitoring of all work performed to ensure compliance with the contract requirements."  Contract ¶ 06, at 15.  It must document "the results of all inspections conducted" and submit these reports to the Federal Protective Service.  Contract ¶ 06, at 15.  If the Federal Protective Service's technical representative orders the Diamond Group to conduct work beyond the Contract's scope, the Diamond Group must immediately notify the contract administrator, who "will then make a determination as to the issue and respond to all affected parties in the most appropriate manner deemed necessary."  Contract ¶ 10B.4, at 17.  That the Federal Protective Service has contract oversight and a right to inspect the Diamond Group's work does not suggest that the Federal Protective Service controlled the Diamond Group's day-to-day performance.  Further, that the Diamond Group was responsive to the Federal Protective Service's instructions and demands, such that Oglesby believed he had two "boss[es]," Oglesby Depo. at 147:16, does not render the Diamond Group's security officers federal employees, cf. Curry v. United States, 97 F.3d at 413 (although the United States had the power to cancel the contractor's contract, and so the contractor viewed the United States' representative as his boss, the representative did not control the contractor's daily activities or manner of work, and so the contractor was not an employee).

The Diamond Group also conducts nearly all of the training for its security officers.  The Contract sets the training requirements, but the Diamond Group must administer the training.  <u>See</u>, <u>e.g.</u>, Contract ¶ 6.6.2.1, at 24 (providing firearms training requirements).  It is responsible for the security officers' basic, general, and "refresher" training, while the United States administers the "Orientation Training" and a written examination for all new security officers that the Diamond Group hires.  Contract ¶ 6.6.6, at 25.  <u>See id.</u> ¶¶ 6.4.1, 6.4.2, at 22.  The Diamond Group also is responsible for providing and administering firearms and less-than-lethal force training.  <u>See</u> Contract ¶ 6.4.1, at 22.  The Diamond Group "is responsible for providing . . . a minimum of 32 hours of firearms training prior to initial qualification."  Contract ¶ 6.6.2.1, at 24.  The Diamond Group is responsible for equipping and managing the firearms training.  <u>See</u> Contract ¶ 6.6.3.3, at 24.  It must "provide weapons, ammunitions, and any other range equipment such as barricades, hearing and eye protections, etc., required for training qualifications," although a Federal Protective Service official must be present at each firearms qualifications test.  Contract ¶ 6.6.1.5, at 23.  The Diamond Group is "responsible for licenses and permits required for weapons during transit between dispatch point and [the firearms] range."  Contract ¶ 6.6.1.7, at 23.  The United States is not responsible for "compensating" the Diamond Group "for any additional expenses or costs incurred . . . to maintain [the officers'] semi-annual weapons qualifications."  Contract ¶ 6.6.5.5, at 24.  Finally, the Diamond Group must ensure that all security officers are certified in "First Aid, Cardiopulmonary Resuscitation (CPR), and Automated External Defibrillator (AED) Training," and must fund such training and certification.  Contract ¶ 6.8, at 26.

On the other side of the ledger, the United States administers the required initial qualification examination and sets the examination's passing score.  <u>See</u> Contract ¶ 6.5.1.2, at 23.

All Diamond Group security officers also must receive "Orientation Training" from the Federal Protective Service "before standing post."  Contract ¶ 6.7.2.1, at 25.  The United States administers training for X-rays, magnetometers, and other weapons detection equipment.  See Contract ¶ 6.7.3, at 25.  Gonzagowski asserts that, because the United States sets the training and certification requirements, it exercises sufficient control over the Diamond Group to create an issue of material fact regarding the Diamond Group's independent contractor status.  See Response at 12-14.  That the United States sets training requirements, however, does not mean that it controls the Diamond Group's daily activities.  Cf. United States v. Orleans, 425 U.S. at 816 (observing that the United States may set "specific and precise conditions to implement federal objectives" without rendering a purported contractor a federal employee).  The United States sets out, before the fact, all training that security officers must receive, but the Diamond Group is responsible for supervising and administering nearly all of that training.  Of the fourteen required courses and certifications, the United States provides five trainings, three of which are "One Time Only," while the remaining two trainings are annual.  Contract Exh. 4, "Required Training," at 36.  Accordingly, the Diamond Group is responsible for the vast majority of its security officers' training, which further suggests an independent contractor relationship.

Gonzagowski's main argument is that the United States controls whom the Diamond Group hires, disciplines, and terminates.  See Response at 13.  He contends that, because the Contract sets hiring qualifications and requires each candidate to complete successfully a federal background check, the United States controls the Diamond Group's hiring.  See Response at 13-14.  He also cites the Diamond Group's responsiveness to the United States' demands regarding disciplinary matters.  See Response at 14.

Oglesby testified that, before he was hired, he completed a federal security clearance form, and that the United States determines the information that he had to disclose.  See Oglesby Depo. at 45:20-46:1; id. at 86:11-19; id. at 87:9-15.  That the United States sets minimum qualifications and conduct standards for its contractors, however, does not belie an independent contractor relationship absent control over the contractors' day-to-day activities.  See, e.g., Brooks v. A.R. & S. Enterprises, Inc., 622 F.2d 8, 11 (1st Cir. 1980)("The Navy had a legitimate interest in assuring the safety of the base and the suitability of AR & S personnel for guard duty, but the government's authority under the safety program to screen applicants and to discharge guards who threatened military security did not constitute control within the meaning of the FTCA.").  Further, although the United States set minimum hiring and disciplinary criteria, the Diamond Group was responsible for determining whom it hired within those criteria.  See Contract ¶ 1.1.2, at 20 ("Contractor shall provide and maintain all management, supervision, [and] manpower[.]").  Although the Contract reserves to the Federal Protective Service the right to supervise the Contract's performance, see Contract ¶ 09, at 15, nowhere in the Contract does the Federal Protective Service hold the right to dictate whom the Diamond Group hires.  In other words, the Contract sets minimum qualifications, but the Diamond Group determines which eligible applicants it will hire.

Nor does the Contract allow the Federal Protective Service the right to supervise the Diamond Group's day-to-day activities.  Gonzagowski points to the SMART Book and Oglesby's testimony that he had "more than one boss," because the Federal Protective Service was the ultimate arbiter for hiring and disciplinary matters.  Response at 13 (citing Oglesby Depo. at 147:21).  The Contract provides that the United States "reserves right and prerogative to deny

and/or restrict facility and information access or to direct removal from contract of any employee whom" it deems: (i) "presents a risk of compromising sensitive Government information"; (ii) "[e]ngages in serious misconduct, to include, but not limited to dishonest and untrustworthy behavior"; (iii) "[s]olicits or receives gifts based upon position"; (iv) "Engages in personal use of government property"; (v) "[e]ngages in political or private fundraising while on duty"; (vi) "[p]romotes or endorses [a] political candidate or agenda while on duty." Contract ¶ 10.1, at 29. That the United States reserved the right to revoke access or direct removal of unfit security officers does not render those security officers federal employees. Cf. United States v. Page, 350 F.2d 28, 30 (10th Cir. 1965)("The fact that the contract may have reserved to the United States the right to inspect the work and facilities of the independent contractor . . . and the right to stop the work, does not in itself override or alter the general rule of nonliability for the torts of the contractor[.]"). Further, Oglesby's belief that the Federal Protective Service was also his "boss" does not, by itself, mean that Gonzagowski creates an issue of material fact regarding the Federal Protective Service's daily control. Cf. Curry v. United States, 97 F.3d at 413-15 (concluding that, although a contractor viewed a federal official as his boss, the federal official did not control the contractor's day-to-day activities). See Macharia v. United States, 238 F. Supp. 2d 13, 27 (D.D.C. 2002)(Kollar-Kotelly, J.)("Broad supervisory control, even on a daily basis, does not suffice to demonstrate control over the physical performance of the contractor."). Accordingly, the Federal Protective Service does not control the Diamond Group's day-to-day activities, but rather supervises its overall performance of the Contract.

**B.     THE REMAINING <u>LILLY</u> FACTORS DEMONSTRATE THAT THE DIAMOND GROUP IS AN INDEPENDENT CONTRACTOR.**

The Court addresses the remaining <u>Lilly</u> factors: "(3) whether the person uses h[is] own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others." <u>Curry v. United States</u>, 97 F.3d at 414 (citing <u>Lilly</u>, 876 F.2d at 859). The facts underlying these factors are largely undisputed. It is undisputed that the Diamond Group provides its own liability insurance, pays its own social security taxes, and has the authority to subcontract with others. <u>See</u> Motion ¶¶ 18, 24, at 5, 6; Response ¶¶ C, E, at 2, 3; Contract § 52.212-4(k), at 12 (providing that the Contract's price "includes all applicable Federal, State, and local taxes and duties"). To the extent that the facts underlying the remaining factors are disputed, the Court concludes that these factors do not counsel an employer-employee relationship.

Gonzagowski and the United States purport to dispute the extent to which the Diamond Group uses its own equipment. <u>See</u> Response at 13-14; Reply at 8. The Court concludes, however, that there is no genuine dispute regarding the extent to which the Diamond Group uses its own equipment. First, Gonzagowski did not dispute the United States' proposed fact that the Diamond Group "is required to provide and maintain all . . . equipment [and] supplies." Motion ¶ 23, at 6. <u>See</u> Response ¶ E, at 3. Second, the record supports that the Diamond Group supplies almost all of the equipment that the security officers use. The Contract provides that the Diamond Group "shall provide all . . . equipment [and] supplies." Contract ¶ 1.1.2, at 20. This includes vehicles, uniforms, communication devices, personal protective equipment, restraints, firearms, and body armor. <u>See</u> Contract ¶¶ 14.1.1, 14.3.1, at 32. The exception to this provision appears to be that

the United States provides X-ray and magnetometers that the security officers use to screen visitors for weapons.  See Contract ¶ 6.7.3, at 25-26.  The Diamond Group's equipment and supplies are factored into the Contract price.  See Contract § 52.212-4(a), at 9.  Cf. Walding v. United States, 955 F. Supp. 2d at 809 (concluding that a contractors' purchasing and supplying of equipment outweighed, for purposes of the independent contractor analysis, the United States' funding of equipment).  Accordingly, the Lilly factor regarding equipment and supplies suggests that the Diamond Group is an independent contractor.

Regarding the remaining factor -- whether federal regulations prohibit federal employees from performing such contracts -- the United States asserts that, under the Contract's terms, "employees of the Federal Protective Service are ineligible to become government contractors and suppliers."  Motion at 15.  As the Court discussed supra notes 15-21, at 10-12, the United States cites the Sienkiewicz Decl. to support this contention, but the Sienkiewicz Decl. does not specifically state that the Federal Protective Service's employees are ineligible to become government contractors or suppliers.  See Sienkiewicz Decl. ¶ 7, at 2 ("[The Diamond Group] and DHS/FPS have separate and distinct work forces.").  Similarly, the Contract does not expressly preclude Federal Protective Service employees from performing the Diamond Group's duties under the Contract.  Accordingly, the United States and the Diamond Group do not present evidence of any federal regulations prohibiting federal employees from performing similar contracts, and the Court, in its independent research, has not found any federal regulations that prohibit federal employees from performing the work.  Accordingly, this factor does not support an independent contractor relationship.

Nonetheless, the other <u>Lilly</u> factors all unambiguously support an independent contractor relationship.  Other courts that have confronted similar facts are in accord.  In <u>Rabieh v. United States</u>, the plaintiff sued the United States for injuries that he sustained during a visit to a federal building in which a private security company was responsible for providing security services.  <u>See</u> 2019 WL 5788673, at *1-2.  The Federal Protective Service conducted background checks for the security company's potential hires, administered a required written examination for all new hires, and supervised the security company's performance of the contract, including conducting periodic inspections.  <u>See</u> 2019 WL 5788673, at *1-2.   The security company "advertise[d] . . . positions and interview[ed] and evaluate[d] candidates," and was responsible for disciplining and terminating its security officers.  2019 WL 5788673, at *2, *8.  The plaintiff also relied on a security officer's statement that he considered a Federal Protective Service officer to be his supervisor.  <u>See</u> 2019 WL 5788673, at *8.  Judge Davila concluded that the Federal Protective Service did not "substantially overs[ee]" the security officers' daily activities, but rather supervised the security company's general performance, and so the security company and its officers were independent contractors.  2019 WL 5788673, at *7.  Although a contract may reserve to the United States substantial, general supervisory authority over a contractor, an employer-employee relationship does not arise where the United States does not exercise control over the contractor's day-to-day activities.  <u>See</u> 2019 WL 5788673, at *8.  <u>Cf.</u> <u>E.D. v. United States</u>, 764 F. App'x 169 (3d Cir. 2019)(unpublished)(concluding that an independent contractor relationship exists where the United States exercises no operational, day-to-day control over a purported contractor);  <u>Reyes Colon v. United States</u>, No. CIV 18-1225 PAD, 2019 WL 165578 (D.P.R. Jan. 10, 2019)(Delgado-Hernandez, J.)(concluding that an independent contractor may be required to comply with

"extensive regulations," guidelines, and inspections without the United States "having the power to supervise the daily operation of the contractor"); Krembel v. United States, No. 16-CT-3018 FL, 2019 WL 1429585 (E.D.N.C. March 29, 2019)(Flanagan, J.)(concluding that a contract that entails the United States supplying financial support, setting general standards, inspecting and approving final work, and providing advice and oversight does not give the United States "day-to-day control" over a contract such that the United States may be liable for the contractor's actions). Accordingly, Gonzagowski does not show a genuine dispute regarding the Diamond Group's independent contractor status, and so the United States is immune from Gonzagowski's claim that it is liable for the Diamond Group's alleged negligence. The Court therefore grants the Motion as to the Complaint's Count II, which asserts a claim against the United States for "Vicarious Liability [and] Respondeat Superior."  Complaint ¶ 20, at 4.

## V. EVEN IF THE DIAMOND GROUP'S SECURITY OFFICERS ARE FEDERAL EMPLOYEES, THE UNITED STATES IS NOT VICARIOUSLY LIABLE FOR THE SECURITY OFFICERS' INTENTIONAL TORTS, BUT THE FTCA'S INTENTIONAL TORT EXCEPTION DOES NOT BAR GONZAGOWSKI'S DIRECT NEGLIGENCE CLAIM AGAINST THE UNITED STATES.

The United States contends that, if the Diamond Group's security officers are federal employees, the United States nonetheless retains its immunity for any claim arising out of the Diamond Group's assault and battery, because the Diamond Group's security officers are not federal law enforcement officers.  See Motion at 21-22.  In his Response, Gonzagowski does not refute or otherwise respond to the United States' intentional tort argument.  See D.N.M.LR-Civ. 7.1(b) ("The failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion.").  Nonetheless, the Court cannot grant a motion to dismiss or a motion for summary judgment based solely on a plaintiff's failure

to respond and must consider the merits of the motion.  See Issa v. Comp USA, 354 F.3d 1174, 1177-78 (10th Cir. 2003).  Accordingly, the Court addresses the United States' argument.  The Court concludes that, even if the Diamond Group's security officers are federal employees, the FTCA's independent torts exception bars any assault and battery claims against the United States, and so the United States has not waived its immunity against the Complaint's Count II.  The Court also concludes, however, that the intentional tort exception does not bar the Complaint's Count I, because Gonzagowski asserts a direct negligence claim against the United States independent of its relationship with the Diamond Group's security officers.  Nonetheless, the Complaint's Count I is barred.  As the Court concludes above, Gonzagowski did not exhaust his administrative remedies regarding the Complaint's Count I, and as the Court discusses below, the FTCA's discretionary function exception bars the Complaint's Count I.

A.     **THE INTENTIONAL TORT EXCEPTION DOES NOT BAR THE COMPLAINT'S COUNT I, BECAUSE GONZAGOWSKI ALLEGES NEGLIGENCE INDEPENDENT OF THE UNITED STATES' RELATIONSHIP WITH THE DIAMOND GROUP.**

The intentional tort exception does not bar the Complaint's Count I, which, liberally construed, alleges that the United States breached its duty as a landowner or possessor.  Neither party expressly addresses this issue, as the United States focuses only on its vicarious liability for the Diamond Group's intentional torts, and Gonzagowski avoids the issue altogether.  The United States reads the Complaint as asserting only: (i) a negligent hiring, training and supervision claim against the United States; and (ii) a claim that the United States is vicariously liable for the Diamond Group's intentional torts.  See Motion at 1.  Construed liberally, however, the Complaint also alleges that the United States breached its duty to "keep the public, including Plaintiff, safe while patronizing its facility."  Complaint ¶ 16, at 4.  The Complaint thus alleges negligence

independent of the United States' role as the Diamond Group's employer or principal.  Because

New Mexico law recognizes a cause of action for this theory, the FTCA does not bar this claim.

See 28 U.S.C. § 2674 ("The United States shall be liable, respecting the provisions of this title

relating to tort claims, in the same manner and to the same extent as a private individual under like

circumstances."); Encinias v. Whitener Law Firm, P.A., 2013-NMSC-045, ¶ 16, 310 P.3d 611, 618

(noting that property owners may be liable for third parties' intentional acts committed on the

premises (citing Reichert v. Atler, 1994-NMSC-056, ¶¶ 1, 3, 875 P.2d 379, 380)).

      A frequently litigated FTCA issue is whether, when a federal employee who is not a law

enforcement officer commits an assault or battery, the plaintiff may raise an FTCA claim based on

negligent hiring, training, or supervision.  In Sheridan v. United States, a Supreme Court plurality

held that such claims may, in some instances, be viable if the United States' liability is premised

on a duty independent of its status as the tortfeasor's employer.  See Sheridan v. United States,

487 U.S. at 403 & n.8.  That case involved an off-duty, drunken servicemember who fired a rifle

into a car on a public road near a naval hospital, injuring the plaintiff.  See 487 U.S. at 395.  Hours

before the incident, three naval corpsmen had found the servicemember in a "drunken stupor" at

the naval hospital and tried to take him to the emergency room.  487 U.S. at 395.  The

servicemember resisted and brandished the rifle, so the corpsmen fled and "neither took further

action to subdue [the servicemember], nor alerted the appropriate authorities that he was heavily

intoxicated and brandishing a weapon."  487 U.S. at 395.  Both the district court and the United

States Court of Appeals for the Fourth Circuit assumed that "the Government would have been

held liable if [the servicemember] had not been a Government employee," but concluded that the

FTCA's intentional tort exception barred the plaintiff's claim.  487 U.S. at 395.  The Supreme

Court reversed.  See 487 U.S. at 401.  Assuming that state law could "furnish a basis for Government liability that is entirely independent of [the servicemember's] employment status," the Supreme Court held that, "the mere fact that [the servicemember] happened to be an off-duty federal employee should not provide a basis for protecting the Government from liability that would attach if [the serviceman] had been an unemployed civilian patient or visitor in the hospital." 487 U.S. at 402.

Most Courts of Appeals have since concluded that, if the intentional tortfeasor was acting within the scope of employment, the FTCA's intentional tort exception bars negligent supervision claims against the United States.  See, e.g., Billingsley v. United States, 251 F.3d 696, 698 (8th Cir. 2001)(per curiam)(collecting cases); Guccione v. United States, 878 F.2d 32 (2d Cir. 1989). If state law affords a duty to the plaintiff independent of the United States' status as the intentional tortfeasor's employer, however, the intentional tort exception will not bar the plaintiff's negligence suit against the United States.  See Franklin v. United States, 992 F.2d 1492, 1499 (10th Cir. 1993); Verran v. United States, 305 F. Supp. 2d 765, 775 (E.D. Mich. 2004)(Rosen, J.)(concluding that Michigan law did not create an independent duty on the United States' part, and so the FTCA's intentional tort exception barred the plaintiff's negligence claim against it which was premised on a federal employee's intentional tort).  Although the Diamond Group's security officers are not law enforcement officers, the intentional tort exception does not bar a negligence claim, if the alleged duty arises independent of the United States' status of the Diamond Group's employer or principal.

Here, New Mexico law imposes a duty on the United States independent of its status as the Diamond Group's principal.  In New Mexico,

the ordinary principles of negligence . . . govern a landowner's conduct as to a licensee and invitee.  A landowner or occupier of premises must act as a reasonable [person] in maintaining his [or her] property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to another, the seriousness of the injury, and the burden of avoiding the risk.

Ford v. Bd. of Cty. Comm'rs, 1994-NMSC-077, ¶ 12, 879 P.2d 766, 771.  This duty extends "to all persons, other than trespassers, who enter property with the defendant's consent, express or implied," Ford v. Bd. of Cty. Comm'rs, 1994-NMSC-077, ¶ 12, 879 P.2d at 771, and "'includes the duty to exercise ordinary care to prevent harmful conduct from a third person, even if the third person's conduct is intentional,'" Rodriguez v. Del Sol Shopping Ctr. Assocs., L.P., 2014-NMSC-014, ¶ 5, 326 P.3d 465, 468 (quoting Reichert v. Atler, 1994-NMSC-056, ¶ 11, 875 P.2d 379, 381).  As the landowner or occupier of the Social Security Administration's Albuquerque office, the United States thus owed Gonzagowski -- who, it is undisputed, was not a trespasser -- a duty of care to minimize the threat of the Diamond Group's harmful conduct.  As this duty exists independent of the United States' relationship to the Diamond Group's security officers, the intentional tort exception does not bar a negligence claim against the United States.  Nonetheless, as the Court discusses below in Section VI, the United States is immune to the Complaint's Count I under the FTCA's discretionary function exception.  See, e.g., Campos v. United States, 888 F.3d 724, 737 (5th Cir. 2018), cert. denied sub nom. Chaidez Campos v. United States, 139 S. Ct. 1317 (2019)("[B]oth the [law enforcement] proviso and the discretionary function exception must be read together. . . .  In other words, one does not moot the other when both cover a fact pattern." (citing Sutton v. United States, 819 F.2d 1289, 1295, 1297 (5th Cir. 1987))).

**B.** **THE FTCA'S INTENTIONAL TORT EXCEPTION BARS THE COMPLAINT'S COUNT II, BECAUSE THE DIAMOND GROUP'S SECURITY OFFICERS ARE NOT FEDERAL LAW ENFORCEMENT OFFICERS.**

The FTCA's immunity waiver does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" 28 U.S.C. § 2680(h).  In Naisbitt v. United States, 611 F.2d 1350 (10th Cir. 1980), the Tenth Circuit relied on § 2680(h)'s language in stating: "[T]he government has waived liability only in negligence cases and has retained its immunity in intentional tort cases."  611 F.2d at 1355.  A plaintiff cannot skirt this immunity by couching in negligence a claim for an intentional tort.  See Wine v. United States, 705 F.2d 366, 367 (10th Cir. 1983); Merkel v. United States, No. CIV 03-1312 JB/WDS, 2004 WL 7337689, at *3 (D.N.M. July 31, 2004)(Browning, J.).  The substance of the Complaint's Count II seeks to hold the United States vicariously liable for the Diamond Group's assault and battery of Gonzagowski.  See Complaint ¶¶ 21-24, at 4-5.  The Court concludes that, even if the Diamond Group's security officers are federal employees, the FTCA's intentional tort exception bars the Complaint's Count II, because the Diamond Group's security officers are not federal law enforcement officers.

In 1974, Congress created an exception to § 2680(h) by allowing suits for claims that arise out of law enforcement officers' intentional torts.  See Act of March 16, 1974, Pub. L. 93-253, § 2, 88 Stat. 50.  This law enforcement exception allows claims for six enumerated intentional torts that are based on the "acts or omissions of investigative or law enforcement officers."  28 U.S.C. § 2680(h).  The proviso defines "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests

for violations of Federal law."  28 U.S.C. § 2680(h).  The Supreme Court has held that "the waiver effected by the law enforcement proviso extends to acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest" when they commit the intentional tort.  Millbrook v. United States, 569 U.S. 50, 57 (2013).

Courts typically look to statutes to determine whether an alleged tortfeasor is a federal law enforcement officer.  Courts have generally concluded, for example, that Transportation Safety Administration ("TSA") screeners are not law enforcement officers, because Congress has carefully delineated TSA screeners' duties to exclude tasks typical of federal law enforcement.  Hernandez v. United States, 34 F. Supp. 3d 1168, 1178 (D. Colo. 2014)(Babcock, J.)(citing 49 U.S.C. § 114).  "As several other district courts have concluded, TSA screeners are not 'investigative or law enforcement officer[s]' within the meaning of § 2680(h), because TSA screeners" are not legally empowered to "seize evidence" or "execute searches," and federal law delegates that authority to "law enforcement officer[s] . . . with different job qualifications and responsibilities."  Walcott v. United States, No. CIV 13-3303, 2013 WL 5708044, at *2 (E.D.N.Y. Oct. 18, 2013)(Gleeson, J.).  But see Pellegrino v. United States of Am. Transp. Sec. Admin., Div. of Dep't of Homeland Sec., 937 F.3d 164, 181 (3d Cir. 2019)(en banc)(concluding that TSA screeners are federal law enforcement officers, because they "may physically examine passengers and the property they bring with them to airports").  Similarly, the United States Court of Appeals for the Second Circuit has held that United States Parole Commission officers were not law enforcement officers, because federal law did not empower them to make arrests but rather only

to "recommend that [issuance of] an arrest warrant," and they can perform only consensual searches.  Wilson v. United States, 959 F.2d 12, 15 (2d Cir. 1992).

Where there is no statutory or regulatory framework, courts look to other sources of the individual's authority, like contractual agreement.  In Rabieh v. United States, Judge Davila looked to a contract between the Federal Protective Service and the private security company to determine whether the company's security officers were federal law enforcement officers.  See 2019 WL 5788673, at *6.  The contract permitted the security officers to "carry out administrative inspections and detain people who are disruptive, violent, suspected of committing a crime, or violating regulations while on federally-owned property."  Rabieh v. United States, 2019 WL 5788673, at *6.  Judge Davila concluded that the ability to conduct such inspections and detentions did not amount to the authority to makes searches or arrests for § 2680(h)'s purposes, because one of the security officers testified that, as "only [a] security guard," he believed he had the authority to make arrests.  2019 WL 5788673, at *6 (internal quotation marks omitted).  Further, in the event that the security officers detained anyone, they were instructed to contact the Federal Protective Service or local law enforcement, "who can perform a constitutional, statutorily authorized arrest, if necessary."  2019 WL 5788673, at *6.  Judge Davila concluded that, together, these facts did not render the security officers federal law enforcement, and so the court lacked subject-matter jurisdiction over the plaintiff's assault, battery, and false imprisonment claims.  See 2019 WL 5788673, at *7.

The United States alleges that the Complaint is fatally flawed, because it does not expressly allege that the Diamond Group's security officers are federal law enforcement officers, but the Court looks to the Complaint's substance, and not to its labels and conclusions.  See Garling v.

United States Envtl. Prot. Agency, 849 F.3d 1289, 1298 (10th Cir. 2017).  It is undisputed that no Federal Protective Service employees were involved in the confrontation between Gonzagowski and the Diamond Group's security officers on August 23, 2016.  See Motion ¶ 5, at 3; Response ¶ A, at 2.  The Contract provides that the Diamond Group's security officers serve as the "primary security response" at the Social Security Administration's New Mexico offices and that they "may have to act independently as primary security response until law enforcement assistance arrives." Contract ¶ 9.20, at 28.  The Contract states that the security officers serve as the primary response for any emergency, "civil disturbance or other criminal acts" that happen at the Social Security Administration's New Mexico offices, Contract ¶ 9.18, at 28, but that, in the event of such an occurrence, they must contact the Federal Protective Service's "megacenter," which will then dispatch Federal Protective Service officers or local law enforcement, Oglesby Depo. at 20:20-24.

When the Diamond Group's security officers conduct a detention, they "handcuff people after.  If we get into an altercation . . . we usually handcuff people for their safety and ours." Oglesby Depo. at 21:8-10.  Oglesby testified that the security officers may "handcuff people . . . regardless [if] there is going to be, you know, a charge" and that "[s]ometimes it's just to question them[, s]ometimes it doesn't mean they are under arrest; you can detain somebody without them being under arrest."  Oblesby Depo. at 21:14-18.  Sienkiewicz testified that the security officers' "authority to detain is based on their state's citizen's arrest authority or state-certified special police status."  Sienkiewicz Decl. ¶ 19, at 4.  New Mexico does not have a citizen's arrest statute, but its caselaw provides that "[a]ny person . . . may arrest another upon good-faith, reasonable grounds that a felony had been or was being committed, or a breach of the peace was being committed in the person's presence."  State v. Arroyos, 2005-NMCA-086, ¶ 5, 115 P.3d 232, 234, overruled on

other grounds by State v. Slayton, 2009-NMSC-054, 223 P.3d 337.  See State v. Johnson, 1996-NMSC-075, ¶ 18, 930 P.2d 1148, 1151.  A breach of the peace is "a disturbance of public order by an act of violence, or by any act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community."  State v. Florstedt, 1966-NMSC-208, ¶ 7, 419 P.2d 248, 249.  Last, the Diamond Group's security officers operate an X-ray or magnetometer to screen all visitors for weapons.  See Contract ¶ 6.7.3, at 25.  In the event that these "administrative searches" reveal weapons or other contraband, the security officers must call the Federal Protective Service or local law enforcement, who determine whether an arrest is warranted.  Sienkiewicz Decl. ¶ 19, at 4.

"[O]nce FPS comes in and arrives they . . . take over the case" from the security officers.  Oglesby Depo. at 23:3-5.  Olgesby stated that "[a]fter FPS arrives then we kind of back off and they take over because it's their deal, they're FPS.  They are the federal law enforcement."  Oglesby Depo. at 23:10-12.  When a Federal Protective Service officers arrives after the Diamond Group's security officers have detained someone, the Federal Protective Service officer will "ask for their ID and then they will run them through for warrants to see if they have active warrants."  Oglesby Depo. at 25:16-17.

These facts do not show a genuine dispute whether the Diamond Group's security officers are federal law enforcement officers.  The Diamond Group's security officers are not "officers of the United States."  28 U.S.C. § 2680(h).  The FTCA distinguishes between "officers of the United States," 28 U.S.C. § 2680(h), and "employees," 28 U.S.C. § 2680(b), reserving the law enforcement proviso's application to officers only, see 28 U.S.C. § 2680(h).  At the time of the law enforcement proviso's enactment, an officer was defined as one who "serve[s] in a position of

trust" or "authority," especially as "provided for by law."   Webster's Third New International Dictionary, "Officer" (1971).   See Black's Law Dictionary, "Officer" (4th ed. rev. 1968)("[A]n officer is one holding a position of trust and authority[.]").   The Diamond Group's employees are not officers of the United States, because the United States does not specifically appoint them to positions of trust and authority; instead, the Diamond Group hires, trains, and appoints them.

But more importantly, the Diamond Group's security officers do not occupy the kinds of positions or hold the authority that § 2680(h) contemplates.   The Supreme Court has instructed that the proviso "focuses on the status of persons whose conduct may be actionable, not the types of activities that may give rise to a tort claim against the United States."   Millbrook v. United States, 569 U.S. at 56.   Although Gonzagowski's claims -- assault and battery -- fall within § 2680(h)'s waiver, the Diamond Group's security officers are not federal investigative or law enforcement officers.   The law enforcement proviso is written in the disjunctive -- officials are federal law enforcement officers if they "execute searches, []seize evidence, or [] make arrests for violations of federal law."   28 U.S.C. § 2680(h) (emphasis added).   The Diamond Group's security officers perform none of these functions.   Their authority, derived by contract, is to conduct consensual, administrative searches of visitors to the Social Security Administration's New Mexico offices.   These searches are administrative, because their "primary purpose" is "distinguishable from the general interest in crime control" or "conducting criminal investigations."   City of Los Angeles v. Patel, 576 U.S. 409, 420 (2015)(internal quotation marks omitted).   They are thus similar to TSA agents or parole officers.   See, e.g., Wilson v. United States, 959 F.2d at 15 ("Because the power to seize evidence depends on the consent of the person from whom the evidence is to be taken, however, parole officers lack the seizure power

contemplated by section 2680(h), and thus cannot be considered law enforcement personnel.");

Walcott v. United States, 2013 WL 5708044, at *2; Weinraub v. United States, 927 F. Supp. 2d

258, 262-63 (E.D.N.C. 2012)(Flanagan, J.)("Therefore, it would be unreasonable to interpret 'to

execute searches' to include the TSA screener's performance of narrowly focused, consensual

searches that are administrative in nature, when considered  in light of the other traditional law

enforcement functions (i.e. seizure of evidence and arrest) that Congress chose to define

'investigative or law enforcement officers.'" (quoting 28 U.S.C. § 2680(h)).   The Diamond

Group's security officers are not permitted to seize evidence.  If they discover a prohibited item,

they must contact the Federal Protective Service or local law enforcement, which decides what to

do with the item.  See Sienkiewicz Decl. ¶ 19, at 4.  Finally, the Diamond Group's security officers

do not have the authority to make arrests for violations of federal law.[51]   They may detain

---

[51]Under the law enforcement proviso, investigative or law enforcement officers must have the authority "to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).  When a statute includes "a list of terms or phrases followed by limiting clause," the limiting clause "should ordinarily be read as modifying only the noun or phrase that it immediately follows." Lockhart v. United States, 136 S. Ct. 958, 962 (2016).  The proviso thus requires more specific arrest powers than the previous two authorities.
    Although not necessary for the Court's analysis, the Court notes that its conclusion is consistent with Congressional intent.  The Fifth Circuit has discussed:

    A review of the legislative history reveals that Congress, in response to "no-knock" raids conducted by federal narcotic agents on the wrong dwellings, passed the 1974 amendment to the Federal Tort Claims Act to provide compensation for such victims.  S. Rep. No. 588, 93rd Cong., 2d Sess., reprinted in (1974) U.S. Code Cong. & Admin. News, pp. 2789, 2790-91.  Congress intended to waive sovereign immunity for the torts of false arrest and false imprisonment only in limited circumstances.  The federal government deprived itself "of the defense of sovereign immunity in cases in which Federal law enforcement agents (or investigative officers), acting within the scope of their employment, or under color of Federal law, commit (committed) . . . false imprisonment, false arrest."

"disruptive or unruly individual[s]" at the Social Security Administration's New Mexico offices, but must then "contact the FPS Megacenter in Denver, CO. or local law enforcement . . . until law enforcement arrives to address the situation and issue a citation or arrest the person if necessary." Sienkiewicz Decl. ¶ 19, at 4.  The security officers' detention powers, "based on [New Mexico's] citizen's arrest authority," do not include the authority to arrest individuals for violations of federal law, and so are not indicative of federal law enforcement duties.  Sienkiewicz Decl. ¶ 19, at 4.  It is undisputed that no Federal Protective Service employee was involved in the altercation that gives rise to the Complaint.  Accordingly, FTCA's intentional tort exception bars Gonzagowski's assault and battery claim against the United States.

## VI.  THE FTCA'S DISCRETIONARY FUNCTION EXCEPTION BARS GONZAGOWSKI'S NEGLIGENT HIRING, TRAINING, AND SUPERVISION CLAIM AGAINST THE UNITED STATES.

Even if Gonzagowski had timely exhausted his administrative claims regarding the United States' hiring, training and supervision of the Diamond Group, the FTCA's discretionary function exception nonetheless bars the Complaint's Count I.  The Court undertakes a two-step analysis in considering the discretionary function exception.  First, for the discretionary function exception to

---

Solomon v. United States, 559 F.2d 309, 310 (5th Cir. 1977) Section 2680(h)'s legislative history thus indicates that Congress did not intend the law enforcement proviso to apply to administrative security officials like TSA screeners or the Diamond Group's security officers who conduct limited, consensual searches of passengers on commercial flights or visitors to federal buildings. Similarly, the proviso's reference to "officers," 28 U.S.C. § 2680(h), alongside its preservation of immunity for "[a]ny claim based upon . . . a discretionary function or duty on the part of . . . an employee of the Government," 28 U.S.C. § 2680(a) (emphasis added), suggests that Congress intended the proviso to apply to a specific category of federal personnel.  Finally, the FTCA's immunity exceptions must be strictly construed in the United States' favor.  See United States Dep't of Energy v. Ohio, 503 U.S. 607, 615 (1992)("Waivers of immunity must be 'construed strictly in favor of the sovereign' and not 'enlarge[d] . . . beyond what the language requires.'").

apply, the Federal Protective Service's acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'"  United States v. Gaubert, 499 U.S. at 322 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 536).  Second, the conduct must be "'based on considerations of public policy.'" United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537).  Because this issue does not go to the merits of Gonzagowski's claim, the Court resolves this issue under the rule 12(b)(1) factual-attack standard. See Davis ex rel. Davis v. United States, 343 F.3d at 1296.

The discretionary function exception preserves the United States' immunity for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).[52]  The Court uses the

---

[52]The Supreme Court has unnecessarily complicated the discretionary function exception, resulting in the rule's application in such a way that threatens to allow the exception to swallow the FTCA.  In an oft-quoted statement, Assistant Attorney General Francis Shea described the discretionary function exception's purpose as the House Judiciary Committee debated the draft FTCA:

> [The discretionary function exception] is a highly important exception, designed to avoid any possibility that the act may be construed to authorize damage suits against the government growing out of legally authorized activity, such as a flood-control or irrigation project . . . .  It is neither desirable nor intended that the constitutionality of legislation, the legality of regulation, or the propriety of a discretionary administrative act should be tested through the medium of a damage suit for tort.

Tort Claims: Hearings on HR. 5373 and HR. 6463 Before the Comm. on the Judiciary HR., 77th Cong., 2d Sess. 1, 28 (1942)(statement of Francis Shea, Assistant Att'y Gen. of the United States). In this way, the FTCA thus reflects the related concerns of separation of powers and ensuring the smooth functioning of the legislative and executive branches without judicial second-guessing, concerns that the Supreme Court has long held justify governmental immunity in the American system.  See, e.g., Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170 (1803)("Questions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made by this Court.").  Spalding v. Vilas, 161 U.S. 483, 494 (1896)("In exercising the functions

of his office, the head of an executive department, keeping within the limits of his authority, should not be under the apprehension that the motives that control his official conduct may at any time become the subject of inquiry in a civil suit for damages.  It would seriously cripple the proper and effective administration of public affairs . . . if he were subjected to any such restraint.").

In applying the discretionary function, however, the Supreme Court has gone beyond these goals, and created a doctrine based on an inapposite and incorrect understanding of sovereign immunity, which threatens to have the discretionary function exception swallow the more general waiver.  The Supreme Court has attempted to define what functions are discretionary, because the FTCA does not itself define which governmental functions are discretionary and so not subject to liability.  As the Fifth Circuit has noted:

> The drafters of the Act . . . failed to define the term "discretionary function."  This omission is understandable in light of the fact that the courts have struggled for nearly three decades to provide such a definition, with limited success.  We will not pretend to succeed where our predecessors for thirty years have failed in providing succinct definition of the term.

Payton v. United States, 679 F.2d 475, 479 (5th Cir. 1982).  The situation has not much improved since the Fifth Circuit noted this lack of clarity.  See United States v. Varig Airlines, 467 U.S. at 813 (stating that it is "impossible[] to define with precision every contour of the discretionary function exception").  The Supreme Court has vacillated in its interpretation of the discretionary function exception.  It has used different metrics, including the tortfeasor's status, see Dalehite v. United States, 346 U.S. 15, 17 (1953), a distinction between governmental operations and planning, see Indian Towing Co. v. United States, 350 U.S. 61, 66 (1955), and the tort's viability under state law, see Rayonier, Inc. v. United States, 352 U.S. 315, 316-17 (1957).  It has more recently settled on a more pragmatic, but equally muddled, approach, requiring an element of choice on the tortfeasor's part that relates to the kind of policy that, in the reviewing court's opinion, pertains to the kind of policy decisions that the FTCA is intended to protect.  See Berkovitz by Berkovitz v. United States, 486 U.S. at 536.  Perhaps seeking to address the difficulties that it had previously encountered in interpreting the exception, the Supreme Court also has imposed a presumption that any action which statute, regulation, or internal agency rules imbue with discretion is policy-driven, such that almost any act involving discretion will fall under the exception.  See United States v. Gaubert, 499 U.S. at 324-25.  This rule has drastically limited the United States' liability exposure and thus minimized the FTCA's waiver.  See Bruce A. Peterson & Mark E. Van Der Weide, Susceptible to Faulty Analysis: United States v. Gaubert and the Resurrection of Federal Sovereign Immunity, 72 Notre Dame L. Rev. 447, 465-66 (1997)(surveying plaintiffs' success rates in FTCA cases and finding a dramatic decrease after United States v. Gaubert).

The Supreme Court's enlargement of the discretionary function exception reflects its presumption of absolute immunity as the default rule, imported from early British common law.  See United States v. Gaubert, 499 U.S. at 324.  This traditional interpretation of sovereign immunity's roots, however, may not be historically accurate and, what is more, this traditional interpretation, borrowed from Britain, is inapposite in the American system.  As for its historical

roots, American courts have long attributed the doctrine of sovereign immunity as an imported vestige from ancient British law.  See, e.g., Hill v. United States, 50 U.S. 386, 389 (1850).  The doctrine is rooted in the notion that the law flows from the sovereign king, who therefore must be above the law.  See Edwin M. Borchard, Government Liability in Tort, 34 Yale L.J. 1, 4 (1924)("British law assumed that no suit or action can be brought against the King, even in civil matters, because no court can have jurisdiction over him, for all jurisdiction implies superiority of power." (internal quotation marks omitted)).  American courts have long pointed to Blackstone and Coke to support the notion that sovereign immunity is rooted in the principle that "the King can do no wrong."   William Blackstone, Commentaries on the Laws of England at 245 (1809)("Besides the attribute of sovereignty, the law also ascribes to the king in his political capacity, absolute perfection.  The king can do no wrong . . . .  The king, moreover, is not only incapable of doing wrong, but even of thinking wrong: he can never mean to do an improper thing: in him is no folly or weakness.").  Under this view, the king was not subject to suit, because he could do no wrong: whatever the king did was necessarily lawful.  See, e.g., Kawananakoa v. Polyblank, 205 U.S. 349, 353 (1907)(Holmes, J.)("A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.").  This view also reflected the notion of the king's divine prerogative: "the theory of the divine right of kings lent support to the proposition that the king was above the law -- that he was in fact the law-giver appointed by God, and therefore could not be subjected to the indignity of suit by his subjects." George W. Pugh, Historical Approach to the Doctrine of Sovereign Immunity, 13 La. L. Rev. 476, 478-89 (1953).  This extreme limitation on the Crown's liability, the theory goes, was thus "a direct and arguably necessary outgrowth of [Britain's] specific form of government." Mark C. Niles, Nothing but Mischief: The Federal Tort Claims Act and the Scope of Discretionary Immunity, 54 Admin. L. Rev. 1275, 1284 (2002).

This view, however, may not historically be accurate:

> [T]his maxim was misunderstood even by Blackstone and Coke. . . .  The maxim merely meant that King was not privileged to do wrong.  If his acts were against the law, they were injuriae (wrongs).  Bracton, while ambiguous in his several statements as to the relation between the King and the Law, did not intend to convey the idea that the King was incapable of committing a legal wrong. . . . Indeed, there appears to have been a considerable measure of redress obtainable.

Borchard, supra, at 2 n.2.  Similarly,

> [i]t is the prevailing view among students of this period that the requirement of consent was not based on a view that the King was above the law.  "[T]he king, as the fountain of justice and equity, could not refuse to redress wrongs when petitioned to do so by his subjects."  Indeed, it is argued by scholars on what seems adequate evidence that the expression "the King can do no wrong" originally meant precisely the contract to what it later came to mean.  "[I]t meant that the king must not, was not allowed, not entitled, to do wrong[.]"

_____

Louis L. Jaffe, Suits against Governments and Officers: Sovereign Immunity, 77 Harv. L. Rev. 1, 3-4 (1963)(first quoting Williams Searle Holdsworth, A History of English Law at 8 (3d ed. 1944), and then quoting Ludwick Ehrlich, "Proceedings Against the Crown (1216-1377)," at 74, in 6 Oxford Studies in Social and Legal History (Vinogradoff ed. 1921)).  Moreover, rather than offering no relief against the Crown, the ancient British legal system recognized the "petition of right," which allowed private civil claims against the king.  Pugh, supra, at 479.

> The petition of right is by far the most famous of such procedures, and dates back to the reign of Edward I. . . .  As the concept of governmental function expanded, English courts permitted suit against the government official or employee who had actually committed the wrong complained of.  Since in theory the king could do no wrong, it would be impossible for him to authorize a wrongful act, and therefore any wrongful command issued by him was to be considered as non-existent, and provided no defense for the dutiful subject.

Pugh, supra, at 479-80.

Second, this view, based on the king's divine prerogative, is inapposite in the American political and legal system.  Although the issue of sovereign immunity was debated at the Constitutional Convention and was mentioned in the Federalist Papers, this debate occurred in the context of the States' immunity for suit to collect war debts.  See Pugh, supra, at 481; James Madison & Alexander Hamilton, The Federalist No. 81 at 567 ("Unless . . . there is a surrender of this immunity in the plan of the convention, it will remain with the States, and the danger intimated must be merely ideal. . . .  [T]here is no color to pretend that the State governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith.").  Indeed, the first Supreme Court case on the matter rejected the wholesale importation of sovereign immunity from the British common law, and noted that "the sovereignties in Europe, and particularly in England, exist on feudal principles," and so the King was not accountable to his subjects, but that "no such ideas obtain here; at the revolution, the sovereignty devolved to the people."  Chisholm v. Georgia, 2 U.S. 419, 471-72 (1793).  Shortly thereafter, however, the Supreme Court, pointing to the British common law and an expansive view of the Eleventh Amendment, adopted a version of sovereign immunity that was "significantly stronger and more absolute than that in England at the time, primarily because the petition of right, which had served to moderate the doctrine in Britain, was never made available here."  Niles, supra, at 1287-88.  See United States v. Clarke, 33 U.S. 436, 444 (1834)(concluding that the United States was immune from civil liability).

This absolutist view of sovereign immunity, however, is generally inapposite in the United States.  Whereas in Britain, sovereign immunity was a natural outgrowth of the fact that the courts were personifications of the king, the Constitution of the United States provides that Article III courts form a separate branch of government and are frequently called upon to adjudicate the other branches' acts, including acts attributable to the Executive.  See, e.g., 5 U.S.C. § 702 (allowing private suits against executive agencies and officials).  Similarly, whereas the king's actions defined the law in Britain, "[l]aw in the United States is the product of the will of the people, either

_____

in the form of laws passed by their elected representatives, or in the Constitution, which is a permanent product of the same will."  Niles, supra, at 1293.  See United States v. Lee, 106 U.S. 196, 220 (1882)("All the officers of the government from the highest to the lowers, are creatures of the law, and are bound to obey it.").  Additionally,

> the application of sovereign immunity to protect our governments from liability misidentifies the true 'sovereign' in this country . . . .  [A]t least as it relates to the federal government, there is no clearly analogous figure that wield the kind of power that was enjoyed by the crown in England, and which gave rise to its idiosyncratic concepts of governmental immunity.

Niles, supra, at 1293.  As the Supreme Court had noted before adopting its expansive immunity jurisprudence, the Framers consciously omitted the word "sovereign" from the Constitution. Chisolm v. Georgia, 2 U.S. at 454.  A more just, accurate, and apposite sovereign immunity doctrine should note these differences between the United States' constitutional republic and the British monarchy from which the United States has imported the doctrine of sovereign immunity. This is not to say that some form of sovereign immunity has no place in federal law -- concerns about the separation of powers and smooth administrative functioning dictate that, in some instances, the United States should be immune.  But a more just, apposite theory of sovereign immunity would not assume that the absolutist immunity principle is the default position.  While the FTCA is perhaps the most clear federal expression of such a theory, the Supreme Court has tended to undermine this expression with its muddled view of the discretionary function exception, and so has reverted to the absolutist concept of sovereign immunity that the FTCA was meant to abolish.

Were the Court writing on a clean slate, the Court would limit the discretionary function exception to apply only to claims against the United States that impinge directly on separation of powers and which, in a similar vein, require the Court to second-guess policies that arise out of the elected branches' unique expertise.  Under this standard, the United States would rarely be immune when it commits a tort for which a private citizen or organization would be liable.  The Court thus would jettison permanently the sometimes-used and sometimes-ignored tests like the status-of-the-employee test, the operational-planning distinction, and the uniquely-governmental-function test.  Courts should not be overly preoccupied with the risk of litigation hindering governmental boldness; the FTCA's procedural provisions -- its limitations period and its administrative exhaustion requirement -- serve independently to reduce litigation of tort claims against the United States in federal courts, such as has occurred in this case.  These limitations do much of the heavy lifting in protecting the United States against meritless litigation, reducing the need for the discretionary-function exception to serve the gatekeeping role that the Supreme Court has assigned to it.  Further, the FTCA makes the United States the proper defendant when its employees commit tortious acts, reducing the extent to which a federal employee's litigation aversion will hinder his or her effective policymaking.

The discretionary function exception should not serve to insulate the United States against liability when its employees act negligently unless liability requires courts to substitute its policy judgment for the United States' judgment.  In other words, consistent with the FTCA's purpose, if

two-prong Berkovitz test.  First, the acts or omissions at issue must be "discretionary in nature, acts that 'involve an element of judgment or choice.'"  United States v. Gaubert, 499 U.S. at 322, (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 536).  Second, the conduct must be "'based on considerations of public policy.'"  United States v. Gaubert, 499 U.S. at 323 (quoting Berkovitz by Berkovitz v. United States, 486 U.S. at 537).  See Garling v. U.S. Envtl. Prot. Agency, 849 F.3d at 1294-95.  "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion."  United States v. Gaubert, 499 U.S. at 324.

The United States argues that the FTCA's discretionary function exception bars Gonzagowski's negligent hiring, training, and supervision claim against the United States.  See Motion at 24-26.  It contends that Gonzagowski has not "identified any mandatory regulations or directives that prescribes a particular course of action or makes DHS/FPS's decision to contract with [the Diamond Group] to be non-discretionary[.]" Motion at 25.  The United States also asserts that the "goals and objectives of cost-efficiency and allocation or resources are exactly the policy-based type of discretionary decisions that Congress intended to protect from judicial second-guessing." Motion at 27.  Although Gonzagowski conceded at the hearing that "the choice to hire an independent contractor . . . is discretionary," Tr. at 32:11-20 (Roehl), he argues that "the

_____

a given action would subject a private citizen or organization to liability, the discretionary function exception should not insulate the United States when it commits that same action.  See 28 U.S.C. § 1346(b)(1) (providing that the United States is liable where a private person "would be liable to the claimant in accordance with the law of the place where the act or omission occurred").  A broader reading of the discretionary function exception "cannot be reasonably justified based on the nature of our governmental system" and Congress' intent in enacting the FTCA.  Niles, supra, at 1338.

applicable policies and procedures, such as [Standard Form 86] used for hiring of PSOs, or the SMART Book used for training and outlining PSOs' conduct, precludes any judgment or choice on the part of any employee," Response at 16.  Gonzagowski leaves it somewhat unclear how the SMART Book negates the discretionary function exception, because he does not explain how the SMART Book pertains to the United States' hiring, training, and supervision of the United States.  See Response at 16.  Nor does he explain how the requirement that all Diamond Group security guards complete an SF-86 Form negates the mandatory function exception.  Finally, he argues that "federal courts routinely reject immunity claims under the discretionary function exception in cases involving ordinary negligence."  Response at 16.

### A.   THE UNITED STATES' DECISION TO HIRE THE DIAMOND GROUP IS A DISCRETIONARY ACT WITHIN THE DISCRETIONARY FUNCTION EXCEPTION.

To determine whether the United States' action falls within this exception, the Court "must first consider whether the action is a matter of choice for the acting employee."  Berkovitz by Berkovitz v. United States, 486 U.S. at 536.  The parties agree that no statute, regulation, or agency rule restricts the United States' general decision whether to hire a contractor to perform security services, much less its specific decision to hire the Diamond Group.  See Motion at 26 (citing Sienkiewicz Decl. ¶ 18, at 4 ("FPS contracts with security companies to provide PSOs in federal buildings for the express purpose of protecting the employees who work in those buildings and members of the public who visit the building."); Response at 16.  The Court notes that 40 U.S.C. § 1315(a) provides that the Department of Homeland Security "shall protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government (including any agency, instrumentality, or wholly owned or mixed-ownership corporation thereof) and the

persons on the property."  40 U.S.C. § 1315(a).  Section 1315(a) does not, however, mandate a specific course or action that the Department of Homeland Security must take in protecting federal buildings.  See Singh v. S. Asian Soc'y of George Washington Univ., 572 F. Supp. 2d at 7. Although a statute or regulation may charge an agency with a responsibility in general terms, such a statute does not negate the agency's discretion in how it must fulfill its responsibility absent specific directives.  Cf. Domme v. United States, 61 F.3d at 790 (concluding that a regulation which provides that an agency must "provide and maintain a safe workplace" did not negate the agency' discretion as to how it fulfilled that charge).  The Tenth Circuit has interpreted the first Berkovitz prong as requiring that a statute or regulation must "specify the precise manner" in which the agency must act in order to negate the agency's discretion.  Domme v. United States, 61 F.3d at 790.  Section 1315(a) is cast in general terms and does not specify the precise manner in which the Department of Homeland Security must protect federal property.  Similarly, to the extent that Gonzagowski alleges that the United States' supervision of the Diamond Group's performance is not a discretionary function, the federal acquisition regulations provide otherwise.  See 48 C.F.R. § 1.602-2 ("Contracting officers are responsible for ensuring performance of all necessary actions for effective contracting. . . .  In order to perform these responsibilities, contracting officers should be allowed wide latitude to exercise business judgment.").  There is thus no statute or regulation that mandates any specific course of action on the United States' part with respect to its hiring, training, and supervision of the Diamond Group.

Nor does the Contract negate such discretion.  Although Gonzagowski asserts that the SF-86 requirement "precludes any judgment or choice on the part of any employee," Response at 16, the use of a standard security clearance form does not render the United States' decision to hire

the Diamond Group and who may work as a security guard non-discretionary, see Bennett v. Chertoff, 425 F.3d 999, 1001 (D.C. Cir. 2005); Saba v. U.S. Army Intelligence & Sec. Command, No. 3:12-CV-305, 2014 WL 28869, at *3 (S.D. Ohio Jan. 2, 2014)(Merz, M.J.)("[W]hether or not to issue or revoke a security clearance is within the discretion of the Executive Branch of the government.").  Further, Gonzagowski does not explain how the Contract's requirement that all applicants complete a standard security clearance form affects the challenged action -- the Department of Homeland Security's decision to contract with the Diamond Group.  See United States v. Gaubert, 499 U.S. at 322; Domme v. United States, 61 F.3d at 787 n.1 ("[W]e should evaluate the specific conduct at issue using the *Berkovitz* test.").  Gonzagowski also contends that "the SMART Book used for training and outlining [the security guards'] conduct[] precludes any judgment or choice on the part of any employee."  Response at 16.  Gonzagowski thus asserts that the SMART Book governs the security officers' actions, and so their failure to adhere to the SMART Book's guidelines constitutes negligence.  See Tr. at 32:14-19 (Roehl).  As the Tenth Circuit has held, however, the discretionary function exception is a threshold issue "which precedes any negligence analysis."  Johnson v. U.S., Dep't of Interior, 949 F.2d 332, 335 (10th Cir. 1991).  In any case, Gonzagowski does not explain how the SMART Book mandates any specific course of action regarding the United States' challenged conduct -- its hiring, training, and supervision of the Diamond Group.  Instead, the SMART Book, as Oglesby describes, guides the security officers' actions, rather than the United States' actions in hiring, training, and supervising the security officers' conduct.  Accordingly, no "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" in hiring the Diamond Group.  United States v. Gaubert, 499 U.S. at 322.

Because the challenged conduct involves the United States' discretionary judgment, the Court next considers "whether that judgment is of the kind that the discretionary function exception was designed to shield." Berkovitz by Berkovitz v. United States, 486 U.S. at 536. "The Berkovitz Court concluded that Congress intended the discretionary function exception to shield governmental decisions based on considerations of social, economic, and political policy." Domme v. United States, 61 F.3d at 791. Gonzagowski contends that it is "under the second prong of the analysis that Defendant's conclusory invocation of the discretionary function utterly fails," because "federal courts routinely reject immunity claims under the discretionary function exception in cases involving ordinary negligence." Response at 16. Gonzagowski also contends that, even for discretionary actions, once the United States exercises its discretion and chooses to engage in a particular course of conduct, the discretionary function exception does not protect the United States if it fails to exercise due care in its chosen activity. See Response at 16.[53] The

---

[53]To support this contention, Gonzagowski cites one of the Court's previous opinions, in which the Court stated that, "when the government exercises its discretion and chooses to participate in an activity, the discretionary function exception does not protect the government from failing to provide due care in its performance of the activity." Coffey v. United States, 906 F. Supp. 2d at 1157. In making that statement, the Court relied on Indian Towing Co. v. United States. See 906 F. Supp. 2d at 1157 (citing Indian Towing Co. v. United States, 350 U.S. at 76). In that case, the Supreme Court held that the discretionary function exception does not necessarily shield all activities done pursuant to a policy-based decision. See Indian Towing Co. v. United States, 350 U.S. at 66. That case did not specifically involve the discretionary function exception, however, because the United States had conceded the exception's inapplicability. See 350 U.S. at 64.

Since Berkovitz and United States v. Gaubert, moreover, the Tenth Circuit has limited the theory that the discretionary function exception does not protect the United States from its duty to exercise due care. See, e.g., Domme v. United States, 61 F.3d at 789 n.1. Although, in Smith v. United States, the Tenth Circuit suggested that the discretionary function exception could not defeat the United States' duties of due care as a landowner, Smith v. United States, 546 F.2d at 876, the Tenth Circuit has recognized that it decided Smith v. United States before the Supreme Court decided Berkovitz. See Domme v. United States, 61 F.3d at 789 n.1. The Tenth Circuit has consequently narrowed Smith v. United States' holding. See, e.g., Clark v. United States, 695 F.

United States argues that its decision to outsource security responsibility to the Diamond Group reflects a policy decision about the "goals and objectives of cost-efficiency and allocation or resources," and so this decision is of the type that "Congress intended to protect from judicial second-guessing."  Motion at 27 (citing United States v. Varig Airlines, 467 U.S. at 820).  The Court agrees with the United States.

As the Court has noted previously, "[i]f one were to think creatively, one could always find some policy or other that one's actions might impact."  Garcia v. United States, 709 F. Supp. 2d 1133, 1150 (D.N.M. 2010).  Care therefore must be taken to ensure that the challenged conduct both involves concrete question of policy and that this policy involves the kind of decisionaking calculus that Congress sought to protect with the discretionary function exception.  The Supreme

---

App'x at 387-88 (focusing on Smith v. United States' facts); Domme v. United States, 61 F.3d at 789 (describing Smith v. United States as fact-specific); Zumwalt v. United States, 928 F.2d 951, 955 (10th Cir. 1991)(describing the failure to warn in Smith v. United States as not based on a policy decision).  The Tenth Circuit has likewise cabined the import of Indian Towing Co. v. United States in light of Berkovitz.  See Sydnes v. United States, 523 F.3d at 1186 n.6.

The Tenth Circuit has noted that, after United States v. Gaubert, Indian Towing Co. v. United States does not provide particularly persuasive authority on the discretionary function exception, see Sydnes v. United States, 523 F.3d at 1186 n.6, because, in Indian Towing Co. v. United States, the government conceded the discretionary function issue, see Black Hills Aviation, Inc. v. United States, 34 F.3d at 977, and because the Supreme Court has since rejected the distinction between high-level policy and operational decisions on which Indian Towing Co. v. United States relied, see Harrell v. United States, 443 F.3d 1231, 1237 (10th Cir. 2006).  But see Lopez v. United States, 376 F.3d 1055, 1059 (10th Cir. 2004)(discussing the plaintiffs' arguments about Indian Towing Co. v. United States and distinguishing Indian Towing Co. v. United States without noting the limits on Indian Towing Co. v. United States' persuasive authority).  Moreover, the Supreme Court also has made clear its view that the discretionary function exception is a threshold issue that must be addressed independent of whether the United States engaged negligently in the discretionary conduct.  See Domme v. United States, 61 F.3d at 789 n.1 ("[T]he availability of the discretionary function exception is a threshold jurisdictional question that must be analyzed before addressing whether the government owed a duty of care to the plaintiff.").  The duty of care does not, therefore, narrow the discretionary function exception's bounds, although, as the Court discusses in note 52, supra, such a construction undermines the FTCA's intent and has contributed to the exception's swallowing the FTCA's general immunity waiver.

Court has concluded that Congress' intention in creating the exception was "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." United States v. Varig Airlines, 467 U.S. at 814. The Tenth Circuit has stated that the exception is "designed to protect policymaking by the executive and legislative branches of government from judicial 'second-guessing.'" Garcia v. U.S. Air Force, 533 F.3d at 1176 (quoting United States v. Varig Airlines, 467 U.S. at 814). Courts typically conclude, however, that the United States' decision to hire independent contractors is based on economic policy which the FTCA is intended to insulate from liability. See, e.g., Domme v. United States, 61 F.3d at 792-93; O'Bryan v. Holy See, 556 F.3d 361, 387 (6th Cir. 2009)("[C]laims of negligent hiring fall within the discretionary function exception."); Begay v. United States, 2016 WL 6394925, at *31 (concluding that the United States' supervision over an independent contract is a matter of policy and discretion); Rabieh v. United States, 2019 WL 5788673, at *10. But see Riascos-Hurtado v. United States, No CIV 09-0003-RJD/VMS, 2015 WL 3603965 at *6 (E.D.N.Y. Jun. 5, 2015)(Dearie, J.)("Issues of employee hiring, training, supervision, and retention generally involve the permissible exercise of policy judgment and fall within the discretionary function exception. However, it is not the case that all claims for negligent hiring or supervision are barred by the discretionary function exception."). The United States' decision to hire the Diamond Group involves policy issues like "budgetary constraints, public perception, economic conditions, individual backgrounds, office diversity, experience and employer intuition." Sydnes v. United States, 523 F.3d at 1186 (quoting Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1217 (D.C. Cir. 1997), and citing Tonelli v. United States, 60

F.3d 492, 496 (8th Cir. 1995)).  Accordingly, the discretionary function exception protects the United States' decision to hire the Diamond Group.

### B.    THE UNITED STATES' TRAINING AND SUPERVISION OF THE DIAMOND GROUP ARE DISCRETIONARY FUNCTIONS.

The United States is also insulated from liability arising from its training and supervision over the Diamond Group.  When the government agent is granted discretion, that discretion is presumptively exercised with considerations of public policy.  See Bell v. United States, 127 F.3d at 1230 n.5.  As the Court has previously concluded, training and supervision, particularly in the law enforcement context, involve careful discretion and delicate policy considerations.  See Garcia v. United States, 709 F. Supp. 3d at 1151-52.  Decisions regarding what skills to train and how extensively to do so involve budgetary and other cost-benefit calculations.  See Tew v. United States, 86 F.3d 1003, 1006 (10th Cir. 1996)(holding that budget considerations constitute considerations of public policy, justifying application of the discretionary-function exception); Domme v. United States, 61 F.3d at 792-93 (holding considerations of how to manage limited resources was an appropriate policy consideration); Williams v. United States, 50 F.3d at 309 ("[T]he decision . . . is grounded in policy because . . . the United States has to balance the needs . . . and desire to engage an independent contractor against the expense of engaging such services.").  Here, the Contract sets out the areas in which the Diamond Group must train the security officers, while reserving discrete issues on which the United States provides training.  In making these decisions, the Department of Homeland Security must balance cost-effectiveness and the safety of federal employees and the general public.  In other words, the nature and extent of the training that the Department of Homeland Security requires of the Diamond Group's security officers involve decisions left to the United States' discretion that are based on safety and

economic policy concerns.  Such decisions are the type that, according to the Supreme Court, Congress seeks to protect with the discretionary function exceptions.  In short, the Court concludes that the training and supervision of the Diamond Group's security officers is conduct which the discretionary-function exception protects.  Accordingly, the Court concludes that the United States has not waived its immunity with respect to Gonzagowski's negligent hiring, training, and supervision claim against the United States.

In summary, the Court concludes that Gonzagowski did not comply with the FTCA's procedural rules: he did not submit his administrative claim within the FTCA's limitations period, and his claim did not provide sufficient notice that he would pursue a negligent hiring, training, and supervision claim against the United States.  Further, even if Gonzagowski had complied with the FTCA's notice and timeliness rules, the Diamond Group is an independent contractor, and so the United States may not be held liable for the Diamond Group's alleged torts.  Moreover, if the Diamond Group's security officers are federal employees, they are not federal law enforcement officers, and so the United States has not waived its immunity for their intentional torts.  Finally, the United States has not waived its immunity against Gonzagowski's negligent hiring, training, and supervision claim, because the actions that Gonzagowski challenges are left to the United States' discretion and are based on policy considerations that the FTCA insulates from judicial second-guessing.  Accordingly, the Court lacks subject-matter jurisdiction over Gonzagowski's claims against the United States, and so the Court grants the Motion.

**IT IS ORDERED** that: (i) the United States' Motion to Dismiss First Amended Complaint, or in the Alternative, Motion for Summary Judgment, and Memorandum in Support, filed June 3, 2020 (Doc. 69), is granted; and (ii) Gonzagowski's claims against the United States are dismissed

without prejudice, because the Court lacks subject-matter jurisdiction over Gonzagowski's claims

against the United States.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Jerrald J. Roehl
Katherine C. Roehl
The Roehl Law Firm, P.C.
Albuquerque, New Mexico

      *Attorneys for the Plaintiff*

John C. Anderson
  United States Attorney
Roberto D. Ortega
Christopher F. Jeu
  Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

      *Attorneys for Defendant United States of America*

Ada B. Priest
Brian L. Shoemaker
David W. Frizzell
Elizabeth G.  Perkins
Mitchell J. Freedman
Chapman and Priest, P.C.
Albuquerque, New Mexico

      *Attorneys for Defendants the Diamond Group, Inc.,
      and SecTek, Inc.*

- 137 -